# EXHIBIT D

4144 | 9 July 2024



# Interactive Brokers Hong Kong Limited Client Agreement

1. **Introduction**

    A. This agreement governs the relationship between you (the "Client"), whose name and details are set out in the account application, and IBKR (as defined below) (the "Agreement" or "Client Agreement") in relation to the opening, maintenance and operation of the account(s) maintained by the Client with IBKR from time to time for the purchase, holding and sale of securities and derivatives (including, without limitation, futures and options), and/or the purchase, hold, sale, or financing of foreign currency exchange positions (collectively, the "Account(s)"). If this Agreement is inconsistent with any content on the IBKR website, this Agreement prevails to the extent of the inconsistency.

    B. This Agreement cannot be amended or waived by anyone, including IBKR representatives, except in writing executed by IBKR's Chief Executive Officer or General Counsel. IBKR's Client service employees are not authorised to amend or waive any part of this Agreement. Client acknowledges that IBKR may revise this Agreement by sending notice of the revised Agreement by e-mail or through an electronic notice upon Client log-in to IBKR's platform. Client's (or any authorised representative of Client's) use of IBKR after such notice conclusively constitutes Client's acceptance of the revised Agreement. Use of IBKR services shall constitute consideration for the revised Agreement.

    C. Each time Client (or its agent) places an order with IBKR to purchase or sell financial products or utilizes any IBKR system (as defined in Paragraph 43), software or technologies ("IBKR Software"), Client affirms its acceptance of, and agreement to, the terms of this Agreement.

    D. The additional terms (which form part of the Agreement) which apply to particular service(s) are as follows:

| Service | Addendum of additional terms | Application |
|---|---|---|
| Securities Margin Lending Facility | Addendum 1 | This Addendum will apply to Clients who apply, and IBKR approves, for a Margin Lending Facility in connection with the financing of the purchase |

|  |  | and the continue holding of positions in securities. |
|---|---|---|
| Virtual Asset Agreement | Addendum 2 | This Addendum will apply to Clients who are professional investors within the meaning of Part 1 of Schedule 1 to the Ordinance, and who have requested and been granted permission to purchase, invest in, sell, exchange or otherwise dispose of and generally deal in and with virtual assets in their IBKR account. |

2. **Notice Requirements**

   A. Where required by this Agreement to provide "Notice" to IBKR, if such Notice must be in writing, Client must either: (i) submit a message through the Message Centre accessible through the "Support" link in IBKR's Client Portal; (ii) submit a message through the Message Centre accessible through the "Account Management" link in Trader Workstation or on IBKR's mobile application; or (iii) submit an email through the "Contact Us: Individuals" page found under the "Support" menu on the IBKR website (www.interactivebrokers.com).

   B. For Notice that is not required to be in writing, Client may still provide IBKR with Notice in writing as described above or by phone through one of the phone numbers set forth in the "Contact Us" page on the IBKR website. Those phone numbers include:1 (877) 442-2757 (United States toll free); 00800-42-276537 (Europe toll free); and +852-3729-0896 (Hong Kong). No other form of communication other than those described in this paragraph will satisfy the Notice requirements contained in this Agreement.

3. **Definitions**

The following definitions are applicable to this Agreement unless otherwise specified:

   - **Approved Custodian** has the same meaning given in its definition in the Client Securities Rules;
   - **BCAN** has the same meaning as defined in paragraph 5.6 of the "Code of Conduct for Persons Licensed by or Registered with the Securities and Futures Commission".

- **CCASS** means the Central Clearing and Settlement System operated by Hong Kong Securities Clearing Company Limited;
- **CID** has the same meaning as defined in paragraph 5.6 of the "Code of Conduct for Persons Licensed by or Registered with the Securities and Futures Commission".
- **Client Contract** has the same meaning as given in SEHK's Options Trading Rule 411 or 411A(b), as the context may require;
- **Client Securities Rules** means the Securities and Futures (Client Securities) Rules, Chapter 571H of the Laws of Hong Kong as amended from time to time;
- **Client Securities Standing Authority** has the same meaning as the term "Standing Authority" as defined in the Client Securities Rules;
- **Default** has the meaning given to it in Paragraph 28 of this Agreement;
- **Equivalent Securities** means, in respect of any particular stock or share, Securities of an identical type, nominal value, description and amount and which are part of the same issue and have the same rights to those shares lent to you by IBKR under the Stock Loan; provided that where any securities have been converted, subdivided, consolidated, redeemed, made the subject of a takeover, merger, capitalisation issue, rights issue or event similar to any of the foregoing, IBKR may reasonably determine what securities or other assets (which may include money or other property) are to be treated as "equivalent" for this purpose and "Equivalent Securities" shall be construed accordingly;
- **Forex** mean foreign currency exchange;
- **HKEx** means Hong Kong Exchanges and Clearing Limited;
- **HKFE** means Hong Kong Futures Exchange Limited;
- **HKFE Clearing House** means HKFE Clearing Corporation Limited;
- **HKSCC** means Hong Kong Securities Clearing Company Limited;
- **IBKR**, **Interactive** or **Interactive Brokers** means Interactive Brokers Hong Kong Ltd, a SFC licensed corporation with CE Number ADI249 carrying on Type 1, 2 and 3 regulated activities under the Ordinance, a member of the SEHK and Futures Commission Merchant of the HKFE, and with a place of business at 1512 Two Pacific Place, 88 Queensway, Hong Kong. Mr. David Friedland (CE No.: ACP478) is the staff member primarily responsible for Client affairs;
- **Margin** has the meaning in Addendum 1;
- **Margin Account** has the meaning in Addendum 1;
- **Margin Call** means a demand from IBKR for Client to deposit money into the Account or as otherwise agreed with IBKR, which is immediately due and payable;
- **Margin Deposit** means property, of a type and in a form acceptable to IBKR, which is pledged, mortgaged, charged or otherwise secured by the Client in favour of IBKR in respect of applicable Margin Requirements, which the Client is required to satisfy.
- **Margin Lending Facility** has the meaning in Addendum 1;

- **Margin Requirements** has the meaning given to it in Paragraph 16(C) of this Agreement;
- **Ordinance** means the Securities and Futures Ordinance, Chapter 571 of the Laws of Hong Kong as amended from time to time;
- **Procedures** means the practices, procedures and administrative requirements prescribed from time to time by the SFC, HKEx, HKFE, SEHK, HKFE Clearing House, CCASS/HKSCC or SEOCH, as applicable;
- **Rules** means the applicable laws, rules and regulations of the relevant government, exchange, regulator or clearing house applicable to IBKR's handling of Client's account and/or where the Client's orders are being placed (e.g., HKEx, HKFE, SEHK, HKFE Clearing House, CCASS/HKSCC, SEOCH, SFC, New York Stock Exchange, etc.), including any amendments, supplements, variations or modifications thereto;
- **Securities** has the same meaning given to it in the Ordinance;
- **Securities Margin Trading** has the meaning in Addendum 1;
- **SEHK** means The Stock Exchange of Hong Kong Limited;
- **SEOCH** means The SEHK Options Clearing House Limited;
- **SFC** means the Hong Kong Securities and Futures Commission; and
- **Stock Loan** means the Securities that IBKR agrees to lend to you to cover your short sale.

4. **Account Information**

   A. IBKR generally endeavours to keep information relating to Client's Account confidential, but IBKR may be required under the applicable Rules, laws or regulations to disclose the name and beneficial identity or such other information concerning the Client as necessary. Client agrees to provide such information to IBKR, and consents to IBKR to provide such information to the relevant exchange, clearing house or regulator and as may otherwise be required under applicable Rules, laws and regulations. The Client irrevocably authorises IBKR to make any such disclosure.

   B. Where IBKR utilizes another broker or entity, which could be an affiliate, to facilitate execution of Client's instructions or provision of services to Client under this Agreement, Client authorises IBKR to provide information relating to the Client's Account to the relevant broker or entity as necessary, including but not limited to the purpose of satisfying the broker or entity's obligations under any applicable Rules, laws or regulations relating to anti-money laundering, "Know Your Customer," trade and position reporting, or as may otherwise be required for such purpose.

5. **Services**

   A. Client hereby requests IBKR to open and maintain on its books one or more Accounts in the name of the Client for the purpose of purchasing,

investing in, selling, exchanging or otherwise disposing of and generally dealing in and with all kinds of securities, futures, Forex and other financial products in accordance with this Agreement from time to time. Client confirms that the Account is not operated for the benefit of any person other than the Client, unless disclosed to, and agreed by, IBKR in writing. Unless indicated by IBKR or specified in this Agreement or the contract note for the relevant transaction or otherwise, IBKR shall act as agent for the Client in effecting transactions pursuant to this Agreement.

B. IBKR does not, and its staff are not authorised to solicit sales, make recommendations, or provide personal investment advice. Client agrees that any order submitted to or transaction executed by IBKR is solely Client's own decision and is based on Client's own evaluation of its personal financial situation, needs and investment objective(s).

C. Unless required by applicable Rules, IBKR does not endorse and is not responsible for any advice, representation, content or other information provided by third parties, including but not limited to any such information or third party referenced by or accessed through any IBKR website, application or platform, including but not limited to the "IBKR Investors Marketplace."

D. Except where (i) IBKR distributes a "complex product", as such term is defined in the SFC's Code of Conduct for Persons Licensed by or Registered with the Securities and Futures Commission, or (ii) otherwise required under applicable Rules, IBKR is not responsible for the suitability of any transaction or any trading generally in any product.

E. If IBKR does solicit the sale of or recommends any financial product to you, the financial product must be reasonably suitable with regards to your financial situation, investment experience and investment objectives. No other provision of this agreement or any other document IBKR may ask you to sign and no statement IBKR may ask you to make derogates from this paragraph.

6. **Responsibility for Client Orders/Trades**

A. Client acknowledges that IBKR does not know whether someone entering orders with Client's username and password is the Client. Unless IBKR is notified and agrees, Client acknowledges and confirms that Client will be the only person who can and will access the Client's Account and Client will not allow anyone to access Client's Account. Client is responsible for the confidentiality and use of Client's username and password and agrees to report any theft/loss of such username and/or password, or any unauthorised access to Client's Account, immediately by telephone or electronically through the IBKR website. Use of Client's credentials to effect any action will constitute conclusive evidence that IBKR may treat such action as authorised. Client remains responsible for all transactions entered using Client's username and password.

B. IBKR is entitled to rely on all instructions given, or apparently given, and all actions taken by Client or on its behalf entered using the Client's username and password, and Client is bound by any transaction or any dealing or other action or omission in connection with its Account or any financial products held for Client in reliance on such instructions. IBKR will not be liable for any loss caused by IBKR acting on instructions, actions or omissions or other communications using the Client's username and password except to the extent that such loss cannot be excluded by law.

7. **Order Routing**

A. Unless otherwise directed by the Client, IBKR will route Client orders to the market or dealer IBKR selects. For products traded on multiple markets, IBHK may provide "Smart Routing," which seeks the best market for each order through a computerized algorithm. "Smart Routing" takes into account one or more of the following factors when placing Clients' orders: (i) price; (ii) sequence in which IBHK receives orders; (iii) speed of execution and/or settlement; (iv) likelihood of execution and/or settlement; (v) size; and (vi) nature of orders and other relevant considerations. If Client directs orders to a particular market, Client is responsible for knowing and trading in accordance with the rules and policies applicable to the Client's order in the relevant market (e.g., trading hours, order types, etc.). IBKR cannot guarantee execution of every order at the best posted price as: IBKR may not have access to every market or dealer; other orders placed by other market participants at another market may trade ahead of Client's order; market centres may not honour posted prices or may re-route orders for manual handling; and applicable Rules, laws and regulations, market rules, decisions or system failures may prevent or delay execution of Client's orders or cause orders not to receive the best price.

B. **Special Risks of Algorithmic Orders**: IBKR makes available various order types that use computerized algorithms.  These order types allow Client to input various conditions as part of an order placed with IBKR.  Client agrees that if algorithmic order types are used, it is the Client's responsibility to understand how the order type works, including through review of the information on the IBKR website describing particular order types. Algorithmic trading involves special risks, including, among others, the risk of software or design flaws, technical errors, adverse market impacts from algorithmic orders and rapid losses.  Client understands and agrees to accept these risks when using algorithmic orders and Client waives any right to make claims against IBKR in connection with such orders.

8. **Payment for Orders and Rebates**

IBKR may receive discounts, rebates, payments or other consideration from an exchange, market, dealer or other party in exchange for routing an order to them or in connection with an order that they trade against or permit others to trade against. In consideration of services provided by IBKR to Client, IBKR is authorised to receive and retain such payments, rebates, or other consideration in whole or in part for its own account and not that of Client, and do so without disclosing the amount received. In some instances, but at its sole discretion, IBKR may share this consideration with Client. IBKR's policies and procedures regarding such consideration are described generally in IBKR's Order Routing and Payment for Order Flow Disclosure, which is posted on IBKR's website and provided to Client, although IBKR does not warrant such information, as it is subject to change without notice. The nature of any such consideration received by IBKR in connection with any Client transaction is available upon IBKR's receipt of written Notice from Client requesting such information.

9. **Order Cancellation/Modification**

It may not be possible to cancel or modify an order and Client is responsible for executions notwithstanding a request to cancel or modify an order.

10. **Order Execution**

   A. IBKR is authorised to execute Client orders as agent or principal as it subsequently confirms to Client. IBKR may act as agent both for buyer and seller in a transaction. IBKR may use another broker, or an affiliate, to execute orders, and that broker or affiliate shall have the benefit of all IBKR's rights hereunder.

   B. IBKR may terminate Client's use of IBKR's services at any time in IBKR's sole discretion without prior notice to Client. IBKR may also decline to accept, to execute or to cancel any Client order, or may otherwise direct, in whole or in part, Client's use of IBKR's services at any time, for any length of time, in IBKR's sole discretion, without prior notice to Client. Such restrictions on trading activity may include, but are not limited to (i) prohibiting Client from engaging in trading of (or entering orders to open or increase the size of a position in) any individual instrument or category of instrument (whether stock, option, or another security, or a commodity, or other investment product); (ii) prohibiting certain types of trades or orders; or (iii) limiting order size or value at risk. Notwithstanding the above, Client remains responsible for its orders and transactions without regard to whether IBKR restricts, or does not restrict, Client's trading activity. All transactions are subject to the Rules and policies of relevant markets and clearing houses, and applicable laws and regulations. IBKR IS NOT LIABLE FOR ANY ACTION OR DECISION OF ANY EXCHANGE, MARKET, DEALER, CLEARING HOUSE OR REGULATOR, OR THE DIRECT OR INDIRECT CONSEQUENCES THEREOF.

C. Exchanges and regulators require brokers to impose various pre-trade filters and other checks to try to ensure that orders do not disrupt the market or violate market rules. Exchanges, other markets, and dealers also apply their own filters and limits to orders they receive. These filters or order limits may cause Client's orders, including but not limited to market orders, to be delayed in submission or execution, either by IBKR or by the market. Filters may also result in an order being cancelled or rejected. IBKR may also cap the price or size of Client's orders before they are submitted to an exchange. IBKR reserves the right in its sole discretion, without notice, to impose filters and order limits on any Client order and will not be liable for any effect of filters or order limits implemented by IBKR or an exchange, market or dealer.

11. **Confirmations and Reporting of Errors**

A. **IBKR has no responsibility for Client's transmission of orders that are inaccurate or not received by IBKR, and may execute any order or trade on the terms actually received by IBKR. Client is bound by their trades as executed, if execution is consistent with Client's order as entered. IBKR may, in its sole discretion, adjust Client's account to correct any error. Client agrees to promptly return to IBKR any erroneous payment, transfer or distribution.**

B. Client will monitor each order until IBKR confirms execution or cancellation. Confirmations of executions or cancellations may be delayed or erroneous (e.g., due to computer system issues or inaccurate reporting), or may be cancelled or adjusted by an exchange, market or dealer. Client will submit Notice to IBKR immediately (but in no event within more than one (1) business day) if:
   i. Client fails to receive an accurate confirmation of an execution or cancellation;
   ii. Client receives a confirmation that is different than Client's order; or
   iii. Client receives a confirmation for an order that Client did not place.

   **If Client fails to provide such Notice, IBKR reserves the right to either remove the trade from Client's account or require Client to accept the trade, in IBKR's sole discretion. Client shall provide IBKR with immediate Notice upon receipt of erroneous information in any account statement or other form not addressed in (i) - (iii) above.**

12. **Proprietary Trading**

A. Subject to all relevant Rules, laws and regulations, Client authorises IBKR to execute proprietary trades for itself and it's affiliates, even though IBKR may simultaneously hold unexecuted Client orders for the same products at the same price. All unexecuted orders, including proprietary orders, for the same products at the same price are executed in the order in which they are received by IBKR. Client further agrees that IBKR may trade with

Client for its own account or for an IBKR affiliate or another client and may earn a profit on those trades.

B. IBKR, its affiliates, and their respective directors and/or employees may trade on their own account and, subject to the provisions of the Ordinance and all other relevant Rules, laws and regulations, IBKR and its affiliates may take the opposite position to the Client's order in relation to any securities, futures and options positions and leveraged Forex transactions, whether on IBKR's or its affiliates' own account or for the account of another client of IBKR, provided that such trade is executed competitively on or through the facilities of SEHK and HKFE or in accordance with the Rules or the facilities of any other securities, commodity, futures or options exchange, market or regulator. In addition, IBKR or its affiliates, or other clients, may take the opposite position to Client's order for Forex and other over-the-counter products.

## 13. Client Qualification

A. Client warrants that the information provided in Client's application is true and complete and that Client will immediately provide written Notice to IBKR of any information changes and authorises IBKR to make any inquiry (with third parties or otherwise) to verify information. Client represents that all assets held in Client's account belong to Client, and that all trading in Client's account is conducted solely for the benefit of Client.

   i. <u>Natural Persons</u>: For individual and joint accounts, Client warrants that Client is:
      a. over 18;
      b. under no legal incapacity; and
      c. has sufficient knowledge and experience to understand that nature and risks of the products to be traded.
   ii. <u>Organizations</u>: For organization accounts, Client and its authorised representatives warrant that Client:
      a. is authorised under its governing document(s) and in the jurisdictions in which it is organised or regulated to enter this Agreement and trade (including on margin if applicable) the products it selects;
      b. is under no legal incapacity; and
      c. that persons identified to enter orders have proper authority and have sufficient knowledge and experience to understand the nature and risks of the products to be traded.
   iii. <u>Trusts</u>: For trust accounts, "Client" refers to the Trust and its Trustees. Trustee(s) represent(s) that:
      a. there are no Trustees other than listed in the application and certifies(y) that IBKR may follow instructions from any Trustee and deliver funds, securities, or any other assets to any Trustee or on any Trustee's instructions, including

delivering assets to a Trustee personally. IBKR may, in its sole discretion, require written consent of any or all Trustee(s) prior to following any instruction of any Trustee;

b. Trustee(s) certify that Trustee(s) has (have) the power under the Trust's governing documents and applicable law to enter into this Agreement, open the type of account applied for, and enter transactions and issue instructions. Such powers include, without limitation, authority to buy, sell (including short), exchange, convert, tender, redeem and withdraw assets (including delivery of securities to or from the Account) to trade securities on margin or otherwise (including the purchase or sale of options), and trade futures and options on futures, for the Trust;

c. should only one Trustee execute this Agreement, Trustee represents that Trustee has the authority to execute this Agreement, without consent of the other Trustees. Trustee(s) certifies(y) that instructions directing IBKR to execute trades or any other type of transaction for this Account will comply with the Trust's governing documents and applicable law and that all trading in this Account will be consistent with the powers delegated to the Trustee(s) by the Trust's governing document(s) and with the fiduciary duties of the Trustee(s) to the Trust and the beneficiary(ies) of the Trust. Trustee(s) also certifies(y) that Trustee(s) will inform any beneficiary(ies) of the Trust of the activity in the Trust's Account(s) as required by the Trust document and applicable law; and

Trustee(s), jointly and severally, shall indemnify IBKR and hold IBKR harmless from any claim, loss, expense or liability arising from or related to IBKR effecting any instructions from the Trustee(s), including but not limited to instructions to buy, sell, transfer or withdraw account assets, even if such instructions may be interpreted to be beyond the scope of the Trustee's authority. Trustee(s) will provide IBKR with immediate Notice if the authority of the Trustee(s) change(s) in any manner relating to this Agreement, including but not limited to any change affecting the accuracy of any representations, warranties or undertakings made herein. IBKR has no duty to review or enforce the legal terms of any Trust, regardless of whether IBKR has some or all of the Trust documents in IBKR's possession

iv. <u>Regulated Persons and Entities; Control Persons and Insiders</u>: Unless Client provides written Notice to IBKR otherwise, Client represents that:

a. Client is not a broker-dealer, futures commission merchant, regulated investment professional, an entity or person licensed by or registered with the SFC or an affiliate, associated person or employee thereof;

b. Client agrees to provide written Notice to IBKR immediately if Client becomes a person licensed by or registered with the SFC or employed or associated with an entity licensed by or registered with the SFC or employed or associated with any other type of regulated investment professional; and

c. Client will provide IBKR with immediate written Notice if Client, or any person or entity affiliated with Client or acting on Client's behalf, is or becomes an insider or control person with respect to any security listed on any exchange.

14. **Designation of a Trusted Contact Person**

A. Client is encouraged, but not required, to designate a Trusted Contact Person ("TCP") for Client's account. A TCP is someone who is 18 years of age or older whom Client authorises IBKR to contact for assistance if IBKR is concerned that Client may be the victim of financial exploitation or experiencing mental or physical impairment that is affecting Client's ability to manage Client's account.

B. By designating a TCP, Client authorises IBKR (and your advisor or introducing broker if you have one) to contact the TCP in IBKR's sole discretion and to disclose to the TCP any information in IBKR's possession about Client and Client's account, including financial information, Client's identity and contact information, the identity of any legal guardian, executor, trustee or holder of power of attorney, and facts regarding the circumstances that have caused IBKR to contact the TCP for assistance.

C. Designating a TCP does not ensure that financial exploitation will not be attempted or occur and does not obligate IBKR to contact the TCP. Client waives any claim for loss or damages against IBKR arising out of or relating to IBKR contacting (or not contacting) a Client-designated TCP.

15. **Joint Accounts**

A. Each joint Account holder agrees that each joint Account holder has authority, without notice to the other, to:
   i. Buy or sell securities, futures and other derivatives, or other products (including on margin);
   ii. receive Account confirmations and correspondence;
   iii. receive and dispose of money, securities or other assets;
   iv. enter, terminate, or agree to modify this Agreement;
   v. waive any part of this Agreement; and
   vi. deal with IBKR as if each joint holder was the sole holder.

B. Notice to any joint Account holder constitutes notice to all joint Account holders. Each joint Account holder is jointly and severally liable to IBKR for all Account matters. IBKR may follow instructions of any joint Account holder and make delivery of any account property to any joint Account holder individually.

C. Upon the death of any joint holder, the surviving holder shall provide immediate written Notice to IBKR and IBKR may, before or after receipt of Notice, initiate proceedings, require documents, retain or liquidate assets or restrict transactions as it deems advisable in its sole discretion to protect itself against any liability or loss. The estate of any deceased joint account holder and each surviving joint account holder will be liable, jointly and severally, to IBKR for any debt or loss in the account or upon liquidation of the account. Unless Clients indicate otherwise, IBKR may presume that joint account holders are joint tenants with rights of survivorship, and upon the death of any such joint tenant, the account shall be vested in the surviving holders, without in any manner releasing the deceased joint tenant's estate from liability.

16. **Margin**

A. Margin Trading
   i. The provisions of this Paragraph 16 shall apply in circumstances where IBKR requires you to maintain margin regarding the orders you submit and transactions entered by or for you, including, but not limited to:
      a. trading investment products such as futures or options where Clients are subject to the relevant Margin Requirements;
      b. engaging in leveraged Forex transactions; and
      c. where applicable, Securities Margin Trading under the terms set out in Addendum 1 (together "Margin Trading").
   ii. Risk of Margin Trading
      Client understands that Margin Trading is highly risky and may result in a loss of funds greater than Client has on deposit in the account. Client represents that Client has read the disclosure titled "Disclosure of Risks of Margin Trading" and the "Hong Kong Risk Disclosure Statement" provided separately by IBKR.
   iii. Requirement to Continuously Maintain Sufficient Margin
      a. Certain transactions, including Margin Trading, are subject, at all times, to the initial and maintenance margin requirements established by IBKR or the applicable exchanges, clearinghouses and regulators, whichever is greater ("Margin Requirements"). IBKR's "house" margin requirements may exceed the margin required by any exchange, clearinghouse or regulator and may include leverage ratio limits or position size limits for securities,

futures, commodities, currencies or other investment products (even for apparently low-risk positions), and may exceed 100% depending upon the product and market conditions.

IBKR MAY MODIFY MARGIN REQUIREMENTS FOR ANY OR ALL CLIENTS FOR ANY OPEN OR NEW POSITIONS AT ANY TIME, IN IBKR'S SOLE DISCRETION WITHOUT PRIOR NOTICE TO YOU.

b. Client shall monitor and maintain, without notice or demand, Client's Account to ensure that Client's Account continuously maintains sufficient Margin Deposit to meet Margin Requirements. IBKR may reject any order if Client's Account has insufficient Margin Deposit to meet Margin Requirements (or would not do so on execution of the Order), and may delay processing of any order while determining the margin status of the account.

c. Formulas for calculating Margin Requirements on the IBKR website are indicative only and may not reflect actual Margin Requirements, which can change rapidly depending on market conditions. Client must at all times satisfy the Margin Requirements calculated by IBKR. If Client has multiple accounts with IBKR (or if Client utilizes IBKR's partition function to create subaccounts), at IBKR's sole discretion, IBKR may treat such accounts (and/or subaccounts) either as separate or as one account for purposes of applying the Margin Requirements. Client acknowledges that this may cause the total Margin Requirement to be higher than otherwise required and could cause positions to be liquidated in one account or subaccount notwithstanding excess equity in another account or subaccount.

d. Client will not rely on IBKR to close or liquidate positions in Client's account in the event Client's account does not comply with Margin requirements. Client will not rely on IBKR's liquidation rights and auto-liquidation systems to function as a stop-loss order. Client cannot assume that IBKR's general policy to liquidate positions will prevent Client from losing more than Client has deposited. Among other things, market prices may not rise or fall incrementally and IBKR may not be able to close out a position at a price that would avoid losses greater than the margin deposit. Likewise, IBKR may in its discretion delay or decide not to liquidate positions in an account with a margin deficit and shall have no liability for any loss sustained by Client in connection with such delay of or forbearance from liquidation.

e. For the purposes of determining Client's compliance with Margin Requirements, IBKR will determine in its sole discretion the value of positions and assets in Client's account. IBKR's calculations may differ from the values or prices disseminated by exchanges or other market data sources. For example, IBKR may calculate its own index values, Exchange Traded Fund ("ETF") values or derivatives values, and IBKR shall have the sole discretion in deciding whether and how to value investment products based on bid price, offer price, last sale price, bid/ask midpoint or using some other method it so chooses. IBKR may use a valuation methodology that is more conservative than the marketplace as a whole and this may effectively constitute a higher "house" margin requirement, which IBKR has the right to establish. IBKR may raise Margin Requirements in advance of an upcoming change in the required exchange or clearinghouse margin even before the effective date of such change.

f. Client acknowledges and agrees that the Margin Requirements and related rules of exchanges, clearinghouses and regulators generally are designed to protect the integrity of markets and the capital of broker-dealers that are subject to such rules and are not generally intended to protect the Client. IBKR's failure to apply or enforce Margin Requirements and related rules shall not give Client any right to bring an action against IBKR and nothing in this Agreement constitutes a warranty or undertaking that IBKR will apply or enforce the Margin Requirements and related rules.

iv. <u>IBKR Generally Does Not Issue Margin Calls</u>

a. IBKR is not obliged to notify Client of any failure to meet Margin Requirements prior to IBKR exercising its rights under this Agreement.

b. IBKR generally <u>will not</u> issue Margin Calls or credit Client's Account to meet intraday or overnight margin deficiencies. IBKR is authorised (<u>but not required to</u>) to liquidate Account positions in order to satisfy Margin Requirements without prior notice under this Agreement.

17. **Liquidation of Positions and Offsetting Transactions**

A. **CLIENT AGREES THAT IBKR HAS THE RIGHT, IN ITS SOLE DISCRETION, BUT NOT THE OBLIGATION, TO LIQUIDATE ALL OR ANY PART OF CLIENT'S POSITIONS OR ASSETS IN ANY OF CLIENT'S IBKR ACCOUNTS, INDIVIDUAL OR JOINT, AT ANY TIME AND IN ANY MANNER (INCLUDING BUT NOT LIMITED TO PRE-**

**MARKET/AFTER-MARKET TRADING AND PRIVATE SALES) AND THROUGH ANY MARKET OR DEALER, WITHOUT PRIOR NOTICE OR MARGIN CALL TO CLIENT IF AT ANY TIME, INCLUDING BUT NOT LIMITED TO:**

    i.   **CLIENT'S ACCOUNT HAS ZERO EQUITY OR IS IN DEFICIT (I.E., NEGATIVE EQUITY);**

    ii.   **CLIENT'S ACCOUNT HAS INSUFFICIENT EQUITY TO MEET MARGIN REQUIREMENTS;**

    iii.   **IBKR ANTICIPATES (IN ITS SOLE DISCRETION) THAT THE HOLDING OF AN OPTION POSITION OR ANY OTHER POSITION IN CLIENT'S ACCOUNT LIKELY WILL RESULT IN A FUTURE MARGIN VIOLATION (FOR EXAMPLE UPON EXPIRATION OF A DERIVATIVE POSITION);**

    iv.   **AN EVENT OF DEFAULT HAS OCCURRED;**

    v.   **THIS AGREEMENT HAS BEEN TERMINATED;**

    vi.   **CLIENT SUBMITS, AND IBKR EXECUTES, AN ORDER FOR WHICH CLIENT DOES NOT HAVE SUFFUCIENT FUNDS; OR**

    vii.   **IBKR DETERMINES (IN ITS SOLE DISCRETION) THAT LIQUIDATION IS NECESSARY OR ADVISABLE FOR IBKR'S PROTECTION.**

B.  **CLIENT SHALL BE LIABLE AND WILL PROMPTLY PAY IBKR FOR ANY DEFICIENCIES IN CLIENT'S ACCOUNT THAT ARISE FROM SUCH LIQUIDATION OR REMAIN AFTER SUCH LIQUIDATION. IBKR HAS NO LIABILITY FOR ANY LOSS SUSTAINED BY CLIENT IN CONNECTION WITH SUCH LIQUIDATION (OR IF IBKR DELAYS EFFECTING, OR DOES NOT EFFECT, SUCH LIQUIDATION), EVEN IF CLIENT RE-ESTABLISHES A LIQUIDATED POSITION AT A WORSE PRICE. Client shall reimburse and hold IBKR harmless for all actions, omissions, costs, fees (including, but not limited to, attorney's fees), or liabilities associated with any such LIQUIDATION undertaken by IBKR.**

C.  IBKR may allow Client to pre-request an order of liquidation of assets in Client's account in the event of a margin deficiency, and IBKR will endeavour to accommodate such requests, all other things being equal, if doing so will not reduce the firm's ability to promptly and effectively resolve Client's margin deficiency in accordance with the firm's standard procedures,  but such requests are not binding on IBKR and IBKR retains sole discretion to determine the assets to be liquidated and the order and manner of liquidation. IBKR may liquidate Client positions through any market or dealer, or through foreclosures or any other method in IBKR's sole discretion, and IBKR or its affiliates may take the other side of liquidating transactions or enter into risk-reducing transactions. If IBKR liquidates any positions in Client's account, such liquidation shall establish Client's gain or loss and remaining indebtedness to IBKR.

D.  If IBKR does not, for any reason, liquidate under-margined positions, and issues a Margin Call, Client must satisfy such call immediately as

requested by depositing funds into Client's account or in any may manner specified by, or otherwise acceptable to, IBKR. Even if a Margin Call is issued, IBKR still may liquidate positions at any time and does not waive any of its other rights against the Client.

E. If any of the events itemized in Paragraph 17(A)(i) - (vii) occurs, Client agrees that IBKR also has the right, in its sole discretion, but not the obligation, to (i) freeze all or any part of positions or assets held in Client's account, or (ii) exercise options positions in Client's account. IBKR may take these actions without prior notice to Client.

18. **Closing Rights Positions Prior to Expiration**

A. Prior to the start of the last trading day before expiration, Client agrees to close out any long (or short) option positions or other rights positions (including but not limited to equity options, ETF options, and non-cash-settled futures options) that Client holds for which Client has insufficient equity, or may have insufficient equity at expiration, to exercise (or be assigned on) such position and to then carry the resulting underlying position in Client's account.

B. Client acknowledges that approaching expiration with long or short options for which Client does not or may not have sufficient equity to hold the underlying position puts the Client and IBKR at serious risk (including the risk of market movements in the underlying product between expiration and the next opening of the market in the product). If IBKR in its sole discretion determines that Client has or may have insufficient equity to take the underlying position in Client's account upon expiration of an option position, IBKR has the right, but not the obligation, to: (i) liquidate some or all of the options or rights position prior to expiration; (ii) lapse some or all of the options (i.e., instruct that they not be exercised), even if in-the-money at expiration; and/or (iii) allow some or all of the options to be exercised or assigned and then liquidate the resulting position. Client shall have no claim for damages or lost profits resulting from IBKR taking or not taking any of these actions.

19. **Short Selling of Securities**

A. Client acknowledges that:
   i. each time Client places a sell order in respect of a Security in which Client does not hold the equivalent long position, including holding a long position that is less than the quantity being sold, Client notifies IBKR that the sell order relates to a short sale ("Short Sale Order"), and Client will be taken to have warranted and represented to IBKR that the sale will meet the requirements and conditions of the relevant Rules;
   ii. Client is required to comply with the relevant reporting obligation of a short seller to report certain short positions to the SFC or other

    relevant regulators as required by the Rules. Short sales must be done in a Margin Account, and IBKR will only accept Short Sale Orders and allow you to maintain a short position if Client's account meet's the Margin Requirements;

iii.    short selling of Hong Kong stocks generally will require Client to enter into a securities lending agreement and to register such agreement and file periodic returns with the Hong Kong Inland Revenue Department ("IRD") in order to comply with exemptions to stamp tax liability in connection with such short sales. IBKR may provide assistance to Client in connection with filing for stamp tax relief in connection with short sales of Hong Kong stocks, but Client remains ultimately and solely responsible for complying with IRD stamp tax rules and IBKR shall have no liability whatsoever in the event that a transaction(s) is not eligible for stamp tax relief;

iv.    prior to executing a short-sale order, IBKR must have reasonable grounds to believe that it (or its affiliate) can arrange for the Client to borrow the stock so that the Client has a presently exercisable and unconditional right to vest the stock in the purchaser;

v.    if IBKR cannot borrow stock (or re-borrow after a recall notice) IBKR may buy-in stock on Client's behalf, without notice to Client, to cover short positions, and Client is liable for any associated losses/costs; and

vi.    there are risks in short selling including but not limited to the risks that:

    a.    the share price may increase and thereby move adversely to your short position and you can lose more money than you invested;

    b.    you may be forced at any time to re-deliver Equivalent Securities by purchasing them at a higher price than what was received for your short sale; and

    c.    your short position may be bought-in at any time and this may occur at a time when the Securities you have short sold are at a price which is disadvantageous to you.

## 20. Mutual Funds

Before investing in any mutual fund, Client agrees to read and understand the terms of its prospectus, and acknowledges that certain mutual funds reserve the right to change or suspend their purchasing or redemption procedures under certain circumstances. Client accepts that trading in mutual funds may be subject to special fees, limitations or restrictions imposed by the fund, IBKR, or both.

## 21. Worthless and Non-transferrable securities

Client agrees IBKR has the right to remove from Client account securities that are worthless and/or non-transferable, including any security that is deemed to have been cancelled, revoked or otherwise invalidated. Worthless, invalid or non-

transferable securities subject to removal may include, but are not limited to, securities with revoked registration, or those issued by an entity that is bankrupt, dissolved or has had its charter revoked.

22. **Use of omnibus accounts**

   A. Subject to applicable Rules, Client acknowledges and agrees that IBKR may use omnibus account(s) for holding Clients' financial and other products and funds together with the financial and other products and funds of its other clients with the exchanges or clearing and depository facilities in which it is a participant and with the overseas market intermediaries (including brokers, clearing facility participants or other depositories and sub-custodians) who execute orders and clear transactions on behalf of IBKR where IBKR is not a participant of a particular market or exchange. Such other intermediaries may use omnibus accounts to hold financial and other products and funds for their clients (including those held by IBKR for Client) with exchanges or clearing and depository facilities of which they are a participant or further sub-custodians or execution and clearing agents utilised by them.
   B. Client acknowledges and accepts the risk that:
      i. Clients' rights to assets held by IBKR in its omnibus account with a clearing and depository facility may be subject to IBKR fulfilling its obligations to such facility, which may be further subject to IBKR's other clients fulfilling their obligations to IBKR, even though the Client may not defaulted on its obligations to IBKR; and
      ii. Clients' rights to assets held by IBKR in any omnibus account with an overseas market intermediary who provides execution or clearing (as outlined above) may be subject to IBKR, IBKR's other clients, the intermediary or their agents, and other clients of the intermediary or their agents fulfilling their obligations to their counterparties, even though the Client may not have defaulted on its obligations to IBKR.

23. **Position Limits; Transfers; Automatic Exercise of Options; Options and Futures Transactions on SEHK and HKFE**

   A. Client acknowledges and agrees that IBKR may, at its sole discretion, establish position limits and/or may limit the number of open positions that Client may execute or hold through IBKR at any time.
   B. Client acknowledges and agrees that IBKR may be required to close out the Client's open position in order to comply with these limits or any other position limits of the relevant exchange.
   C. Client acknowledges that the relevant options or futures exchange or its clearing house may do all things necessary to close out or to transfer any open positions held by IBKR on the Client's behalf and money and securities standing to the credit of the Client's Account with IBKR to

another member of the relevant options or futures exchange if deemed necessary under the rules of the relevant exchange or clearing house.

D. The relevant Rules may require Client to notify the relevant exchange or regulator if the Client holds a reportable position as defined by the relevant Rules ("Reporting Requirements"). Client acknowledges and confirm that:

    i.    Client knows and understands the Reporting Requirements related to the relevant products and exchange the client places order on, including but not limited to, options and futures orders on the SEHK and HKFE; and

    ii.    Client is responsible for complying with the relevant Reporting Requirements.

E. In relation to options contracts traded on the SEHK, Client acknowledges that:

    i.    on the expiry day, and only on the expiry day, the SEHK Option System will automatically generate exercise instructions in respect of all open long positions which are in-the-money by or above a percentage prescribed by SEOCH from time-to-time. If Client does not wish for such automatically generated exercise to occur, Client may instruct IBKR to override this automatically generated exercise before the System Closure time as specified in the SEOCH Procedures. Similar procedures for automatic exercise of certain options exist on foreign options markets and Client agrees to review the automatic exercise procedures for any exchange on which Client trades;

    ii.    the standard terms and conditions applicable to an option contract as specified by the SEHK from time to time shall apply to each relevant Client Contract between IBKR and Client arising in accordance with the relevant Rules, and that all Client Contracts shall be created, exercised, settled and discharged in accordance with the Rules;

    iii.    Client and IBKR shall contract as principals under Client Contracts;

    iv.    at Client's request, IBKR may agree to Client Contracts between itself and Client being replaced, in accordance with the relevant Rules, by Client Contracts between Client and another exchange participant; and

    v.    if IBKR goes into default, the default procedures of SEHK may result in any Client Contract between IBKR and Client being closed out or replaced by contracts between Client and another exchange participant of the SEHK.

F. In relation to futures contracts traded on the HKFE, Client acknowledges that in respect of any account IBKR maintained with the HKFE Clearing House, IBKR deals as principal and accordingly no such account is impressed with any trust or other equitable interest in favour of Client and monies, approved debt securities and approved securities paid to or deposited with HKFE Clearing House are thereby freed from any trust.

24. **Safekeeping of Securities; Client Funds**

   A. The Client appoints IBKR to act as custodian for the Client to provide custody of Client's securities. The Client agrees to not pledge, charge, sell, grant an option or otherwise deal in any securities held by IBKR as custodian without the prior written consent of IBKR.

   B. Unless otherwise authorised by Client in the Client Securities Standing Authority or other written authorisation, any securities held in Hong Kong by IBKR for safekeeping on behalf of the Client may, at IBKR's discretion, be deposited in safe custody in a segregated account which is designated as a trust or client account with an authorised financial institution as defined in the Ordinance, an Approved Custodian or another intermediary licensed by the SFC for dealing in securities in each case in Hong Kong.

   C. IBKR, its affiliate or its appointed sub-custodian are not bound to redeliver to the Client the same securities received from or for the Client but may redeliver to the Client securities of like quantity, type and description.

   D. Securities held by IBKR for the safekeeping pursuant to this paragraph are held by IBKR at the sole risk of the Client and IBKR shall not be responsible for or liable in respect of any loss or damage suffered by the Client unless such loss or damage has been caused as a direct consequence of IBKR's gross negligence, breach of duty, fraud or wilful misconduct.

   E. All monies or other properties received by IBKR from the Client or from any other person, including the HKFE Clearing House for the Account of the Client in respect of the futures/options contracts transacted on behalf of the Client, shall be held by IBKR as trustee, segregated from IBKR's own assets. All monies or other property so held by IBKR shall not form part of the assets of IBKR for insolvency or winding up purposes but shall be promptly returned to Client upon the appointment of a provisional liquidator, liquidator or similar officer over all or any part of IBKR's business or assets.

   F. All currency exchange risks regarding any payment instruction or any order or transaction entered into or arranged for you by IBKR will be the Client's responsibility. Other than a foreign exchange transaction executed in accordance with terms agreed between the Client and IBKR, any conversion from one currency to another required to be made for performing or executing any payment instruction, order or transaction may be effected by IBKR in the manner and at the time and at the exchange rates that IBKR determines in its sole discretion.

25. **IBKR's Right to Loan/Pledge Client Assets**

   A. To the extent allowed by the Client Securities Rules and other relevant laws, IBKR is authorised by the Client to lend to itself, or others, the Client securities or assets.

B. IBKR may, without notice, pledge, re-pledge, hypothecate or re-hypothecate the Client's securities and assets, separately or together with those of other clients, for any amount due in any IBKR account in which Client has an interest, without retaining in IBKR's possession or control a similar amount of assets.

C. For loans of securities, Client acknowledges that IBKR may receive financial and other benefits to which Client is not entitled. Such loans could limit Client's ability to exercise securities' voting rights.

26. **Security Interest**

All assets of any kind held by or on behalf of IBKR for Client's Account are hereby pledged to IBKR and Client hereby grants to IBKR a perfected first priority lien and security interest in IBKR's favour to secure performance of obligations and liabilities to IBKR arising under this or any other Agreement with respect to this Account or any other Account for which Client is the legal and beneficial owner.

27. **No Restricted Securities**

Unless Client has submitted written Notice to IBKR to the contrary, no assets held as collateral are "restricted securities", as such term is defined pursuant to Rule 144 under the United States Securities Act of 1933 in the United States of America, (the "U.S. Securities Act"), or securities of an issuer with which Client is an "affiliate" (as such term is defined pursuant to Rule 144 under the U.S. Securities Act), and Client will not attempt to sell such shares through IBKR without prior written Notice to and written consent of IBKR.

28. **Event of Default**

A. "Default" occurs automatically, without notice upon any of the following:
   i. Client breach/repudiation of any agreement with IBKR;
   ii. Client fails to pay, or provide security for, any amounts payable to IBKR under these terms;
   iii. Client fails to pay the amounts due in respect of any transactions entered into pursuant to these terms, or Client's account is in deficit for any reason whatsoever;
   iv. Client failure to provide assurance satisfactory to IBKR (in IBKR's sole discretion) of performance of an obligation, after request from IBKR;
   v. proceedings by/against Client under any bankruptcy, insolvency, or similar law;
   vi. assignment for the benefit of Client's creditors;
   vii. appointment of a receiver, trustee, liquidator or similar officer for Client or Client property;

viii.   Client representations being untrue or misleading when made or later becoming untrue and not corrected within three (3) business days;

ix.   legal incompetence of Client;

x.   the suspension of, or the commencement of any proceeding to suspend Client's business or license issued by any regulatory or governmental body;

xi.   Client failure to respond to IBKR's attempts to contact the Client concerning potentially abandoned property; or

xii.   IBKR having reason to believe that any of the foregoing is likely to occur imminently.

B.   Client agrees that, upon a Default, IBKR may terminate any of IBKR's obligations to Client and may deduct from the equity in any Client account any losses, costs, expenses or other liabilities incurred by IBKR arising from such Default.

29. **Suspicious Activity**

If IBKR in its sole discretion believes that a Client Account has been involved in any fraud or crime or violation of any laws or regulations, or has been accessed unlawfully, or is otherwise involved in any suspicious activity (whether victim or perpetrator or otherwise), IBKR may suspend or freeze the Account or any privileges of the Account, may freeze or liquidate funds or assets, or may utilize any of the remedies in this Agreement for a "Default." Client waives any claim for loss or damages against IBKR arising out of or related to IBKR exercising its rights under this paragraph.

30. **Unclaimed Property**

Under the laws applicable to Client's account, IBKR may be required to turn over to government authorities property that is deemed abandoned. To avoid such escheatment of property, Client must periodically show activity on their account (by logging in) or otherwise contact IBKR. Before remitting abandoned property, IBKR will send written notice to the last know physical and email address on the account. IBKR is not liable for any loss arising from or related to escheatment of Client property under applicable law.

31. **Multi-Currency Function in IBKR Accounts**

A.   Clients may be able to conduct transactions and trade products denominated in different currencies.

B.   <u>For Clients with a Margin Account</u>, if Client incurs an obligation in a currency in a Margin Account (for example, by withdrawal of such currency or by purchase of a product denominated in such currency), and if insufficient funds exist in the account in that currency, a margin loan shall be created to fund the obligation, secured by the assets in Client's

accounts. If Client maintains positions denominated in foreign currencies, IBKR will calculate Margin Requirements by applying exchange rates specified by IBKR. **IBKR will apply "haircuts" (a percentage discount on the foreign currency equity amount) to reflect the possibility of fluctuating exchange rates between the base currency and the foreign currency. Client must closely monitor Margin Requirements at all times, particularly for positions denominated in foreign currencies, because fluctuation in the currency and value of the underlying position can cause a margin deficit and may result in liquidation of Client's positions.**

C. <u>For Clients with a cash account</u>, if Client incurs an obligation in a cash account in a currency as a result of a purchase denominated in such currency (the "Purchase Currency"), and if insufficient funds exist in the account in the Purchase Currency as at the time of the transaction, then Client authorises and instructs IBKR that it may (but is not obliged) enter into a foreign exchange transaction to sell the necessary amount of Client's long currency balance(s) to purchase ("Convert") the required amount (including commissions and fees) of the Purchase Currency for settlement by the same date as the date on which the purchase transaction settles. Client appoints IBKR in its sole discretion to determine which of Client's long balances will be sold to buy the Purchase Currency in order to meet Client's settlement obligation, having regard to, without limitation, the amount of Client's long currency balances and the number of transactions IBKR itself is required to enter into or arrange in order to make delivery of the Purchase Currency to meet Client's settlement obligation. IBKR's determination shall be final and Client agrees not to hold IBKR liable for any losses Client may incur resulting from any foreign exchange transaction conducted in this manner. Client agrees that this currency conversion will be undertaken by IBKR at a rate derived from prevailing market conditions at the time of the execution and adjusted for costs which arise due to the differences between the agreed settlement cycle for the purchase transaction and the standard settlement cycle for the applicable currency pair(s), if any. Client agrees that IBKR may charge fees and commissions for such automatic currency conversion trades as set out on the Commissions and Fees page on the IBKR website[1].

D. If the value of an amount of money in a particular currency in a Client's Account (other than amounts in the nominated base currency in the Account) is less than the "Nominal Balance" (which has the meaning and value as set out in the Hong Kong Risk Disclosure Statement as amended from time to time), then Client authorises and instructs IBKR to enter into foreign exchange transaction(s) to Convert the Nominal Balance in the non-base currency to the nominated base currency of the Account. Client

---

[1] The automatic foreign exchange conversion service to which 31.C. relates is not enabled for certain Accounts including Accounts with Financial Information eXchange ("FIX") connections, Accounts with guaranteed dollar arrangements ("GD"), and those linked to an introducing broker that has opt-ed out of this automatic foreign exchange conversion. Holders of such Accounts will receive notice from IBKR if/when this function has been enabled.

agrees not to hold IBKR liable for any losses Client may incur resulting from any foreign exchange transaction(s) conducted in this manner. Client agrees that this currency conversion will be undertaken by IBKR at a rate derived from prevailing market conditions at the time of execution, and the currency will be delivered to the Account based on the standard settlement cycle for the applicable currency pair(s). Client agrees that IBKR may charge fees and commissions, if any, for such automatic currency conversion trades as set out on the Commissions and Fees page on the IBKR website, and/or the Hong Kong Risk Disclosure Statement.

E. IBKR does not warrant that it will allow cash withdrawals or deposits in every currency in which investment products are denominated on the IBKR platform. In such case, Client authorises IBKR to Convert the currency of the credit or debit of the product to a currency in which a withdrawal or deposit is allowed (at then-current rates on the IBKR platform, plus applicable commission). If the account type or the IBKR platform does not support carrying a debit in a particular currency to satisfy an obligation to IBKR incurred in that currency (for example, by entering an order in a options or futures contract settled in a particular currency), Client agrees that IBKR may Convert sufficient funds of that particular currency to the appropriate currency to meet applicable obligations or requirements.

F. Client agrees that IBKR's obligations to Client shall be denominated in: (i) the Hong Kong dollar; (ii) a currency in which funds were deposited by Client or were Converted at the request of Client, to the extent of such deposits and conversions; or (iii) a currency in which funds have accrued to the client as a result of trading conducted on a designated contract market or registered derivatives transaction execution facility, to the extent of such accruals. Information regarding Client's currency conversions is provided on the IBKR Client statements.

32. **Foreign Currency Exchange Transactions**

A. <u>HIGH RISKS OF LEVERAGED FOREX TRADING</u>:
LEVERAGED FOREX TRADING IS GENERALLY UNREGULATED, IS HIGHLY RISKY DUE TO THE LEVERAGE (MARGIN) INVOLVED, AND MAY RESULT IN LOSS OF FUNDS GREATER THAN CLIENT DEPOSITED IN THE ACCOUNT. Client represents that he or she has read and acknowledges the "Hong Kong Risk Disclosure Statement" provided separately by IBKR.

B. <u>General provisions</u>:
   i. For Forex and leveraged Forex transactions, IBKR generally will act as agent or riskless principal and will charge a fee, as applicable. IBKR may effect Forex and leveraged Forex transactions through an affiliate or third party, which may profit or suffer loss from such transactions. Client agrees that IBKR may transfer to or from any of the Client's Accounts held with IBKR any funds or assets that may

      be required to avoid Margin Calls, reduce debit balances or for any other lawful reason.

ii. The value of Client's open positions will be marked to market in accordance with IBKR's determination as made from time to time during the trading hours by reference to the current prices quoted by a reputable financial information services organization. Interest chargeable or payable by IBKR will be determined with reference to the prevailing marketing rates and in accordance with the provisions of this Agreement (as amended).

iii. Client acknowledges that he may be affected by any curtailment of, or restriction on, the capacity of IBKR to trade in respect of open positions as a result of action taken by SFC under applicable Rules, laws and regulations, and in such circumstances Client may be required or close out its open positions with IBKR.

iv. If the Client has an obligation to make a payment in respect of an international transaction, the Client authorizes IBKR to withdraw such amounts from monies held on the Client's behalf to discharge that obligation and, if the Client has insufficient funds in the relevant currency, the Client authorizes and directs IBKR to enter into a Forex or leveraged Forex transaction on the Client's behalf to Convert amounts the Client holds in other currencies into the relevant currency (using an exchange rate that IBKR determines, acting reasonably, is appropriate in the circumstances). If the Client has a right to receive a payment in respect of an international transaction in a currency for which IBKR does not maintain a segregated account which is designated as a trust or client account with an authorized financial institution as defined in the Ordinance, an Approved Custodian or another intermediary licensed by the SFC for dealing in securities in each case in Hong Kong, the Client authorizes and directs IBKR to enter into a Forex and/or leveraged Forex transaction on the Client's behalf to Convert such amounts on receipt into a currency in which IBKR does maintain a segregated account (using an exchange rate that IBKR determines, acting reasonably, is appropriate in the circumstances). IBKR may aggregate transactions undertaken under this clause for the Client with the transactions undertaken for IBKR's other clients.

C. <u>Netting:</u>

Client acknowledges and authorises IBKR to net off, as permitted by the relevant laws, Rules and regulations, the Client's open Forex or leveraged Forex position in the following manner:

i. Netting by Novation:

Each Forex transaction between Client and IBKR will immediately be netted with all existing Forex transactions between Client and IBKR for the same currencies to constitute one transaction.

ii. Payment Netting:

       If on any delivery date more than one delivery of a currency is due, each party shall aggregate the amounts deliverable and only the difference shall be delivered.

     iii.  Close-Out Netting:

       If Client: (a) incurs a margin deficit in any IBKR account, (b) defaults on any obligation to IBKR, (c) becomes subject to bankruptcy, insolvency or other similar proceedings, or (d) fails to pay debts when due, IBKR has the right but not the obligation to close-out Client's Forex transactions, liquidate all or some of Client's collateral and apply the proceeds to any debt to IBKR ("Close-Out Netting"). Upon Close-Out Netting or any "Default," all outstanding Forex transactions will be deemed terminated as of the time immediately preceding the triggering event, petition or proceeding. IBKR's rights herein are in addition to any other rights IBKR has (whether by agreement, by law or otherwise).

D.  Nothing herein constitutes a commitment of IBKR to offer Forex transactions generally or to enter into any specific Forex transaction. IBKR reserves the unlimited right to refuse any Forex order or to decline to quote a two-way market in any currency.

## 33. Commodity Options and Futures Not Settled in Cash

A.  Client acknowledges that:

     i.  for futures contracts that do not settle in cash but settle by physical delivery of the commodity (including currencies, except for currencies on IBKR's deliverable currency list), Client cannot make or receive delivery; and

     ii.  for options contracts that settle into futures contracts covered by (i) above, Client cannot hold such option contract to expiry if doing so would result in Client being obligated to make or receive delivery on such futures contract.

     iii.  If Client has not offset a commodity option or physical delivery futures position prior to the deadline on the IBKR website, IBKR is authorised to roll or liquidate the position or liquidate any position or commodity resulting from the option or futures contract, and Client is liable to IBKR for all losses or costs incurred in connection with such transaction.

## 34. Commissions and Fees, Interest, Funds

A.  Client shall pay commissions, fees and interest at the rates and terms specified on the IBKR website to IBKR unless: (i) otherwise agreed in writing by an IBKR (through its Chief Executive Officer or General Counsel); or (ii) a separate commission, fee or interest schedule applies based on Client's relationship to a third-party, such as an introducing broker or financial advisor for Client's IBKR account.

B. Client acknowledges and authorises IBKR to deduct commissions/fees from Client Accounts, which will reduce account equity. Commissions will generally be deducted on the same day as they are earned, which is generally the trade date. Positions may be liquidated (as set forth in paragraph 17) if commissions or other charges cause an Account to become margin deficient or incur a deficit. Changes to commissions and fees are effective immediately upon posting on the IBKR website or email or other written notice to Client. IBKR shall pay credit interest (if Client is eligible) and charge debit interest to Client at interest rates and terms published on the IBKR website unless: (i) otherwise agreed in writing by IBKR (through its Chief Executive Officer or General Counsel); or, (ii) a separate commission, fee or interest schedule applies based on Client's relationship to a third-party, such as an introducing broker or financial advisor for Client's IBKR account, as applicable. Client funds will not be disbursed until after transactions are settled. The terms and conditions that govern the deposit and withdrawal of funds (including holding periods) are as specified on the IBKR website.

C. For certain products, IBKR may offer "tiered" or "unbundled" or "component" commissions where the total commission is based on various component factors (e.g., exchange fees, IBKR fees, etc.). These commission models are not intended to be a direct pass-through of exchange or third-party fees and rebates. Costs passed on to clients in these commission schedules may be greater than the costs paid by IBKR to the relevant exchange, regulator, clearinghouse or third-party. For example, IBKR may receive volume discounts that are not passed on to clients. Likewise, rebates passed on to clients by IBKR may be less than the rebates IBKR receives from the relevant market.

D. IBKR is not required to compensate Client for any differential tax treatment, and if Client is allocated a substitute payment in lieu of interest, dividends, or other payments, Client understands that such a payment may not be entitled to the same tax treatment. IBKR may allocate payments in lieu of interest, dividends, or other payments by any mechanism permitted by law.

E. Notwithstanding any language to the contrary in this Agreement or on the IBKR website regarding credit and debit interest, interest rates for a particular currency may be "negative." If the interest rate on funds held in a particular currency is negative, this means Client will be charged a fee at the negative interest rate for positive balances in such currency, and earn interest for negative balances in the currency. Client should refer to rates specified on the IBKR website except where Client's obligation to pay interest and potential entitlement to interest is (i) otherwise agreed in writing by IBKR (through its Chief Executive Officer or General Counsel) or (ii) subject to a separate commission, fee or interest schedule based on Client's relationship to a third-party, such as an introducing broker or financial advisor for Client's IBKR account, as applicable.

F. The Client hereby authorises IBKR to apply any monies, approved debt securities or approved securities that the Client may pay to IBKR in order to:

    i. meet obligations to the relevant clearing house (provided that no withdrawal from the Client's Accounts with IBKR may be made which would have the effect that the relevant Margin Requirements or trading liabilities conducted on behalf of any client are thereby financed by any other client);

    ii. pay commission, brokerage, levies and other proper charges for contracts transacted by IBKR on behalf of the Client; and/or

    iii. make payments in accordance with the Client's directions (provided that no money may be paid into another account of the Client unless that account is also a segregated bank account).

The Client acknowledges that IBKR may apply such monies, approved debt securities or approved securities in or towards meeting IBKR's obligations to any party insofar as such obligations arise in connection with or incidental to all contracts transacted on the Client's behalf. The Client agrees that IBKR may retain interest on the Client's money.

## 35. Account Deficits and Exposure Fees

A. If an Account incurs an equity deficit (regardless of Account type), margin interest rates will apply until balance is repaid with the rate being, as applicable, either

    i. as specified on the IBKR website, or

    ii. as otherwise agreed in writing by IBKR (through its Chief Executive Officer or General Counsel), or

    iii. if Client's IBKR Account is subject to a separate commission, fee or interest schedule based on Client's relationship to a third-party (such as an introducing broker or financial advisor for Client's IBKR Account), pursuant to such schedule.

IBKR may, at its sole discretion, charge interest on the deficit at the margin interest rates applicable to Client's IBKR Account (as set out in the foregoing) until the deficit is repaid. IBKR has the right, but not the obligation, to take any actions which it is authorised to take in accordance with Paragraph 17 in order to resolve such deficit and has a right, but not the obligation, to treat a cash account in equity deficit as a margin account. Client agrees to pay reasonable costs of collection for any unpaid Client deficit, including attorneys' and collection agent fees.

B. If IBKR seeks to recover any unpaid Client deficit through a court or arbitration proceeding, IBKR reserves the right to recover interest at statutory interest rates, rather than margin interest rates. IBKR may take all steps permissible under applicable law to recover an unpaid Client deficit, including but not limited to transferring or assigning the debt to an affiliate or other third-party entity for collection.

C. IBKR calculates and charges a daily "exposure fee" to Client accounts that are deemed in IBKR's discretion to have significant risk exposure (potential exposure that exceeds the account's equity were certain scenarios to occur). The exposure fee is NOT a form of insurance for Client's account. If Client's account incurs a debt or deficit to IBKR, Client remains liable to IBKR to satisfy that debt or deficit. Payment of exposure fees does NOT reduce, offset, or relieve Client of that liability. Deduction of exposure fees will reduce account equity. Positions may be liquidated if exposure fees cause an Account to have a negative cash balance or a margin deficiency.

36. **Risks of Foreign Markets; After Hours Trading**

Client acknowledges that trading securities, options, futures, currencies, or any product on a foreign market is speculative and involves high risk. Client may have varying levels and types of protection in relation to transactions on different markets and exchanges. Trading outside ordinary market hours poses special risks, including risk of lower liquidity, higher volatility, changing prices, un-linked markets, news announcements affecting prices, and wider spreads. Client represents that Client is knowledgeable and able to assume these risks.

37. **Risks Regarding Political and Governmental Actions**

Governments of countries in which IBKR clients reside, or countries in which IBKR clients invest, may take economic and/or political actions that are adverse to investors and such actions may negatively affect Client's account. Client agrees that IBKR is not liable for such actions. For example, if Client invests in securities, futures, foreign currency or other investment products in a foreign jurisdiction, such assets, or cash to secure such assets, typically will be held at a bank, clearinghouse or other facility in such foreign jurisdiction. Assets and cash held in foreign jurisdictions are inherently vulnerable to the risk that the government in such jurisdiction could freeze or confiscate or take some other action against such assets for some purpose, temporarily or permanently. Likewise, even with respect to investments within Client's own country, governments may freeze or take other action against such assets on the basis of political, economic, or military conflict. Client acknowledges and agrees that IBKR (and its affiliates) cannot and will not protect Client from actions by any governmental, political, military, or economic actor that may adversely impact Client's assets held by IBKR, its agents or subcustodians. Client agrees that that IBKR (and its affiliates) is not liable for any losses or damages Client may incur as a result of any such action.

38. **Knowledge of Securities, Warrants and Options; Corporate Actions**

A. Client is responsible for knowing the terms of any securities, options, derivatives, futures, warrants or other products in Client's Account,

including but not limited to upcoming corporate actions (e.g., tender offers, reorganizations, stock splits, bankruptcy, etc.) and expiration dates of futures, options or other derivative products. IBKR has no obligation to notify Client of deadlines or required actions or dates of meetings, nor is IBKR obligated to take any action without written Notice from Client to IBKR.

B.  If Client receives fractional shares as the result of a stock split or other corporate action, IBKR, in its sole discretion, may sell the fractional shares either on the open market or to the issuer or transfer agent, and Client is entitled to receive Client's pro rata share of the proceeds of such sale. If sold on the open market, the sale price may differ from that offered to certain registered owners by the issuer or transfer agent.

39. **Quotes, Market Information, Research and Internet Links**

Quotes, news, research and information accessible through IBKR tools and services (including through links to outside websites) ("Information") may be prepared and/or provided by third parties ("Providers"). The Information is the property of the Provider or their licensors, who are solely responsible for its content, and is protected by law. Client agrees not to reproduce, distribute, sell or commercially exploit the Information in any manner without written consent of the Provider. IBKR reserves the right to terminate access to the Information. None of the Information constitutes a recommendation by IBKR or a solicitation to buy or sell. IBKR, its affiliates and the Providers do not guarantee accuracy, timeliness, or completeness of the Information, and Client should consult an advisor before making investment decisions. RELIANCE ON QUOTES, DATA OR OTHER INFORMATION IS AT CLIENT'S OWN RISK. IN NO EVENT WILL IBKR, ANY IBKR AFFILIATE OR THE PROVIDERS BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES ARISING FROM USE OF THE INFORMATION. THERE IS NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, REGARDING THE INFORMATION, INCLUDING WARRANTY OF MERCHANTIBILITY, WARRANTY OF FITNESS FOR A PARTICULAR USE, OR WARRANTY OF NON-INFRINGEMENT.

40. **License to Use IBKR Software**

IBKR grants to Client a non-exclusive, non-transferable license to use all software related to provision of products and services hereunder ("IBKR Software") solely as provided herein. Title to IBKR Software and updates shall remain the sole property of IBKR or its affiliates, including all patents, copyrights, trademarks and other intellectual property rights. Client shall not sell, exchange, or transfer the IBKR Software to others. Client shall not copy, modify, translate, decompile, reverse engineer, disassemble or reduce to a human readable form, or adapt, the IBKR Software or use it to create a derivative work, unless authorised in writing by IBKR (through its Chief Executive Officer or General

Counsel). IBKR is entitled to immediate injunctive relief, without the necessity of establishing irreparable injury, for threatened breaches of these undertakings.

41. **Limitation of Liability**

A. CLIENT ACCEPTS THE IBKR SYSTEM "AS IS," AND WITHOUT WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE, PURPOSE OR APPLICATION; TIMELINESS; FREEDOM FROM INTERRUPTION; OR ANY IMPLIED WARRANTIES ARISING FROM TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE. UNDER NO CIRCUMSTANCES SHALL IBKR (AND ANY AFFILIATE OF IBKR) BE LIABLE FOR ANY PUNITIVE, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGES, INCLUDING LOSS OF BUSINESS, PROFITS OR GOODWILL. IBKR (AND ANY OF ITS AFFILIATES) SHALL NOT BE LIABLE TO CLIENT FOR ANY SYSTEM FAILURE (AS DEFINED IN PARAGRAPH 43), DELAYS OR INTERRUPTIONS OF SERVICE OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF THE IBKR SYSTEM, REGARDLESS OF CAUSE, INCLUDING, BUT NOT LIMITED TO, THOSE CAUSED BY HARDWARE OR SOFTWARE MALFUNCTION; HUMAN ERROR; GOVERNMENTAL, EXCHANGE OR OTHER REGULATORY ACTION; ACTS OF GOD; WAR, TERRORISM, PUBLIC HEALTH EVENTS (INCLUDING PANDEMICS) OR IBKR'S INTENTIONAL ACTS. CLIENT RECOGNIZES THAT THERE MAY BE DELAYS OR INTERRUPTIONS IN THE USE OF THE IBKR SYSTEM, INCLUDING, FOR EXAMPLE, THOSE CAUSED INTENTIONALLY BY IBKR FOR PURPOSES OF SERVICING THE IBKR SYSTEM, OR BY IBKR'S FAILURE TO ACT TO PREVENT SERVICE DISRUPTION OR SYSTEM FAILURE (AS DEFINED IN PARAGRAPH 43).
B. IN NO EVENT SHALL IBKR'S LIABILITY, REGARDLESS OF THE FORM OF ACTION AND DAMAGES SUFFERED BY CLIENT, EXCEED THE HIGHEST TOTAL MONTHLY COMMISSIONS PAID BY CLIENT TO IBKR OVER THE SIX (6) MONTHS PRIOR TO ANY INCIDENT EXCEPT TO THE EXTENT SUCH LIABILITY IS IN RESPECT OF:
    i. DEATH OR PERSONAL INJURY CAUSED BY IBKR'S NEGLIGENCE OR THE NEGLIGENCE OF ITS PERSONNEL OR AGENTS;
    ii. FRAUD OR FRAUDULENT MISREPRESENTATION; OR
    iii. ANY OTHER LIABILITY WHICH CANNOT BE LIMITED OR EXCLUDED BY APPLICABLE LAW.
C. NOTHING IN THIS AGREEMENT REPRESENTS A CONTRACTUAL PROMISE OF WARRANTY TO THE CLIENT REGARDING IBKR'S COMPLIANCE WITH APPLICABLE LAWS, RULES, OR REGULATIONS. NOR IS ANYTHING IN THIS AGREEMENT INTENDED TO CREATE A CONTRACTUAL OBLIGATION FOR ANY NON-COMPLIANCE WITH

APPLICABLE LAWS, RULES (INCLUDING BUT NOT LIMITED TO RULES OF ANY EXCHANGE, MARKET CENTER, OR CLEARINGHOUSE) OR REGULATIONS. IBKR SPECIFICALLY DISCLAIMS ANY SUCH WARRANTY OR OBLIGATION.

D. IBHK is not liable to Client for loss arising from or attributable to the insolvency, default or other failure to perform obligations in respect of any entity (e.g. broker), which may or may not be an affiliate of IBHK, who executes orders or clears and settles transactions on behalf of IBHK on markets or exchanges in which IBHK is not a participant ("**Foreign Market Participant**"), provided IBHK has not failed to exercise reasonable care and diligence in the selection, appointment and ongoing monitoring of such Foreign Market Participant, except (i) if such loss is directly attributable to the wilful default or fraud of IBHK or (ii) to the extent prohibited under applicable Rules. Notwithstanding any other provision of this Agreement, in the absence of either (a) a demonstrable failure by IBHK to exercise reasonable care and diligence in the selection, appointment and ongoing monitoring of a Foreign Market Participant, or (b) wilful default or fraud on the part of IBHK, IBHK will only be obliged to return any financial or other product(s) or funds held for Client with a Foreign Market Participant who is insolvent or in default, or which financial or other products or funds have otherwise been subjected to loss due to an event of hacking of, or embezzlement or theft from the Foreign Market Participant, solely if and to the extent that those financial products or funds or cash equivalents are recovered by IBHK from that Foreign Market Participant. Unless otherwise provided under applicable Rules, Client hereby agrees not to bring any action against IBHK on any claim arising from a loss occurring at a Foreign Market Participant, in the absence of circumstances addressed under (a) or (b) in this clause, so long as IBHK makes commercially reasonable efforts to assert a claim for recovery of such financial or other products or funds against the Foreign Market Participant.

42. **Indemnification**

A. Client agrees to indemnify, hold harmless and defend IBKR, its affiliates, and their respective officers, directors, employees, agents, and representatives from any and all liabilities, losses, costs, judgments, penalties, claims, actions, damages, or expenses (collectively, "Losses") arising from or relating to:
   i.    any action taken in reliance on any representation, information or instruction received from Client;
   ii.   Client's breach of this Agreement;
   iii.  any action taken by IBKR to enforce its rights under this Agreement;

    iv.    any inquiry, information request, or other action by a third party related to Client's account, including to Client assets, liabilities, transactions, instructions, actions, or inactions;

    v.    any Event of Default as defined hereunder; or

    vi.    Client's violation or infringement of any intellectual property right held by IBKR or its affiliates, except to the extent that such Losses directly result from IBKR's gross negligence, fraud or wilful misconduct.

43. **System Failure and Alternative Trading Arrangements**

Client acknowledges that IBKR uses computer-based automated systems in connection with providing services, including but not limited to: the receipt and handling of orders; the execution and cancellation of orders; order and trade confirmation; the clearing and settlement of transactions; tax-related reporting; the delivery of corporate action information; account management; storing and processing account information; and risk management (collectively "IBKR System"). Client understands that the use of IBKR System entails risks, including but not limited to: interruption or delays of service and systems, network or communications failures; cyberattacks; and errors in the design or functionality of such IBKR System (collectively, a "System Failure") that could cause damage, expense or liability to Client.

IBKR is not liable to Client for any loss Client may suffer due to any System Failure. In order to mitigate the risk of loss to Client that may be caused by a System Failure, Client acknowledges that it should maintain alternative trading arrangements of sufficient capacity and utility to allow Client to open, close or change positions as necessary to mitigate risk of loss to Client during a System Failure. By not maintaining alternative trading arrangements, Client expressly assumes the risk of not being able to process transactions, including executing trades, through Client's account at IBKR in the event of a System Failure. Client agrees that IBKR's commissions and fees charged under this Agreement reflect the allocation of risk between the parties, including the allocation of risk under this Paragraph 43 and the limitation of liability in Paragraph 41. Client acknowledges that IBKR's commissions and fees charged by IBKR would be higher or IBKR would not have entered into this Agreement without this allocation of risk and limitation of liability.

44. **Fast and Volatile Markets**

During periods of heavy trading and/or fast or volatile market conditions with wide price fluctuations ("Fast Markets"), there may be delays in IBKR executing Client's orders or providing trading activity reports to Client. If Client places a market order in a Fast Market, there may be a significant difference in the quote Client receives prior to or at the time Client places the order and the execution price Client receives. By placing a market order under such conditions, Client accepts this risk and waives any claim related to a difference between quoted

and execution price. If IBKR, in its sole discretion, believes any particular stock is or may be volatile, IBKR may, but is not obligated to, decline to allow customers, including Client, to place orders for that stock through IBKR's systems. In addition, IBKR reserves the right, but is not obligated, to prevent any IPO stock from being traded through IBKR's services. IBKR is not liable to Client for any losses, lost opportunities or increased commissions that may result from Client being unable to place orders for these stocks through IBKR's services.

45. **Consent to Accept Electronic Records and Communications**

Client agrees that IBKR may furnish, and Client consents to accept records and communications in electronic form to the maximum extent permitted by applicable law, including but not limited to electronic trade confirmations, account statements, tax information and other Client records and communications (collectively, "Records and Communications"). Electronic Records and Communications may be sent to Client's Trader Workstation ("TWS") or to Client's e-mail address, or for security purposes may be posted on the IBKR website or on the secure website of one of IBKR's service providers and client will need to login and retrieve the Record or Communication. Client's consent to the receipt of electronic Records and Communications will apply on an ongoing basis and for every tax year unless withdrawn by Client. Client may withdraw such consent at any time by notification to IBKR. If Client withdraws such consent, IBKR will provide required Records and Communications (e.g. tax documents, proxy materials, etc) in paper form. However, IBKR reserves the right to require Client to close Client's Account if Client withdraws consent to receiving electronic delivery of Records and Communications.
In order to trade using the IBKR TWS, and to receive Records and Communications through the TWS, certain hardware systems and software are required. These requirements are described on the IBKR website. Because these requirements may change, Client must periodically refer to the IBKR website for current system requirements. To receive electronic mail from IBKR, Client is responsible for maintaining a valid and functioning e-mail address. Client must submit immediate written Notice to IB of a change in Client's e-mail address by using those procedures to change a Client e-mail address available on the IBKR website.

46. **Complaints**

Complaints about Client's IB account may be directed to IB by submitting written Notice, as defined below, or by sending a letter by registered mail, return receipt requested to Interactive Brokers Hong Kong Limited, Attention: Client Services, 1512 Two Pacific Place, 88 Queensway, Hong Kong.

47. **Rules and Laws**

A.  All transactions under this Agreement shall be subject to the constitution, rules, regulations, customs, usages, rulings and interpretations, from time to time extant or in force of the HKEx, HKFE or SEHK or other markets as applicable (and of their respective clearing house, if any), where the transactions are executed by IBKR or IBKR agents. All transactions under this Agreement shall also be subject to any law, Rule, or regulation then applicable thereto, including but not limited to, the provisions of the Ordinance, as amended from time to time, and the subsidiary legislation, rules and guidance thereunder.

B.  All transactions entered between IBKR and the Client relating to any money, foreign currency, currency option, currency future, or currency forward contract or foreign exchange contract shall be governed by and subject to all the rules, regulations, orders and laws of the country of the currency or money concerned and those of Hong Kong and/or the by-laws, rules and regulations of the exchange or market concerned in which the transaction is done.

C.  This Agreement is governed by the laws of the Hong Kong SAR. IN ALL JUDICIAL ACTIONS, ARBITRATIONS, OR DISPUTE RESOLUTION METHODS IN CONNECTION WITH A DISPUTE ARISING OUT OF THIS AGREEMENT, THE PARTIES WAIVE ANY RIGHT TO PUNITIVE DAMAGES.

48. **Service of Process**

Client agrees that IBKR may effect service of process for any legal proceeding, including but not limited to arbitration actions, by email and mail delivery to the email address and mailing address Client has most recently provided to IBKR in connection with Client's IBKR account.

49. **Severability and Non-Waiver**

If any provision of this Agreement is unenforceable, it shall not invalidate other provisions. If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then Client and IBKR will be relieved of all obligations arising under such provision, but only to the extent that it is illegal, unenforceable or void, and Client and IBKR agree that this Agreement will be deemed amended by modifying such provision to the minimum extent necessary to make it legal and enforceable while preserving its intent or, if that is not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives. Failure of IBKR to enforce any term or condition of this Agreement is not a waiver of the term or condition. No provision of this Agreement can be waived without the written consent of IBKR (through its Chief Executive Officer or General Counsel).

50. **Entire Agreement**

Client agrees to the provision of this Agreement in English and represents that it understands its terms and conditions. This Agreement contains the entire agreement between the parties, who have made no other representations or warranties.

51. **Privacy and Data Protection**

   A. Client accepts the Interactive Brokers Group Privacy Policy ("IBKR Privacy Policy"), which is posted on IBKR's website and is incorporated herein by reference. Client consents to the collection and use of Client's information as described in the IBKR Privacy Policy. By signing this Agreement, you indicate you have read and understood that IBKR may use your personal data for direct marketing purposes and consent to such use of your personal data by IBKR. If you do not agree to such use of your personal information, you can exercise your opt-out option by following the instructions on the IBKR website, or by visiting the following link: https://www.interactivebrokers.com/en/index.php?f=464

   B. Without limiting the IBKR Privacy Policy, you authorise IBKR to disclose your personal information to:
      i. any international financial market participant and any affiliate of IBKR, whether local or overseas;
      ii. any clearing or settlement participant responsible for the clearing or settlement of transactions;
      iii. IBKR's service providers (including marketing companies, data consultants and IT contractors);
      iv. IBKR's agents, contractors, and external advisers;
      v. government and other regulatory bodies and authorities whether local or elsewhere;
      vi. payment system operators;
      vii. other financial institutions and credit providers;
      viii. on a confidential basis, a prospective purchaser of, or investor in, IBKR or an affiliate or all or part of the business of IBKR or an affiliate; and
      ix. any other relevant person to the extent required by applicable law.

   C. Client consents to recording of all telephone conversations on a centralized tape-recording system operated by IBKR.

   D. Client authorises IBKR, directly or through third parties, to make any inquiries that IBKR considers necessary to conduct business with Client. This may include ordering a credit report, performing other credit checks, and performing an investigation in the event of any default or breach of the obligations herein by Client, or verifying the information Client provides against third party databases. Any information obtained is maintained in accordance with the IBKR Privacy Policy.

52. **Personal Data Collection Statement for SEHK Trading or Stock Connect Northbound Trading Service or in connection with an application for IPO securities pursuant to the Hong Kong IPO Agreement**

   A. Should you request for trading permission in relation to Securities listed or traded on the SEHK or the Stock Connect Northbound Trading Service or should you make an application for securities in an initial public offer ("IPO") in Hong Kong pursuant to the IBKR Hong Kong IPO Agreement, this Paragraph 52 will apply. As required by the rules of the HKEx and the SFC, IBKR is required to collect and process your personal data as described below.

   B. <u>SEHK Trading Permission</u>: By signing this agreement, you acknowledge and agree that IBKR may collect, store, process, use, disclose and transfer personal data relating to you (including CID and BCAN(s)) as required for us to provide services to you in relation to Securities listed or traded on the SEHK and for complying with the rules and requirements of SEHK and the SFC in effect from time to time. Without limiting the foregoing, this includes:

      i. disclosing and transferring your personal data (including CID and BCAN(s)) to SEHK and/or the SFC in accordance with the rules and requirements of SEHK and the SFC in effect from time to time;

      ii. allowing SEHK to:

         i. collect, store, process and use your personal data (including CID and BCAN(s)) for market surveillance and monitoring purposes and enforcement of the rules of the HKEx; and

         ii. disclose and transfer such information to the relevant regulators and law enforcement agencies in Hong Kong (including, but not limited to, the SFC) so as to facilitate the performance of their statutory functions with respect to the Hong Kong financial markets; and

         iii. use such information for conducting analysis for the purposes of market oversight; and

      iii. allowing SFC to:

         a. collect, store, process and use your personal data (including CID and BCAN(s)) for the performance of its statutory functions including monitoring, surveillance, and enforcement functions with respect to the Hong Kong financial markets; and

         b. disclose and transfer such information to relevant regulators and law enforcement agencies in Hong Kong in accordance with applicable laws or regulatory requirements.

      iv. Providing BCAN to HKSCC allowing HKSCC to: (i) retrieve from SEHK (which is allowed to disclose and transfer to HKSCC), process and store your CID and transfer your CID to the issuer's share registrar to enable HKSCC and/ or the issuer's share

registrar to verify that you have not made any duplicate applications for the relevant share subscription and to facilitate initial public offer ("IPO") balloting and IPO settlement; and (ii) process and store your CID and transfer your CID to the issuer, the issuer's share registrar, the SFC, SEHK and any other party involved in the IPO for the purposes of processing your application for the relevant share subscription or any other purpose set out in the IPO issuer's prospectus.

C. <u>Stock Connect Northbound Trading Permission</u>: Without limitation to any notification we have given you or consent we have obtained from you in respect of the processing of your personal data in connection with your account and our services to you, by signing this agreement, you acknowledge and agree that we may collect, store, use, disclose and transfer personal data relating to you as required as part of our Stock Connect Northbound Trading Service, including as follows:

- i. tag each of your orders submitted to the China Stock Connect System ("CSC") with a BCAN that is unique to you, or the BCAN that is assigned to your joint account with is, as appropriate; and

- ii. provide to the HKEx your assigned BCAN and such identification information (including CID) relating to you as the HKEx may request from time to time under the rules of the HKEx.

- iii. to disclose and transfer your BCAN and CID to the HKEx and its relevant wholly-owned subsidiaries which are duly authorized and licensed to provide order-routing service in connection with the Stock Connect Northbound Trading ("SEHK subsidiary" or "SEHK Subsidiaries") from time to time, including by indicating your BCAN when inputting a China Connect Order into the CSC, which will be further routed to the relevant China Connect Market Operator on a real-time basis;

- iv. to allow each of the HKEx and the relevant SEHK subsidiaries:

  - i. collect, use and store your BCAN, CID and any consolidated, validated and mapped BCANs and CID information provided by the relevant China Connect Clearing House (in the case of storage, by any of them or via the HKEx) for market surveillance and monitoring purposes and enforcement of the rules of the HKEx;

  - ii. transfer such information to the relevant China Connect Market Operator (directly or through the relevant China Connect Clearing House) from time to time for the purposes set out in (v) and (vi) below; and

  - iii. disclose such information to the relevant regulators and law enforcement agencies in Hong Kong so as to facilitate the performance of their statutory functions with respect to the Hong Kong financial markets;

- v. to allow the relevant China Connect Clearing House to:

      i.     collect, use and store your BCAN and CID to facilitate the consolidation and validation of BCANs and CID and the mapping of BCANs and CID with its investor identification database, and provide such consolidated, validated and mapped BCANs and CID information to the relevant China Connect Market Operator, the HKEx and the relevant SEHK Subsidiary;

      ii.    use your BCAN and CID for the performance of its regulatory functions of Securities account management; and

    iii.    disclose such information to the Mainland regulatory authorities and law enforcement agencies having jurisdiction over it so as to facilitate the performance of their regulatory, surveillance and enforcement functions with respect to the Mainland financial markets; and

vi.    to allow the relevant China Connect Market Operator to:

      i.     collect, use and store your BCAN and CID to facilitate their surveillance and monitoring of Securities trading on the relevant China Connect Market through the use of the China Connect Service and enforcement of the rules of the relevant China Connect Market Operator; and

      ii.    disclose such information to the Mainland regulatory authorities and law enforcement agencies so as to facilitate the performance of their regulatory, surveillance and enforcement functions with respect to the Mainland financial markets.

By instructing us in respect of any transaction relating to China Connect Securities, you acknowledge and agree that we may use your personal data for the purposes of complying with the requirements of the HKEx and its rules as in force from time to time in connection with the Stock Connect Northbound Trading.

D. You also agree that despite any subsequent purported withdrawal of consent by you, your personal data may be continue to be stored, used, disclosed, transferred and otherwise processed for the above purposes, whether before or after such purported withdrawal of consent, when that is required to meet any legal or regulatory obligations.

E. Failure to provide us with your personal data or consent as described above may mean that we will not, or will no longer be able to, as the case may be, carry out your trading instructions or provide you with the Securities related services for SEHK trading or for our Stock Connect

Northbound Trading Service (other than to sell, transfer out or withdraw your existing holdings or Securities, if any).

53. **Miscellaneous**

A. Client may not assign or transfer any rights or obligations hereunder without the prior written consent of IBKR (through its Chief Executive Officer or General Counsel). IBKR may assign any debts or deficits owed by Client to an IBKR affiliate. In addition, upon notice to Client, IBKR may assign its rights and obligations under this Agreement to another brokerage firm and the Client agrees to such assignment of IBKR's rights and obligations. This Agreement shall inure to the benefit of IBKR's successors and assigns. IBKR may terminate this Agreement or its services to Client at any time. Client may close their Account upon written Notice to IBKR, but only after all positions are closed and all other requirements specified on the IBKR website regarding Account closure are satisfied.

B. IBKR is licensed to trade in the products approved by the various exchanges including HKFE or SEHK, as applicable, from time to time. Product specifications and any such other offering documents for the products in question are available on request.

C. If Client suffers pecuniary loss by reason of IBKR's default, the Client may have the right to claim under the Investor Compensation Fund established under the Ordinance. The liability of the Investor Compensation Fund will be restricted to valid claims as provided for in the Ordinance and the relevant subsidiary legislation and will be subject to the monetary limits specified in the Securities and Futures (Investor Compensation - Compensation Limits) Rules and accordingly there can be no assurance that any pecuniary loss sustained by reason of such a default will necessarily be recouped from the Investor Compensation Fund in full, in part or at all.

D. Every contract executed on the HKFE shall be subject to the charge of an applicable Investor Compensation Fund levy and a levy pursuant to the Ordinance, the cost of both of which shall be borne by Client.

E. Unless stated otherwise in this Agreement, IBKR undertakes to inform Client of any material change in relation to the following matters via its website:

    a. the name and address of IBKR;

    b. the nature of service provided by IBKR to Client;

    c. the remuneration payable by Client to IBKR; and

    d. the details of Margin Requirements, interest rates (except as contemplated in Clause 34 and if Client has a relationship with a third party in connection with the Account, such third party will inform Client of changes to interest rates determined by them), Margin Calls and the circumstances

under which Client's positions may be closed without Client's consent.

54. **Mandatory Arbitration**

A. This Agreement contains a pre-dispute arbitration clause. By signing this Agreement the parties agree as follows:
   i. ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, EXCEPT AS PROVIDED BY THE LAW OF THE SEAT OF THE ARBITRATION AND/OR THE APPLICABLE ARBITRATION RULES;
   ii. ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED;
   iii. THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS;
   iv. IN CERTAIN CIRCUMSTANCES, THE ARBITRATORS MAY NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD;
   v. THE LAW OF THE SEAT OF THE ARBITRATION AND/OR THE APPLICABLE ARBITRATION RULES MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION;
   vi. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT; AND
   vii. THE APPLICABLE ARBITRATION RULES, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.
B. Subject to Paragraph 54(C), Client agrees that any controversy, dispute, claim, or grievance between IBKR and Client arising out of, or relating to, this Agreement, or any Account(s) established hereunder in which securities may be traded; any transactions therein; any transactions between IBKR and Client; any provision of the Agreement or any other agreement between IBKR and Client; or any breach of such transactions or agreements ("Dispute), shall be resolved by arbitration administered by the Hong Kong International Arbitration Centre under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The law of this arbitration clause shall be Hong Kong law. The seat of the arbitration shall be Hong Kong. The arbitration proceedings shall be conducted in English. The award of the arbitrators, or a majority of them, shall be final, and judgment upon the award rendered may be entered in any court having jurisdiction.
C. Any dispute between IBKR and Client concerning leveraged Forex transactions entered into by Client will be settled, if Client so requires, by arbitration in accordance with the Securities and Futures (Leveraged

Foreign Exchange Trading - Arbitration) Rules in force at the time such arbitration proceedings are commenced.

THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE IN PARAGRAPH 54. BY SIGNING THIS AGREEMENT CLIENT ACKNOWLEDGES THAT THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE AND THAT CLIENT HAS RECEIVED, READ AND UNDERSTOOD THE TERMS THEREOF.