# EXHIBIT A

FINRA Arbitration No. _____

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (CA Bar No. 226112)
548 Market St. #85399
San Francisco, CA 94104
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law

*Attorneys for Claimant Stephanie Lin Foon Wong*

**FINANCIAL INDUSTRY REGULATORY AUTHORITY
OFFICE OF DISPUTE RESOLUTION**

| | |
|---|---|
| STEPHANIE LIN FOON WONG, an individual, <br><br> *Claimant,* <br><br> v. <br><br> INTERACTIVE BROKERS LLC, a Connecticut limited liability company, <br><br> *Respondent.* | FINRA Arbitration No. _____ <br><br> **STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION** |

**INTRODUCTION**

1. Claimant Stephanie Lin Foon Wong ("Ms. Wong" or "Claimant"), by and through the undersigned counsel, hereby files this Statement of Claim and Demand for Arbitration against Respondent Interactive Brokers LLC ("IB LLC" or "Respondent"), and alleges as follows:

2. This case arises from the catastrophic failure of Respondent's cybersecurity infrastructure, which permitted an unauthorized third party to access Ms. Wong's brokerage account, liquidate her entire portfolio worth approximately $4.85 million, and use the proceeds to purchase shares of a pump-and-dump microcap security, all without triggering the two-factor authentication ("2FA") system that Respondent represented would protect her account. Ms. Wong's total losses exceed $4 million, representing approximately 83% of her life savings.

3. The unauthorized access and trading on Ms. Wong's account on May 29–30, 2025 was not the result of any failure on Ms. Wong's part. It was the direct and foreseeable consequence of Respondent's failure to maintain, test, and audit the IB Key two-factor authentication system that

Respondent developed, controlled, and deployed globally. That system, on the day it mattered most, simply did not function. The unauthorized party logged into Ms. Wong's account from a new device and an unfamiliar IP address, and IB Key never sent the required push notification to Ms. Wong's phone. Ms. Wong never received an authentication prompt. She never approved any login. She never authorized a single trade.

4. Respondent's failures extend far beyond the 2FA malfunction. Respondent's systems failed to detect or flag any of the glaring red flags that accompanied the unauthorized activity: login from a datacenter IP address never previously associated with the account; login from a new, unrecognized device; complete liquidation of a diversified $4.85 million portfolio in a single trading session; and immediate concentration of all proceeds into 560,000 shares of a single microcap stock, Huachen AI Parking Management Technology ("HCAI"), in a textbook pump-and-dump pattern. A broker-dealer exercising even minimal supervisory diligence would have frozen the account. Respondent did nothing.

5. Respondent's pattern of security and compliance failures is not new. Federal regulators have sanctioned Respondent repeatedly for systemic deficiencies in transaction monitoring, access controls, supervision, and automated trading systems, resulting in over $74 million in combined penalties since 2020. The failure that devastated Ms. Wong's account is not an isolated incident. It is the foreseeable consequence of an institutional culture that has consistently prioritized platform innovation over security infrastructure.

## PARTIES

6. Claimant Stephanie Lin Foon Wong is an individual, age 61, who at all times relevant to this action resided in Hong Kong and England. Ms. Wong opened her brokerage account (Account No. U8686280) with Interactive Brokers Hong Kong Limited ("IBHK") in approximately July 2018. She deposited funds of $1,665,461.96 and, through disciplined, self-directed trading in U.S. equities over the following seven years, grew her portfolio to approximately $4,855,022.34 by May 29, 2025.

7. Respondent Interactive Brokers LLC is a limited liability company organized under the laws of the state of Connecticut, with its principal place of business at One Pickwick Plaza, Greenwich, Connecticut 06830. IB LLC is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer and is a member of the Financial Industry Regulatory Authority ("FINRA") (CRD No. 108857). IB LLC is also a member of the New York Stock Exchange, Nasdaq, and numerous other exchanges.

8. IB LLC is a wholly-owned subsidiary of IBG LLC, which is the central holding company of the Interactive Brokers Group. IBG LLC also owns and controls IBHK. Thomas Peterffy and affiliates hold approximately 74.2% of IBG LLC membership interests. IB LLC and IBHK are not

independent companies operating at arm's length; they are affiliates within a unified corporate structure controlled by the same parent.

9. At all times relevant to this action, IB LLC served as the clearing agent and sub-custodian for Ms. Wong's account, as identified on every account statement issued for Account No. U8686280. IB LLC developed, maintained, and operated the unified global trading platform (Trader Workstation, Client Portal, and IBKR Mobile) through which all trades in Ms. Wong's account were executed. IB LLC developed, maintained, and controlled the IB Key two-factor authentication system that was enabled on Ms. Wong's account and that failed to function on May 29–30, 2025. IB LLC's risk management and surveillance systems are centralized at its headquarters in Greenwich, Connecticut.

## JURISDICTION AND VENUE FOR ARBITRATION

10. This Statement of Claim is filed pursuant to FINRA Rule 12200, which provides that parties must arbitrate a dispute under the FINRA Code of Arbitration Procedure if: (a) arbitration under the Code is either required by a written agreement or requested by the customer; (b) the dispute is between a customer and a member or associated person of a member; and (c) the dispute arises in connection with the business activities of the member or the associated person. All three conditions are satisfied here.

11. First, Claimant requests FINRA arbitration. Second, IB LLC is a FINRA member (CRD No. 108857), and this dispute is between Ms. Wong, a customer whose account IB LLC cleared, custodied, and serviced, and IB LLC. Third, the dispute arises directly from IB LLC's business activities as the clearing agent, sub-custodian, platform operator, and 2FA technology developer for Ms. Wong's account.

12. FINRA Rule 12200 creates an independent, non-waivable obligation for FINRA members to submit to arbitration when a customer requests it. FINRA Rule 2268(d) further prohibits FINRA members from enforcing any predispute arbitration agreement that limits a customer's right to file a claim in any forum otherwise available under FINRA rules.

13. The operative IBHK Client Agreement (Form 4144, dated May 10, 2017), which was in effect when Ms. Wong opened her account in July 2018, affirmatively supports FINRA jurisdiction. (**Ex. A** – IBHK Client Agreement.) Clause 36 of that agreement provides for mandatory arbitration of disputes "between IB, any IB affiliate, or any of their respective directors, officers, employees, or agents, on the one hand, and Client, on the other hand." Critically, Clause 36 grants the claimant the right to elect among three forums, including "any exchange of which IB is a member." IB LLC is a FINRA member. Ms. Wong, as the Claimant, elects FINRA as the arbitral forum under Clause 36(c).

14. Claimant seeks compensatory damages exceeding $4,073,036.34, plus interest, attorneys' fees, costs of arbitration, expert fees, and punitive damages.

## STATEMENT OF FACTS

### A. Ms. Wong's Account and Trading History

15. When Ms. Wong's prior broker, DBS Vickers Hong Kong, announced that it was ceasing to accept retail orders in October 2018, Ms. Wong searched for an alternative brokerage. Mr. Wong found Interactive Brokers, which appeared large, was publicly traded, and, most importantly, promoted how its brokerage was highly secure. Relying on these statements about high security, Ms. Wong opened her Interactive Brokers brokerage account (U8686280) with IBHK in approximately July 2018. Over time, she deposited funds of $1,665,461.96 into her account. Over the following seven years, Ms. Wong engaged in disciplined, self-directed trading in U.S. equities, principally blue-chip stocks including Apple (AAPL), Nvidia (NVDA), Tesla (TSLA), Amazon (AMZN), Alphabet (GOOGL), and Alibaba (BABA), as well as U.S. Treasury bills. Ms. Wong had never traded in microcap or penny stocks.

16. By May 29, 2025, Ms. Wong had grown her portfolio to a net asset value of $4,855,022.34. This represented substantially all of her life savings.

17. Ms. Wong's account statements identify IB LLC as one of two entities that IBHK may use as a clearing agent or sub-custodian. Given that Ms. Wong traded exclusively U.S.-listed securities on NASDAQ and NYSE, IB LLC was necessarily the clearing agent for all trades in her account. (**Ex. B** – May 30, 2025 and June 2025 statement.)  All trades in Ms. Wong's account were executed through IB LLC's proprietary trading platform and processed through IB LLC's clearing and settlement infrastructure.

### B. The IB Key Two-Factor Authentication System

18. Ms. Wong had IB Key, Interactive Brokers' proprietary two-factor authentication system, enabled on her account. IB Key is a mobile application that, under normal operation, sends a push notification to the account holder's registered mobile device whenever a login attempt is made. The account holder must then use biometric verification (fingerprint) to approve or deny the login. Without this affirmative approval, access should be denied.

19. IB Key is not a product of IBHK or any regional affiliate. It is developed, maintained, and operated by IB LLC's centralized technology team in Greenwich, Connecticut. The IB Key application is identical for all Interactive Brokers customers worldwide, regardless of which affiliate holds their account. The authentication servers, security protocols, and push notification infrastructure are all controlled by IB LLC.  IBG Inc.'s 10-K annual reports confirm that "core software technology is developed internally" by the group and that all affiliates operate through a

"single unified platform." Every account statement for Account No. U8686280 separately identifies IB LLC as the clearing agent and sub-custodian.[1] (*See* Ex. B.)

20. Ms. Wong relied on IB Key as a critical security measure to protect her account. Under normal circumstances, every time Ms. Wong or anyone else attempted to log into her account, she received a push notification on her Samsung Android phone requiring biometric approval. This process functioned consistently throughout her years as an IB customer, except on the day it mattered most.

### C. The Unauthorized Access: May 29–30, 2025

21. On May 29, 2025, IB gave an unauthorized third party access to Ms. Wong's account on the platform. IB's own investigation (conducted by Melvin C, Support Ticket T981507) subsequently confirmed that two new network addresses and one new device were observed accessing the account:

- IP Address 165.154.1.64 — Ucloud Information Technology (HK) Limited, a datacenter IP address;
- IP Address 14.0.237.93 — CSL Next G, Hong Kong; and
- New Device MAC Address: FE:8B:39:48:91:62.

22. It is unclear exactly how IB gave an unauthorized party access to Ms. Wong's account. Notably, even if Ms. Wong's credentials were obtained through a phishing attack or some other act of fraud, these sorts of compromises of login credentials are precisely the scenario that two-factor authentication is designed to protect against. The entire purpose of properly configured 2FA is to ensure that knowledge of a password alone is insufficient to access an account, i.e., a user needs more than a single factor (knowledge).

23. Critically, when IB gave the unauthorized party access to Ms. Wong's account on May 29 and May 30, 2025, the IB Key two-factor authentication system did not send a push notification to Ms. Wong's registered device. Not once. Across multiple unauthorized login sessions, IB Key never triggered. Ms. Wong received no authentication prompt. She did not approve any login. She did not authorize any trade. The 2FA system simply did not function.

### D. The Unauthorized Liquidation and HCAI Purchases: May 30, 2025

24. On May 30, 2025, beginning at approximately 10:33 AM ET (22:33 HKT), on instructions from the unauthorized party, IB liquidated Ms. Wong's entire portfolio, selling all holdings in blue-chip U.S. equities and Treasury bills, and used the proceeds to purchase

---

[1] *See* IBG Inc., Annual Report on Form 10-K for the Year Ended Dec. 31, 2024 (filed Feb. 27, 2025), Item 1 (Business), Technology Section, pp. 9-12, SEC EDGAR Acc. No. 0001381197-25-000036, available at https://www.sec.gov/Archives/edgar/data/1381197/000138119725000036/ibkr-20241231x10k.htm.

approximately 560,000 shares of Huachen AI Parking Management Technology ("HCAI") (NASDAQ: HCAI) at an average price of approximately $8.53 per share.

25. HCAI is a microcap security. The pattern of trading in Ms. Wong's account, including the sudden, complete liquidation of a diversified portfolio followed by massive concentration in a single microcap stock, is a textbook indicator of a pump-and-dump scheme, in which fraudsters inflate the price of a thinly-traded stock by coordinating purchases through compromised accounts, then sell their own holdings at the artificially inflated price.[2]

26. HCAI's stock price collapsed shortly after the unauthorized purchases. By the close of trading on May 30, 2025, HCAI had fallen from the $8.53 average purchase price to $6.37 per share, resulting in an immediate unrealized loss of approximately $1,208,318. Over the following weeks, HCAI continued to decline. By June 30, 2025, HCAI shares were trading between $0.80 and $6.90. Ms. Wong's account net asset value had fallen from $4,855,022.34 to approximately $781,986, a total loss of approximately $4,073,036.34, representing 83% of her life savings.

### E. Respondent's Security Notification Failures

27. Respondent's security notification systems failed at every stage. The following chronology demonstrates that every security alert arrived after it could have prevented harm:

| Date/Time (HKT) | Event | Significance |
| --- | --- | --- |
| May 29, 04:50 | Login notification sent | First unauthorized access from new device/datacenter IP. IB Key 2FA did NOT trigger. |
| May 29, 17:12 | Login notification sent | Second unauthorized session. Still no 2FA challenge. |
| May 29–May 30 | ~24-hour gap | Hacker maintained access for a full day before executing trades. No account freeze. |
| May 30, 00:19 | Login notification sent | Continued unauthorized access overnight. |
| May 30, 02:49 | Login notification sent | Fourth login session, still no 2FA prompt to Ms. Wong. |
| **May 30, 22:33** | **UNAUTHORIZED TRADES BEGIN** | Entire portfolio liquidated; 560,000 HCAI shares purchased. |

---

[2] *See* SEC, Pump and Dump Schemes, https://www.investor.gov/protect-your-investments/fraud/types-fraud/pump-and-dump-schemes; *see* also para. 44, infra (IB LLC previously sanctioned $38 million for failing to detect suspicious microcap trading in customer accounts).

| May 30, 22:34 | First trade confirmation email | Sent 1 minute AFTER first trade. 53 confirmations follow, all post-execution. |
|---|---|---|
| May 30, 23:04 | Login notification sent | 31 minutes after trades began. Hacker still actively accessing the account while portfolio was being liquidated. Still no 2FA prompt to Ms. Wong. |
| May 30, 23:17 | "New device/IP" alert sent | 44 MINUTES after trades began. Too late to prevent any harm. |
| May 30, 23:57 | Password reset notification | 84 MINUTES after trades began. $4.07M in losses already locked in. |

28. The fact that IB's platform generated 53 real-time trade confirmation emails demonstrates that the system had the technical capability to detect and communicate trading activity instantaneously. Yet this capability was deployed exclusively as a post-execution notification rather than a pre-authorization control. The system told Ms. Wong what had already happened to her money; it never asked whether she approved it. This is a design choice, not a technical limitation, and it renders the notification system functionally useless as a security measure.

29. The rapid-fire generation of 53 trade notifications in a single session, representing the complete liquidation of a $4.85 million portfolio followed by a massive single-stock purchase, should have triggered automated anomaly detection and a trading halt. This pattern was wildly inconsistent with Ms. Wong's seven-year trading history. A broker-dealer exercising reasonable supervision would have implemented circuit-breaker protocols for such extraordinary activity. Respondent did not.

### F. Ms. Wong's Immediate Response

30. As soon as Ms. Wong noticed multiple trade execution notifications on her mobile phone on May 30, 2025, she immediately attempted to contact Respondent:

- 16:13 HKT: Called IBKR Hong Kong—unable to connect.
- 16:15 HKT: Called IBKR US—unable to connect.
- 16:19–16:20 HKT: Reached a service agent who assisted with a password reset, which took approximately 20 minutes.

31. By the time Ms. Wong was able to reach Respondent, the damage was complete. The unauthorized party had timed the attack to coincide with a period when immediate support was difficult to obtain.

### G. Respondent's Inadequate Investigation and Denial of Liability

32. On June 1, 2025, Ms. Wong filed a formal complaint with IBHK (Support Ticket 966872, IBNR Case Number 960561). (**Ex. C.**) She also filed a report with the Hong Kong Police (Case No. ERC2506021049735). (**Ex. D.**) On June 3, 2025, Melvin C of IBKR Client Services confirmed the unauthorized access from new network addresses and a new device. (**Ex. E.**)

33. On October 2, 2025, IBHK issued a denial letter asserting that its investigation "found no breach of or deficiencies in IBHK's systems and security controls" and that Ms. Wong was bound by all trades executed with valid credentials under Paragraph 5(b) of the Client Agreement. (**Ex. F.**) Notably, IBHK's denial letter cites "Paragraph 6" of the Client Agreement, but Paragraph 6 of the operative 2017 IBHK Client Agreement (Form 4144) governs order routing and contains no credential or liability provision. IBHK's denial letter conspicuously failed to address the central issue: why the IB Key two-factor authentication system did not send a push notification to Ms. Wong's registered device when an unauthorized party logged into her account from a new device and datacenter IP address. IBHK's position, that "valid credentials" were used and therefore the trades are authorized, ignores the fact that the entire purpose of 2FA is to prevent unauthorized access even when credentials are compromised.

34. Notably, IBHK acknowledged in its denial letter that it had sent messages to clients on May 23 and May 28, 2025, "regarding recent SMS scams attempted on brokerage firm customers worldwide." Respondent was therefore aware of an active, ongoing phishing campaign targeting its customers at the very time Ms. Wong's account was compromised. Despite this heightened threat awareness, Respondent's 2FA system failed to function, and its anomaly detection systems failed to flag or halt the unauthorized trades.

### H. IB LLC's Direct Role and Control Over Account Security

35. IB LLC is not a passive affiliate in this matter. IB LLC directly controlled every system that failed Ms. Wong:

- Platform: IB LLC operates the unified global trading platform through which all trades in Ms. Wong's account were executed.

- 2FA: IB LLC developed and maintains the IB Key authentication system that failed to send a notification.

- Clearing: IB LLC served as the clearing agent and sub-custodian identified on every account statement.

- Surveillance: IB LLC's centralized risk management and anomaly detection systems in Greenwich, Connecticut, are responsible for monitoring trading activity across all accounts.

- Technology: IBHK does not maintain an independent technology division; it relies entirely on IB LLC's centralized platform and authentication infrastructure.

36.  IBG Inc.'s 10-K (FY2024) confirms that "core software technology is developed internally" by the group without outside vendors, and that the group operates a "single unified platform" for all customers worldwide.[3] The 10-K attributes this to "we" (i.e., the IBG, Inc. consolidated group) consistent with IB LLC's role as the primary operating subsidiary. IB LLC's role as clearing agent and sub-custodian for Account No. U8686280 is confirmed on every account statement issued to Ms. Wong. (*See* Ex. B.) The IB Key mobile application is identical regardless of which IB affiliate holds the customer's account. IBHK is not an independent company; it is a conduit for IB LLC's global brokerage operations.

### I. Respondent's Obligations to Implement Effective Two-Factor Authentication

37. Two-factor authentication is the minimum industry standard for any financial services company handling customer accounts and assets.[4] 2FA works by implementing a secondary security check whenever a user attempts to log in to an online account. Instead of allowing access with only a username and password, 2FA requires a second factor of verification, typically a push notification to a registered mobile device requiring biometric confirmation, a time-based one-time code, or a hardware security key. The primary purpose of 2FA is to protect a user's account from unauthorized access even when the user's credentials have been compromised.

38. New York law imposes specific cybersecurity obligations on financial services companies. The New York Department of Financial Services Cybersecurity Regulation, 23 NYCRR Part 500, requires covered entities to implement multi-factor authentication for any individual accessing the covered entity's internal networks, and to maintain a cybersecurity program designed to protect the confidentiality, integrity, and availability of information systems. Section 500.12 specifically mandates the use of multi-factor authentication to protect against unauthorized access to nonpublic information or information systems.

39. Respondent's current Customer Agreement applies New York law.[5] Respondent is subject to New York's cybersecurity requirements, including the obligation to implement effective multi-factor authentication. The IB Key system that Respondent deployed on Ms. Wong's account was Respondent's implementation of this obligation. When IB Key failed to send any authentication notification on May 29-30, 2025, Respondent breached its obligations under New York law to maintain effective 2FA protections.

---

[3] IBG Inc., Annual Report on Form 10-K for the Year Ended Dec. 31, 2024, Item 1 (Business), Technology Section, pp. 9-12, SEC EDGAR Acc. No. 0001381197-25-000036.

[4] See NIST SP 800-63B, Digital Identity Guidelines: Authentication and Lifecycle Management (2017), §§ 4-5, https://pages.nist.gov/800-63-3/sp800-63b.html; 23 NYCRR § 500.12; FFIEC, Authentication and Access to Financial Institution Services and Systems (Aug. 2021), https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf; *see also Nero v. Uphold, Inc.*, No. 1:22-cv-01602 (S.D.N.Y.)

[5] While Complainant never agreed to the IB LLC Customer Agreement, IB LLC's affirmative election of New York law for its direct customers confirms the company's acknowledgment that New York law applies to the company generally.

40. The non-statutory claims asserted herein are governed by the laws of the State of New York. Respondent IB LLC is a registered broker-dealer subject to the regulatory jurisdiction of the New York Department of Financial Services and the cybersecurity requirements of 23 NYCRR Part 500. IB LLC's own Customer Agreement designates New York law as the governing law. The unauthorized transactions at issue were executed on United States exchanges through systems operated and maintained by IB LLC from within the United States. To the extent the IBHK Client Agreement purports to designate Hong Kong law, that provision applies by its terms to the agreement between Ms. Wong and IBHK, not to Ms. Wong's claims against IB LLC, which arise from IB LLC's own independent duties as a FINRA member firm and registered broker-dealer.

41. Additionally, SEC Regulation S-ID (17 C.F.R. § 248.201-202) requires broker-dealers to develop and implement a written Identity Theft Prevention Program designed to detect, prevent, and mitigate identity theft in connection with certain accounts. A login from a previously unknown datacenter IP address and a new, unrecognized device are precisely the "red flags" that such programs are designed to detect. Respondent's systems failed to detect or act on any of these red flags.

42. 2FA that can be bypassed without the account holder's knowledge or approval is functionally useless. The primary purpose of two-factor authentication is to protect a user's account from unauthorized access even when the user's credentials have been compromised. *See* NIST Special Publication 800-63B (defining multi-factor authentication requirements); 23 NYCRR § 500.12 (mandating MFA for financial services companies to protect against unauthorized access);. PCI DSS v4.0, Requirement 8.4 (Multi-Factor Authentication Requirements). 2FA that can be bypassed without the account holder's knowledge or approval is functionally useless. Ms. Wong's IB Key did not merely prove circumventable; it failed to activate at all.

### J. Respondent's History of Regulatory Sanctions and Enforcement Actions

43. Respondent's failure to protect Ms. Wong's account is part of a documented pattern of systemic compliance and technology failures spanning every layer of its operations. Federal regulators have imposed over $74 million in penalties against Respondent since 2020:

44. SEC Enforcement (2020): Failure to File Suspicious Activity Reports. On August 10, 2020, the SEC, FINRA, and CFTC simultaneously settled actions against IB LLC totaling $38 million for anti-money laundering failures. The SEC found that IB LLC failed to file more than 150 Suspicious Activity Reports for suspicious microcap trading. "…[T]he sales by IB's customer accounted for a significant portion of the daily trading volume in certain U.S. microcap securities issuers." The unauthorized HCAI purchases in Ms. Wong's account present the identical category of suspicious microcap activity that Respondent has already been sanctioned for failing to detect.[6]

---

[6] In re Interactive Brokers LLC, Exchange Act Release No. 89510 (Aug. 10, 2020), https://www.sec.gov/files/litigation/admin/2020/34-89510.pdf; Press Release, SEC, SEC Charges Interactive Brokers With Repeatedly Failing to File Suspicious Activity Reports, Rel. No. 2020-178 (Aug. 10, 2020),

45. CFTC Enforcement (2023): Supervision Failures. On September 29, 2023, the CFTC ordered IB LLC to pay $20 million for recordkeeping and supervision failures. IB LLC admitted the facts. The CFTC found that supervisory personnel responsible for ensuring compliance with the firm's policies and procedures "themselves used non-approved methods of communication… in violation of firm policy." Supervisors charged with enforcing internal controls were themselves violating those controls. This finding directly undermines any defense that Respondent maintained adequate supervisory systems over account security.[7]

46. OFAC Enforcement (2025): Technology Failures and Sanctions Violations. On July 15, 2025, OFAC announced a $11,832,136 settlement with IB LLC for 12,367 apparent sanctions violations spanning nearly eight years. Critically, OFAC found that "certain deficiencies in IB's IP geo-blocking controls (including a technical bug) allowed access by a limited number of customers located in Iran, Cuba, and Syria." OFAC further found that IB LLC "did not adequately audit or test these systems." IB LLC's IP geo-blocking failure, a security layer that was nominally in place but failed in practice due to an undetected bug, is directly analogous to the IB Key 2FA failure in Ms. Wong's case: a security control that existed on paper but did not function when it mattered.[8]

47. *Batchelar v. Interactive Brokers*, LLC, 422 F. Supp. 3d 502, 515 (D. Conn. 2019): Negligent System Design. In September 2019, U.S. District Judge Alvin W. Thompson denied IB LLC's motion to dismiss a negligence claim arising from its faulty auto-liquidation algorithm, holding that although IB LLC's contract and regulations permitted it to liquidate positions in its discretion, "that does not mean that the parties would normally expect that Interactive has the right to liquidate the positions in the account in a negligent manner." The court recognized "an independent extracontractual duty owed by Interactive to [the customer] to use care in designing and using the auto-liquidation software." This holding directly applies here: even if Respondent's Client Agreement purports to disclaim liability for trades executed with valid credentials, contractual authorization does not insulate Respondent from negligence liability in how its systems operate. The case subsequently preliminarily approved for class settlement for $5 million on January, 27, 2026.

---

https://www.sec.gov/newsroom/press-releases/2020-178; Press Release, CFTC, CFTC Orders Interactive Brokers LLC to Pay More Than $12 Million for Anti-Money Laundering and Supervision Violations, Rel. No. 8218-20 (Aug. 10, 2020), https://www.cftc.gov/PressRoom/PressReleases/8218-20; FINRA Letter of Acceptance, Waiver, and Consent No. 2017053209901, Interactive Brokers LLC (Aug. 10, 2020), https://www.finra.org/sites/default/files/2020-08/Interactive-brokers-awc-081020.pdf.

[7] In re Interactive Brokers Corp. & Interactive Brokers LLC, CFTC Docket No. 23-56 (Sept. 29, 2023); Press Release, CFTC, CFTC Orders Interactive Brokers to Pay $20 Million for Recordkeeping and Supervision Failures for Widespread Use of Unapproved Communication Methods, Rel. No. 8794-23 (Sept. 29, 2023), https://www.cftc.gov/PressRoom/PressReleases/8794-23.

[8] U.S. Dep't of the Treasury, Office of Foreign Assets Control, Enforcement Release: Interactive Brokers LLC Settles with OFAC for $11,832,136 Related to Apparent Violations of Multiple Sanctions Regulations (July 15, 2025), https://ofac.treasury.gov/media/934501/download?inline; *see also* OFAC, Recent Actions (July 15, 2025), https://ofac.treasury.gov/recent-actions/20250715.

FINRA Arbitration No. _____

### K. Severe Emotional Distress Suffered by Ms. Wong

48. The unauthorized liquidation of Ms. Wong's account and the loss of approximately $4,073,036.34, representing 83% of her life savings, has caused Ms. Wong severe and ongoing emotional distress. Ms. Wong, who is 61 years old, accumulated these savings over years of disciplined investing. The sudden and catastrophic loss of substantially all of her financial security has profoundly affected her physical and mental health.

49. Ms. Wong's distress has been compounded by Respondent's refusal to accept any responsibility for the security failure that caused her losses. IBHK's October 2, 2025 denial letter, which blamed Ms. Wong for the compromise of her credentials while ignoring the complete failure of Respondent's own 2FA system, added insult to injury. Ms. Wong now faces her retirement years with her financial security destroyed through no fault of her own, solely because of Respondent's failure to maintain the security systems it represented would protect her account.

## CAUSES OF ACTION

### COUNT I
### (Negligence and Gross Negligence)

50. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

51. As the clearing agent, sub-custodian, platform operator, and developer of the IB Key 2FA system for Ms. Wong's account, IB LLC owed Ms. Wong a duty of care to implement and maintain reasonable cybersecurity measures to protect her account and assets from unauthorized access.

52. IB LLC breached this duty by, among other things:

(a)  Failing to ensure that the IB Key two-factor authentication system functioned as designed, such that the unauthorized party bypassed 2FA entirely without triggering any authentication prompt to Ms. Wong;

(b)  Failing to detect and flag anomalous login activity from a datacenter IP address (Ucloud) and a new, unrecognized device (MAC address FE:8B:39:48:91:62) that had never previously been associated with Ms. Wong's account;

(c)  Failing to implement effective real-time monitoring or circuit-breaker protocols that would have frozen Ms. Wong's account when the entire $4.85 million portfolio was liquidated in a single trading session and all proceeds were concentrated into a single microcap stock;

FINRA Arbitration No. _____

(d)    Failing to send timely security alerts, with the "new device/IP" notification arriving 44 minutes after the unauthorized trades began, and the password reset notification arriving 84 minutes after;

(e)    Failing to adequately audit, test, or maintain the IB Key 2FA system to ensure it functioned as represented to customers;

(f)    Failing to comply with Respondent's obligations under New York law, including 23 NYCRR Part 500, to implement and maintain effective multi-factor authentication to protect customer accounts from unauthorized access; and

(g)    Deploying a notification system capable of generating 53 real-time trade confirmation emails but failing to use that same capability for pre-authorization or protective purposes.

53. IB LLC's failures were not mere inadvertence. The complete failure of the 2FA system, combined with the absence of anomaly detection for manifestly suspicious trading patterns, the delayed security notifications, and Respondent's documented history of over $74 million in regulatory sanctions for analogous failures, demonstrates a willful and reckless disregard for customer security that constitutes gross negligence.

54. As a direct and proximate result of IB LLC's negligence and gross negligence, Ms. Wong suffered damages in excess of $4,073,036.34.

## COUNT II
### (Breach of Fiduciary Duty)

55. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

56. As the clearing agent and sub-custodian for Ms. Wong's account, IB LLC held and controlled Ms. Wong's assets and owed her fiduciary duties, including the duty of care, the duty to safeguard client assets, and the duty to act in good faith in the handling of those assets.

57. IB LLC breached its fiduciary duties by failing to maintain adequate security controls to protect Ms. Wong's assets from unauthorized access; by permitting the complete liquidation of her portfolio through systems that IB LLC controlled and that failed to function; and by subsequently denying liability and refusing to investigate the 2FA failure.

58. Valid credentials do not equal authorization. The 2FA system was specifically designed to prevent unauthorized access even when credentials are compromised. The failure of that system is IB LLC's responsibility, not Ms. Wong's.

59. As a direct and proximate result of IB LLC's breach of fiduciary duty, Ms. Wong suffered damages in excess of $4,073,036.34.

**COUNT III**
**(Failure to Supervise)**
**(FINRA Rules 3110, 3120, and 4512)**

60. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

61. FINRA Rule 3110 requires member firms to "establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." FINRA Rule 3120 requires each member to designate and specifically identify one or more principals who shall establish, maintain, and enforce a system of supervisory control policies and procedures. FINRA Rule 4512 requires members to maintain accurate records for each customer account.

62. IB LLC failed to comply with these rules by failing to establish or maintain supervisory systems reasonably designed to detect and prevent unauthorized account access. Specifically, IB LLC failed to:

   (a)    Implement effective monitoring for login attempts from new, unrecognized devices and datacenter IP addresses;

   (b)    Establish anomaly detection protocols that would identify and halt trading activity wildly inconsistent with a customer's seven-year trading history, including the complete liquidation of a $4.85 million diversified portfolio and immediate concentration into a single microcap stock;

   (c)    Implement circuit-breaker or trade-confirmation protocols for extraordinary account activity, such as the generation of 53 trade executions in a single session;

   (d)    Ensure that the 2FA authentication system functioned as designed and was regularly audited and tested; and

   (e)    Detect and report the suspicious microcap purchases in Ms. Wong's account, despite the SEC's 2020 finding that IB LLC had previously failed to detect and report precisely this type of activity.

63. IB LLC's failure to supervise directly caused or contributed to the losses in Ms. Wong's account. Had IB LLC maintained reasonable supervisory systems, the unauthorized access would have been detected and halted before any trades were executed, or, at a minimum, the account would have been frozen before the entire portfolio was liquidated.

64. As a direct and proximate result of IB LLC's failure to supervise, Ms. Wong suffered damages in excess of $4,073,036.34.

FINRA Arbitration No. _____

## COUNT IV
### (Violation of SEC Regulation S-P)
### (17 C.F.R. § 248.30 (Safeguards Rule))

65. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

66. SEC Regulation S-P, 17 C.F.R. § 248.30 (the "Safeguards Rule"), requires every broker-dealer registered with the SEC to "adopt written policies and procedures that address administrative, technical, and physical safeguards" for the protection of customer records and information. These safeguards must be "reasonably designed" to ensure the security and confidentiality of customer records and information, protect against anticipated threats or hazards, and protect against unauthorized access to or use of customer records or information. Regulation S-P was amended on May 16, 2024 (effective August 2, 2024) to add specific incident response and breach notification requirements, further strengthening the obligations that IB LLC violated in this matter. (SEC Release No. 34-100155, 89 Fed. Reg. 47688 (June 3, 2024).)

67. IB LLC violated the Safeguards Rule by failing to maintain adequate technical safeguards for Ms. Wong's account. The complete bypass of the IB Key 2FA system, a system that IB LLC developed, maintained, and deployed as a primary security control, demonstrates that IB LLC's technical safeguards were not "reasonably designed" to protect against unauthorized access. The delayed security notifications (44 minutes for the new device alert, 84 minutes for the password reset) further demonstrate the inadequacy of IB LLC's security infrastructure.

68. OFAC's 2025 finding that IB LLC "did not adequately audit or test" its IP geo-blocking security systems confirms that the failure to audit and test security technology is a systemic deficiency at IB LLC, not an isolated lapse specific to one system.

69. As a direct and proximate result of IB LLC's violation of the Safeguards Rule, Ms. Wong suffered damages in excess of $4,073,036.34.

## COUNT V
### (Breach of Contract)

70. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

71. IB LLC, through its role as platform operator, clearing agent, and developer of the IB Key 2FA system, expressly and impliedly represented to Ms. Wong that her account would be protected by functioning security controls, including two-factor authentication via IB Key. IB LLC deployed the IB Key system on Ms. Wong's account and required its use as part of the account security framework. Ms. Wong relied on these representations in maintaining her life savings in her account.

72. IB LLC breached these contractual representations and obligations by failing to ensure that the IB Key 2FA system functioned as represented. The 2FA system did not send a push notification to Ms. Wong's registered device when an unauthorized party accessed her account from a new device and IP address on May 29–30, 2025. This failure permitted the unauthorized liquidation of Ms. Wong's entire portfolio.

73. IB LLC's reliance on Paragraph 5(b) of the Client Agreement (misidentified by IBHK as "Paragraph 6" in its denial letter), which purports to bind customers to all trades entered with valid credentials, does not absolve IB LLC of its breach. As the court held in *Batchelar v. Interactive Brokers, LLC*, 422 F. Supp. 3d 502, 514-15 (D. Conn. 2019), contractual authorization does not insulate IB LLC from liability for the negligent operation of its systems. Paragraph 5(b) presupposes that IB LLC's security systems, including 2FA, are functioning as designed. When those systems fail, the premise of the contractual allocation of risk collapses.

74. As a direct and proximate result of IB LLC's breach of contract, Ms. Wong suffered damages in excess of $4,073,036.34.

## COUNT VI
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

75. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

76. Every contract contains an implied covenant of good faith and fair dealing, which requires that neither party do anything to deprive the other of the benefits of their agreement.

77. IB LLC breached the implied covenant by: (a) deploying a 2FA security system that did not function as represented, thereby depriving Ms. Wong of the account security she was promised; (b) failing to investigate or acknowledge the 2FA failure in its October 2, 2025 denial letter, instead shifting all blame to Ms. Wong for the compromise of her credentials; (c) asserting that its systems suffered "no breach" when its own investigation confirmed that a new device and datacenter IP address accessed Ms. Wong's account without triggering 2FA; and (d) invoking the Client Agreement to disclaim all liability while knowing that its 2FA system, which was supposed to prevent exactly this scenario, had failed.

78. As a direct and proximate result of IB LLC's breach of the implied covenant of good faith and fair dealing, Ms. Wong suffered damages in excess of $4,073,036.34.

## COUNT VII
### (Violation of FINRA Rule 2010)
### (Standards of Commercial Honor and Principles of Just and Equitable Trade)

79. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

80. FINRA Rule 2010 requires that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."

81. IB LLC violated Rule 2010 by: (a) deploying a 2FA security system that it knew or should have known was susceptible to failure, without adequate testing or auditing; (b) failing to detect or prevent manifestly suspicious trading activity in Ms. Wong's account, despite having been sanctioned by the SEC for identical failures in 2020; (c) denying liability for the unauthorized trades while knowing that its 2FA system had failed to function; (d) characterizing the unauthorized trades as "legitimate trades entered using your valid password" when Respondent's own investigation confirmed unauthorized access from a new device and datacenter IP; and (e) failing to maintain and implement reasonable security systems despite having been warned by OFAC that its security technology suffered from unaudited and untested deficiencies.

82. As a direct and proximate result of IB LLC's violation of FINRA Rule 2010, Ms. Wong suffered damages in excess of $4,073,036.34.

## COUNT VIII
### (Negligent Misrepresentation)

83. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

84. In marketing messages, IB LLC represented itself as highly safe and secure for consumers entrusting their savings to the company. For example, IBKR's own IB Key Authentication page states: "The security of your assets and personal information is of utmost concern to IBKR and we are committed to taking the steps necessary to make certain that you are protected from the moment you open your account." The same page describes IB Key as "a login process which relies upon Two-Factor Authentication to prevent anyone from accessing or using your account, even if they know your username and password." (IBKR Mobile – IB Key Authentication, https://www.ibkrguides.com/clientportal/sls/ibkrmobile.htm.) Ms. Wong has further attested that she specifically chose Interactive Brokers because it "promoted how its brokerage was highly secure." *See* para. 15, supra. IB LLC also represented to Ms. Wong, through the deployment of IB Key on her account and through its marketing and platform communications, that the IB Key two-factor authentication system would provide an effective security layer to protect her account from unauthorized access. These representations were material. Ms. Wong

relied on IB LLC's marketing messages and on the existence and functionality of 2FA in deciding to become a customer and to maintain substantially all of her life savings in her IB account.

85. These representations were false or misleading. The IB Key system did not function as represented on May 29–30, 2025. IB LLC knew or should have known that its security systems were susceptible to failure, given OFAC's findings regarding unaudited and untested security technology and IB LLC's own history of systemic compliance failures.

86. Ms. Wong justifiably relied on IB LLC's representations regarding its general security levels and about the security of her account. Had Ms. Wong known that IB LLC's 2FA system was unreliable or that Respondent's security infrastructure suffered from systemic deficiencies, she would have taken additional protective measures or moved her assets to a broker with more reliable security.

87. As a direct and proximate result of IB LLC's negligent misrepresentation, Ms. Wong suffered damages in excess of $4,073,036.34.

## COUNT IX
### (Unjust Enrichment)

88. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

89. IB LLC received economic benefits from the unauthorized trading in Ms. Wong's account, including but not limited to commissions, fees, and transaction revenue generated by the liquidation of Ms. Wong's entire portfolio and the purchase of 560,000 shares of HCAI.

90. IB LLC's retention of these economic benefits is unjust and inequitable given that the trades generating those benefits were unauthorized, were facilitated by the failure of IB LLC's own security systems, and caused catastrophic harm to Ms. Wong.

91. Ms. Wong is entitled to disgorgement of all commissions, fees, and transaction revenue that IB LLC received in connection with the unauthorized trading in her account.

## COUNT X
### (Violation of the Electronic Fund Transfer Act)
### (15 U.S.C. §§1693, et seq. and 12 C.F.R. Part 1005 (Regulation E))

92. Claimant repeats and incorporates by reference the allegations in all foregoing paragraphs, as though set forth fully herein.

93. IB LLC is a "financial institution" for purposes of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §1693 et seq., because it "holds an account belonging to a consumer." 15 U.S.C. §1693a(9). IB LLC holds Ms. Wong's Account No. U8686280, maintains the cash balances

FINRA Arbitration No. _____

in that account, and provides electronic access to those funds through its proprietary trading platform (Trader Workstation, Client Portal, and IBKR Mobile). IB LLC's platforms enable electronic instructions that debit and credit consumer accounts, constituting "electronic fund transfers" as defined in 15 U.S.C. §1693a(7) and 12 C.F.R. §1005.3(b)(1).

94. Ms. Wong's brokerage account with IB LLC is an "account" under 15 U.S.C. §1693a(2), which defines "account" as "a demand deposit, savings deposit, or other asset account … established primarily for personal, family, or household purposes." Ms. Wong's account is an asset account established for personal and household purposes, accessible via electronic means (IB LLC's web-based and mobile platforms), and funded with Ms. Wong's personal savings of $1,665,461.96, which she grew through disciplined self-directed savings to a net asset value of $4,855,022.34 by May 29, 2025. Significantly, Ms. Wong's account is designated as a "Cash" account (as confirmed on the face of every activity statement under "Account Capabilities: Cash"), meaning that all transactions settle through the account's cash balance. The account held cash, equities, and U.S. Treasury bills, and at all times maintained a cash balance from which electronic debits and credits were made to fund purchases and receive sale proceeds.

95. The unauthorized transactions at issue constitute "electronic fund transfers" within the meaning of 15 U.S.C. §1693a(7). That section defines "electronic fund transfer" as "any transfer of funds … which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." On May 30, 2025, the unauthorized party used IB LLC's electronic trading platform to initiate a series of transactions that liquidated Ms. Wong's entire portfolio of blue-chip equities and U.S. Treasury bills and used the resulting cash proceeds to purchase approximately 560,000 shares of Huachen AI Parking Management Technology ("HCAI"), a microcap penny stock. As reflected in the Cash Report on the May 30, 2025 Activity Statement (Ex. B), these transactions generated $4,779,622.45 in "Trades (Sales)" credits to the account's cash balance and $4,772,650.83 in "Trades (Purchase)" debits from that same cash balance. Each HCAI purchase order was an electronic instruction to IB LLC to debit Ms. Wong's cash balance without her authorization.

96. The Activity Statement confirms that the unauthorized sales and HCAI purchases were executed in rapid, interleaved sequence over approximately 28 minutes. The first stock sale (TSLA, 2,400 shares) executed at 10:33:10 AM ET, and the first HCAI purchase (100,000 shares, $849,976.00) followed just 31 seconds later at 10:33:41 AM ET. At that moment, the account's starting cash balance was only $43,058.56, far less than the $849,976.00 required for the first HCAI purchase alone. The platform processed the HCAI purchase by drawing on intraday sale proceeds that had not yet formally settled, cycling the cash balance through a total of $4,772,650.83 in unauthorized debits to fund six tranches of HCAI purchases. IB LLC's own Cash Report treats these transactions as cash flows, crediting sale proceeds and debiting purchase costs against the single cash balance in Ms. Wong's account. Whether the sales and purchases occurred simultaneously or sequentially, the economic substance is the same: the unauthorized party

electronically ordered IB LLC to debit Ms. Wong's cash account, and IB LLC executed those debits without authorization.

97. Moreover, IB LLC was not merely a passive intermediary in these unauthorized transactions. The Activity Statement's trade codes reveal that several of the unauthorized stock sales were executed directly against IB LLC or an IB affiliate acting as counterparty. Trades marked with code "IA" (indicating "the transaction was executed against IB or an affiliate") and "IM" (indicating "a portion of the order was executed against IB or an affiliate; IB acted as agent on a portion") appear throughout the unauthorized liquidation trades, including sales of AMZN, NKE, AAPL, ASML, MU, PYPL, SNOW, and ZM. IB LLC thus directly participated in the mechanics of converting Ms. Wong's securities holdings into cash that was then used to fund the unauthorized HCAI purchases.

98. Plaintiff maintained a cash balance in her account. Unauthorized electronic debits were made from that cash balance without Plaintiff's knowledge or consent. The debited funds were used to purchase shares of HCAI, a thinly traded microcap security, resulting in the conversion of Plaintiff's cash into HCAI shares. The HCAI transactions were associated with coordinated trading activity involving the artificial inflation of the security's price followed by sales by other market participants. At all relevant times, the funds debited from Plaintiff's account consisted of cash held in the brokerage account, not securities.

99. On May 29–30, 2025, IB gave an unauthorized third party access to Ms. Wong's account without her knowledge, authorization, or consent. The IB Key two-factor authentication system, which was designed to prevent unauthorized access even when credentials are compromised, failed entirely. It did not send a single push notification to Ms. Wong's registered device. The unauthorized party liquidated Ms. Wong's entire diversified portfolio worth $4,855,022.34 and used the cash proceeds to purchase 560,000 shares of HCAI in six tranches beginning at 10:33:41 AM ET at an average price of approximately $8.53 per share. Ms. Wong did not authorize any of these transactions. She did not provide her login credentials, two-factor authentication codes, or any other means of access to the unauthorized party.

100. Ms. Wong discovered the unauthorized transactions on May 30, 2025, when she received multiple trade execution notifications on her mobile phone. She immediately attempted to contact Respondent, first calling IBKR Hong Kong at 16:13 HKT and then IBKR US at 16:15 HKT. She reached a service agent at 16:19 HKT. On June 1, 2025, Ms. Wong filed a formal complaint with IBHK (Support Ticket 966872, IBNR Case Number 960561) clearly identifying the transactions as unauthorized and requesting investigation and remediation. Ms. Wong's notifications clearly constituted "notice of error" within the meaning of 15 U.S.C. §1693f and 12 C.F.R. §1005.11(b).

101. Upon receiving Ms. Wong's notice of unauthorized electronic fund transfers, IB LLC had affirmative duties under 15 U.S.C. §1693f(a) and 12 C.F.R. §1005.11 (error resolution

FINRA Arbitration No. _____

procedures), and was subject to the consumer-liability limitations in 15 U.S.C. §1693g and 12 C.F.R. §1005.6. Those duties included obligations to:

(a)  Investigate Ms. Wong's notice of error promptly and, absent compliance with the provisional-credit provisions, determine whether an error occurred within ten (10) business days;

(b)  Determine whether the transfers at issue were in fact unauthorized electronic fund transfers;

(c)  Report the results of its investigation to Ms. Wong and correct any error identified; and

(d)  If it could not complete its investigation within ten (10) business days, provisionally recredit Ms. Wong's account in the amount of the alleged error, thereby ensuring that Ms. Wong was not deprived of access to her funds while the investigation continued.

102. IB LLC failed to perform a good-faith investigation of Ms. Wong's unauthorized transfer claim. IBHK's October 2, 2025 denial letter, issued more than four months after Ms. Wong's notice of error, asserted that its investigation "found no breach of or deficiencies in IBHK's systems and security controls" and that Ms. Wong was bound by all trades executed with valid credentials. This denial was pretextual and failed to comply with the EFTA's mandatory error-resolution framework. Specifically, IB LLC:

(a)  Failed to conduct any meaningful forensic analysis of why the IB Key two-factor authentication system did not send a push notification to Ms. Wong's registered device when the unauthorized party accessed her account from a new device and a datacenter IP address;

(b)  Failed to analyze the account access logs, IP addresses, and device identifiers (including the datacenter IP 165.154.1.64 and new MAC address FE:8B:39:48:91:62) that IB's own investigation confirmed were associated with the unauthorized access;

(c)  Failed to compare the unauthorized trading activity against Ms. Wong's seven-year trading history, which consisted exclusively of blue-chip equities and Treasury bills and never included microcap or penny stock purchases;

(d)  Failed to investigate why its anomaly detection and surveillance systems did not flag the complete liquidation of a $4.85 million diversified portfolio followed by massive concentration into a single microcap stock, a textbook pump-and-dump pattern that IB LLC's own Cash Report shows generated $4,772,650.83 in unauthorized purchase debits in under 28 minutes;

(e)   Summarily concluded that Ms. Wong was not entitled to reimbursement based solely on the use of "valid credentials," ignoring the fact that its 2FA system, the very mechanism designed to prevent unauthorized access when credentials are compromised, had completely failed to function; and

(f)   Conspicuously failed to address *why* IB Key did not send a push notification, which is the central question any good-faith investigation would have answered.

103. IB LLC's failure to make a good-faith investigation of Ms. Wong's error complaint violated:

(a)   15 U.S.C. §1693f(a), which mandates that a financial institution receiving a timely notice of error promptly investigate and determine whether an error occurred;

(b)   15 U.S.C. §1693f(c), which requires a financial institution that cannot complete its investigation within the initial ten-business-day period to provisionally recredit the consumer's account within ten (10) business days and then complete its investigation within the extended time limits;

(c)   15 U.S.C. §1693f(d), which requires the institution to deliver the results of its investigation, along with an explanation of its findings, to the consumer within three (3) business days after completing the investigation and to correct any error within one business day; and

(d)   15 U.S.C. §1693 *et seq.* generally, by failing to provide the consumer protections required by the EFTA's mandatory error-resolution and liability-limitation framework.

104. IB LLC's violations were not unintentional or the result of a bona fide error. IB LLC's denial letter blamed Ms. Wong for the compromise of her credentials while ignoring the complete failure of its own 2FA system, a system that IB LLC developed, maintained, and controlled. IB LLC characterized the unauthorized trades as legitimate based solely on the use of valid credentials, despite knowing from its own investigation (Support Ticket T981507) that the access came from a new device and datacenter IP address. IB LLC's conduct evidences deliberate indifference to its EFTA obligations and willful disregard of Ms. Wong's statutory rights. This willfulness is further demonstrated by IB LLC's documented pattern of regulatory noncompliance, including over $74 million in penalties since 2020 for failures in transaction monitoring, security controls, and supervisory systems.

105. IB LLC did not provisionally recredit Ms. Wong's account within the ten (10) business day period required by 15 U.S.C. §1693f(c) and 12 C.F.R. §1005.11(c). Ms. Wong filed her notice of error on June 1, 2025. By June 16, 2025 (ten business days later), IB LLC had neither completed its investigation nor provisionally recredited Ms. Wong's account. IB LLC did not issue any response until October 2, 2025, more than four months after Ms. Wong's notice, and that response was a denial, not a provisional credit.

FINRA Arbitration No. _____

106. IB LLC did not deliver or mail to Ms. Wong the findings and explanation of any good-faith investigation within the three (3) business day period required by 15 U.S.C. §1693f(d). IBHK's October 2, 2025 denial letter consisted of conclusory assertions that its systems suffered "no breach" and that trades executed with valid credentials are authorized, without reference to specific evidence, forensic analysis, or the critical question of why IB Key failed to function.

107. The EFTA and Regulation E cap consumer liability for unauthorized electronic fund transfers, where the consumer gives timely notice, at the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution. 15 U.S.C. §1693g(a); 12 C.F.R. §1005.6(b)(1). Ms. Wong gave notice on the same day she discovered the unauthorized transactions (May 30, 2025) and filed a formal written complaint two days later (June 1, 2025). Under the EFTA's liability limitations, Ms. Wong's maximum liability for the unauthorized transfers should not exceed $50.

108. Moreover, a consumer may be held liable for unauthorized transfers only if the institution has first provided the three initial disclosures required by 12 C.F.R. §1005.7(b)(1), (2), and (3): a summary of the consumer's liability for unauthorized transfers, contact information for reporting unauthorized transfers, and disclosure of the institution's business days. If those disclosures are not provided, the institution may not impose any liability on the consumer. 12 C.F.R. §1005.6(a). On information and belief, IB LLC did not provide Ms. Wong with these required EFTA disclosures in connection with her brokerage account.

109. The EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them. 15 U.S.C. §1693g(b). IB LLC cannot meet this burden. IB LLC's own investigation confirmed that the access came from a new device and datacenter IP address never previously associated with Ms. Wong's account. The IB Key 2FA system that was designed to prevent unauthorized access did not send a single notification. The trading pattern (complete liquidation of a diversified blue-chip portfolio and immediate concentration into a microcap penny stock) was wildly inconsistent with Ms. Wong's seven-year trading history. And IB LLC's own Cash Report confirms that $4,772,650.83 in purchase debits were processed through Ms. Wong's cash balance in under 28 minutes, starting when the account held only $43,058.56 in cash.

110. A reasonable investigation would have revealed, inter alia, the following:

(a) Ms. Wong did not authorize the disputed transactions;

(b) Ms. Wong promptly reported the unauthorized transactions upon discovery;

(c) Ms. Wong had no history of trading microcap or penny stocks in seven years of account activity;

(d) The unauthorized trading pattern was a textbook indicator of a pump-and-dump scheme, not legitimate investment activity;

(e)  The IB Key two-factor authentication system failed to send any notification to Ms. Wong's registered device, thereby eliminating the only mechanism by which Ms. Wong could have prevented the unauthorized access;

(f)  The account's starting cash balance of $43,058.56 was grossly insufficient to fund $4,772,650.83 in HCAI purchases, confirming that the unauthorized party relied on the simultaneous liquidation of Ms. Wong's existing holdings to generate the cash needed for the scheme; and

(g)  No evidence existed to refute Ms. Wong's report that the transactions were unauthorized.

111. IB LLC's acts and omissions set forth above constitute violations of the EFTA.

112. As a direct and proximate result of IB LLC's violations of the EFTA, Ms. Wong was injured in her person and property. But for IB LLC's failure to comply with the consumer-liability limitations imposed by 15 U.S.C. §1693g and its implementing Regulation E provisions, Ms. Wong would not have been left to bear losses of approximately $4,073,036.34. Likewise, but for IB LLC's failure to provide provisional credit within ten (10) business days of Ms. Wong's June 1, 2025 error notice, as required by 15 U.S.C. §1693f(c) and 12 C.F.R. §1005.11(c), Ms. Wong would have had her account recredited by June 16, 2025 and would not have been deprived of access to her funds during IB LLC's purported investigation.

113. Ms. Wong's actual damages resulting from IB LLC's EFTA violations equal the full amount of the unauthorized transfers. The May 30, 2025 Activity Statement confirms that $4,772,650.83 was debited from Ms. Wong's cash balance in unauthorized "Trades (Purchase)" of HCAI shares, against total "Trades (Sales)" credits of $4,779,622.45 from the unauthorized liquidation of her portfolio. Claimant estimates her total direct losses at approximately $4,073,036.34, representing the difference between her pre-incident net asset value of $4,855,022.34 and her post-incident net asset value of approximately $781,986.

114. Ms. Wong is entitled to an award of statutory and actual damages, as well as attorney's fees and costs, under 15 U.S.C. §1693m(a).

115. In addition, IB LLC is liable to Ms. Wong for treble damages under 15 U.S.C. §1693f(e), calculated as three times the amount of Ms. Wong's actual damages described in §1693m(a)(1), because IB LLC (a) did not provisionally recredit Ms. Wong's account within the ten (10) business day period specified in §1693f(c), and (b) did not make a good-faith investigation of Ms. Wong's alleged error or have a reasonable basis for concluding that Ms. Wong's account was not in error.

116. IB LLC knew or should have known that Ms. Wong did not authorize the transactions at issue, given its own confirmation of unauthorized access from a new device and datacenter IP, the complete failure of its 2FA system, the patently suspicious trading pattern, and the Cash Report

FINRA Arbitration No. _____

showing that $4,772,650.83 in HCAI purchase debits were processed through a cash account that began the day with only $43,058.56. IB LLC knowingly and willfully failed to honor Ms. Wong's rights under the EFTA.

## DAMAGES

117. As a result of Respondent's wrongful conduct as alleged herein, Ms. Wong has suffered the following damages:

| Category | Amount |
|---|---|
| Pre-Incident Net Asset Value (May 29, 2025) | $43,058.56 Cash<br>$3,506,103.50 Stock<br>$1,298,116.13 Bonds<br>$7,744.15 Interest<br>=$4,855,022.34<br>(per May 30, 2025 Activity Statement, Ex. B) |
| HCAI Loss - sourced from June 2025 activity statement<br><br>Realized losses – 383,888 shares sold June 2025<br><br>Proceeds: $560,573.51 on cost basis of $3,270,825.26 | -$2,710,251.75 |
| Unrealized losses - 176,112 shares remaining at June 30, 2025<br><br>Cost basis: $1,506,643.32<br>Closing value: $142,474.61 @ $0.809/share | -$1,364,168.71 |
| Post-Incident Net Asset Value (June 30, 2025) | $780,601.88 |
| **Total Direct Losses** | **$4,074,420.46** |
| **Treble Damages under EFTA (not cumulative with direct losses above)** | **$12,219,109.02** |
| Pre-Judgment Interest | TBD |
| Attorneys' Fees and Costs | TBD |
| Expert Fees (Forensic Investigation) | TBD |
| Severe Emotional Distress | TBD |
| Punitive / Exemplary Damages | TBD |

## PRAYER FOR RELIEF

WHEREFORE, Claimant Stephanie Lin Foon Wong respectfully requests that the Arbitration Panel enter an award against Respondent Interactive Brokers LLC as follows:

A. Compensatory damages in an amount not less than $4,073,036.34, representing the total direct losses suffered by Ms. Wong as a result of Respondent's wrongful conduct arising from the non-Electronic Fund Transfer Act claims;

B. Treble damages under 15 U.S.C. §1693f(e) for violations of the Electronic Fund Transfer Act, in an amount equal to three times Ms. Wong's actual damages of approximately $4,073,036.34, or $12,219,109.02, or in such other amount as may be proven at trial;

C. Statutory damages under 15 U.S.C. §1693m(a)(2);

D. Actual damages under 15 U.S.C. §1693m(a)(1) equal to the total amount of unauthorized electronic fund transfers, approximately $4,073,036.34;

E. Attorney's fees and costs under 15 U.S.C. §1693m(a)(3);

F. Such other and further relief as the Arbitration Panel deems just and equitable under the EFTA;

G. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

H. Punitive and exemplary damages in an amount sufficient to punish Respondent for its willful and reckless disregard of customer security and to deter similar conduct in the future;

I. Damages for severe emotional distress suffered by Ms. Wong as a result of the loss of substantially all of her life savings;

J. Disgorgement of all commissions, fees, and transaction revenue earned by Respondent in connection with the unauthorized trades in Ms. Wong's account;

K. Attorneys' fees and costs of this arbitration, including expert fees; and

L. Such other and further relief as the Arbitration Panel deems just and equitable.

Respectfully submitted,

DATED: May 29, 2026

KRONENBERGER ROSENFELD, LLP

By: _____
Karl S. Kronenberger
*Attorneys for Stephanie Lin Foon Wong*

# EXHIBIT A



# Interactive Brokers Hong Kong Limited Client Agreement

1. **Client Agreement**:

   a. This Agreement governs the relationship between the Client, whose name, address and details are set out in the account application ("Client") and Interactive Brokers Hong Kong Limited ("IB&", "Interactive" or "Interactive Brokers" ) in relation to the opening, maintenance and operation of the account(s) maintained by the Client from time to time for the purchase and sale, or the financing thereof, of financial products ("Accounts"). If this Agreement varies from the IB website, this Agreement controls.

   b. This Agreement cannot be amended or waived except in writing by an IB officer. Client Service employees cannot amend or waive any part of this Agreement. Client acknowledges that IB may revise this Agreement by sending notice of the revised Agreement by e-mail or upon Client log-in to IB's platform. Client's use of IB after such notice constitutes acceptance of the revised Agreement.

   c. Each time Client (or its agent) places an order with IB to purchase or sell financial products or utilizes any IB system, software or technologies, Client affirms its acceptance of ,and agreement to, the terms outlined in this Agreement;

2. <u>Definitions</u>: The following definitions are applicable to this Agreement unless otherwise specified.

   » "Approved Custodian" has the same meaning as the term is defined in the Client Securities Rules;

   » "CCASS" means the Central Clearing and Settlement System operated by Hong Kong Securities Clearing Company Limited;

   » "Client Securities Rules" means the Securities and Futures (Client Securities) Rules, Chapter 571H of the Laws of Hong Kong as amended from time to time;

   » "Client Securities Standing Authority" has the same meaning as the term "Standing Authority" as defined in the Client Securities Rules;

   » "HKEx" means Hong Kong Exchanges and Clearing Limited;

   » "HKFE" means Hong Kong Futures Exchange Limited;

   » "HKFE Clearing House" means HKFE Clearing Corporation Limited;

   » "HKSCC" means Hong Kong Securities Clearing Company Limited;

   » "IB" or "Interactive Brokers" means Interactive Brokers Hong Kong Ltd, a SFC licensed corporation with CE Number ADI249 carrying on Type 1, 2 and 3 regulated activities under the Ordinance, member of the SEHK and Futures Commission Merchant of the HKFE. Mr. David Friedland (CE No.: ACP478) is the staff member primarily responsible for client affairs;

   » "Procedures" means the practices, procedures and administrative requirements prescribed from time to time by the SFC, HKEx, HKFE, SEHK, HKFE Clearing House, CCASS/HKSCC or SEOCH, as applicable;

   » "Rules" means the Rules and Regulations of the relevant exchange, regulator or clearing house where the Client's orders are being placed (<u>e.g.</u>, HKEx, HKFE, SEHK, HKFE Clearing House, CCASS/HKSCC, SEOCH, SFC, New York Stock Exchange, etc.), including any amendments, supplements, variations or modifications thereto;

   » "SFC" means the Hong Kong Securities and Futures Commission;

   » "SEHK" means The Stock Exchange of Hong Kong Limited;

   » "SEOCH" means The SEHK Options Clearing House Limited;

» "the Ordinance" means the Securities and Futures Ordinance, Chapter 571 of the Laws of Hong Kong as amended from time to time.

3. **Account Information:**

   a. IB generally will endeavor to keep information relating to Client's Account confidential, but IB may be required under the applicable Rules, laws or regulations to disclose the name and beneficial identity or such other information concerning the Client as necessary. Client agrees to provide such information to IB, and consents for IB to provide such information to the relevant exchange, clearing house or regulator. The Client irrevocably authorizes IB to make any such disclosure.
   b. Where IB utilizes another broker or entity, who could be an affiliate, to facilitate execution of Client's instructions or provision of services to Client under this Agreement, Client authorizes IB to provide information relating to the Client's Account to the relevant broker or entity as necessary, including but not limited to the purpose of satisfying the broker or entity's obligations under any applicable Rules, laws or regulations relating to anti-money laundering, "Know Your Customer", trade and position reporting, etc.

4. **Services:**

   a. Client hereby requests IB to open and maintain on its books one or more Account(s) in the name of the Client for the purpose of purchasing, investing in, selling, exchanging or otherwise disposing of and generally dealing in and with all kinds of securities, futures, foreign exchange and other financial products in accordance with this agreement from time to time. Unless indicated by IB or specified in this Agreement (in the contract note for the relevant transaction or otherwise), IB shall act as agent for the Client in effecting transactions pursuant to this Agreement.
   b. <u>No Investment, Tax or Trading Advice:</u> IB representatives are not authorized to provide investment, tax or trading advice or to solicit orders. Nothing on IB's website is a recommendation or solicitation to buy or sell securities, futures or other investments.
   c. If IB solicits the sale of or recommends any financial product to you, the financial product must be reasonably suitable for you having regard to your financial situation, investment experience and investment objectives. No other provision of this agreement or any other document IB may ask you to sign and no statement IB may ask you to make derogates from this clause.

5. **Responsibility for Client Orders/Trades**:

   a. Client acknowledges that IB does not know whether someone entering orders with Client's user name and password is the Client. Unless IB is notified and agrees, Client acknowledges and confirms that Client will be the only person who can and will access the Client's Account and Client will not allow anyone to access Client's Account. Client is responsible for the confidentiality and use of Client's user name and password and agrees to report any theft/loss of such user name and/or password, or any unauthorized access to Client's Account, immediately by telephone or electronically through the IB website. Client remains responsible for all transactions entered using Client's user name and password.
   b. IB is entitled to rely on all instructions given, or apparently given and all actions taken by Client or on its behalf entered using the Client's user name and password, and Client is bound by any Transaction or any dealing or other action or omission in connection with its Account or any financial products held for Client in reliance on such instructions. IB will not be liable for any Loss caused by us acting on instructions, actions or omissions or other communications using the using the Client's user name and password.

6. **Order Routing**:

   Unless otherwise directed, IB will select the market/dealer to which to route Client's orders. For products traded at multiple markets, IB may provide "Smart Routing", which seeks the best market for each order through a computerized algorithm. If Client directs orders to a particular market, Client assumes responsibility for knowing and trading in accordance with the rules and policies of that market (<u>e.g.</u>, trading

hours, order types, etc.). IB cannot guarantee execution of every order at the best posted price: IB may not have access to every market/dealer; other orders may trade ahead; market centers may not honor posted prices or may re-route orders for manual handling; or market rules, decisions or system failures may prevent/delay execution of Client's orders or cause orders not to receive the best price.

7. **Order Cancellation/Modification**:

Client acknowledges that it may not be possible to cancel/modify an order and that Client is responsible for executions notwithstanding a cancel/modify request.

8. **Order Execution**:

IB shall execute Client orders as agent, unless otherwise confirmed. IB can execute Client orders as principal. IB may use another broker, or an affiliate, to execute orders, and they have benefit of all IB's rights hereunder. IB may decline any Client order, or terminate Client's use of IB's services at any time in IB's discretion. All transactions are subject to rules and policies of relevant markets and clearing houses, and applicable laws and regulations. IB IS NOT LIABLE FOR ANY ACTION OR DECISION OF ANY EXCHANGE, MARKET, DEALER, CLEARING HOUSE OR REGULATOR.

9. **Confirmations**:

a. Client agrees to monitor each order until IB confirms execution or cancellation. Client acknowledges that confirmations of executions or cancellations may be delayed or may be erroneous (e.g., due to computer system issues) or may be cancelled/adjusted by an exchange. Client is bound by the actual order execution, if consistent with Client's order. If IB confirms execution or cancellation in error and Client delays reporting such error, IB reserves the right to remove the trade from the Account or require Client to accept the trade, in IB's discretion.

b. Client agrees to notify IB immediately by telephone or electronically through the IB website if:

   i. Client fails to receive an accurate confirmation of an execution or cancellation;
   ii. Client receives a confirmation that is different than Client's order;
   iii. Client receives a confirmation for an order that Client did not place; OR
   iv. Client receives an Account statement, confirmation, or other information reflecting inaccurate orders, trades, balances, positions, margin status, or transaction history.

c. Client acknowledges that IB may adjust Client's Account to correct any error. Client agrees to promptly return to IB any assets erroneously distributed to Client.

10. **Proprietary Trading**:

a. Subject to all relevant Rules, laws and regulations, Client authorizes IB to execute proprietary trades of itself and its affiliates, though IB may simultaneously hold unexecuted Client orders for the same products at the same price.

b. IB, its affiliates, and their respective directors and/or employees may trade on their own Account and, subject to the provisions of the Ordinance and all other relevant Rules, laws and regulations, IB and its affiliates may take the opposite position to the Client's order in relation to any securities, futures and options positions, whether on IB's or its affiliate's own account or for the account of another client of IB, provided that such trade is executed competitively on or through the facilities of SEHK and HKFE or in accordance with the Rules or the facilities of any other securities, commodity, futures or options exchange, market or regulator. In addition, IB or its affiliates, or other clients, may take the opposite position to Client's order for foreign exchange and other over-the-counter products.

11. **Client Qualification**:

a. Client warrants that the information provided in his, her or its application is true and complete; will promptly notify IB of any information changes; and authorizes IB to make any inquiry to verify information.

b. <u>Natural Persons</u>:

Client warrants that Client is over 18; is under no legal incapacity; and has sufficient knowledge and experience to understand the nature and risks of the products to be traded.

c. <u>Organizations</u>:

Client and its authorized representatives warrant that Client:

i. is authorized under its governing document(s) and in the jurisdictions in which it is organized and/or regulated to enter this Agreement and trade (including on margin if applicable);
ii. is under no legal incapacity; and
iii. that persons identified to enter orders have proper authority and have sufficient knowledge and experience to understand the nature and risks of the products to be traded.

d. <u>Trusts</u>:

"Client" refers to the Trust and/or Trustees. Trustee(s) represent(s) that there are no Trustees other than listed in the application and certifies(y) that IB may follow instructions from any Trustee and deliver funds, securities, or any other assets to any Trustee or on any Trustee's instructions, including delivering assets to a Trustee personally. IB, in its discretion, may require written consent of any or all Trustee(s) prior to following instructions of any Trustee. Trustee(s) certify that Trustee(s) has (have) the power under the Trust documents and applicable law to enter this Agreement, open the type of account applied for, and enter transactions and issue instructions. Such powers include, without limit, authority to buy, sell (including short), exchange, convert, tender, redeem and withdraw assets (including delivery of securities to/from the Account) to trade securities on margin or otherwise (including purchase/sale of options), and trade futures and/or options on futures, for the Trust. Should only one Trustee execute this Agreement, Trustee represents that Trustee has the authority to execute this Agreement, without consent by the other Trustees. Trustee(s) certifies(y) that all transactions for this Account will comply with the Trust documents and applicable law and that all trading in this Account will be consistent with the powers delegated to the Trustee(s) by the Trust document(s) and with the fiduciary duties of the Trustee(s) to the Trust and/or the beneficiary(ies) of the Trust. Trustee(s) also certifies(y) that Trustee(s) will inform any beneficiary(ies) of the Trust of the activity in the Trust's Account(s) as required by the Trust document and applicable law. Trustee(s), jointly and severally, shall indemnify IB and hold IB harmless from any claim, loss, expense or liability for effecting any transactions, and acting upon any instructions given by the Trustee(s). Trustee(s) will notify Interactive promptly if the authority of the Trustee(s) change in any manner material to this Agreement, including but not limited to any change affecting the accuracy of any warrants made herein.

e. <u>Regulated Persons and Entities</u>:

Unless Client notifies IB otherwise, Client represents that Client is not an entity or person licensed by the SFC; or affiliate, associated person or employee thereof. Client agrees to notify IB immediately by telephone or electronically through the IB website if Client becomes a person licensed by the SFC or employed or associated with an entity licensed by the SFC.

12. **Joint Accounts**:

a. Each joint Account holder agrees that each joint holder has authority, without notice to the other, to:

i. buy/sell securities, futures or other products (including on margin);
ii. receive Account confirmations and correspondence;
iii. receive and dispose of money, securities or other assets;
iv. enter, terminate, or agree to modify this Agreement;

v. waive any part of this Agreement; and

vi. deal with IB as if each joint holder was the sole holder.

b. Notice to any joint holder constitutes notice to all joint holders. Each joint Account holder is jointly and severally liable to IB for all Account matters. IB may follow instructions of any joint holder and make delivery to any joint Account holder individually of any Account property.

c. Upon death of any joint holder, the surviving holder shall give IB notice by telephone or electronically through the IB website and IB may, before or after notice, initiate proceedings, require documents, retain assets and/or restrict transactions as it deems advisable to protect itself against any liability or loss. The estate of any deceased joint Account holder shall be liable and each survivor will be liable, jointly and severally, to IB for any debt or loss in the Account or upon liquidation of the Account. Unless Clients indicate otherwise, IB may presume that Account holders are joint tenants with rights of survivorship. Upon death of any joint holder, the Account shall be vested in the surviving holders, without in any manner releasing the deceased joint holder's estate from liability.

13. **Margin**:

a. Risk of Margin Trading:

Margin trading is highly risky and may result in a loss of funds greater than Client has deposited in the Account. Client represents that he or she has read the "Hong Kong Risk Disclosure Statement" and the "IB Hong Kong Margin Trading and Risk Disclosure", which have been provided separately.

b. Requirement to Maintain Sufficient Margin Continuously:

Margin transactions are subject to initial and maintenance margin requirements of exchanges, clearing houses and regulators and also to any additional margin requirement of IB, which may be greater ("Margin Requirements"). IB MAY MODIFY MARGIN REQUIREMENTS FOR ANY OR ALL CLIENTS FOR ANY OPEN OR NEW POSITIONS AT ANY TIME, IN IB'S SOLE DISCRETION. Any changes in margin requirements (whether imposed by the exchange or by IB) will be communicated to clients on the IB website. Client shall monitor his, her or its Account so that at all times the Account contains sufficient equity to meet Margin Requirements. IB may reject any order if the Account has insufficient equity to meet Margin Requirements, and may delay processing any order while determining margin status. Client shall maintain, without notice or demand, sufficient equity at all times to continuously meet Margin Requirements. Formulas for calculating Margin Requirements on the IB website are indicative only and may not reflect actual Margin Requirements. Client must at all times satisfy whatever Margin Requirement is calculated by IB.

c. IB Will Not Issue Margin Calls:

IB does not have to notify Client of any failure to meet Margin Requirements prior to IB exercising its rights under this Agreement. Client acknowledges that IB generally will not issue margin calls; generally will not credit Client's Account to meet intraday or overnight margin deficiencies; and is authorized (but not required to) to liquidate Account positions in order to satisfy Margin Requirements without prior notice.

d. Liquidation of Positions and Offsetting Transactions:

i. IF AT ANY TIME CLIENT'S ACCOUNT HAS INSUFFICIENT EQUITY TO MEET MARGIN REQUIREMENTS OR IS IN DEFICIT, IB HAS THE RIGHT, IN ITS SOLE DISCRETION, BUT NOT THE OBLIGATION, TO LIQUIDATE ALL OR ANY PART OF CLIENT'S POSITIONS IN ANY OF CLIENT'S IB ACCOUNTS, INDIVIDUAL OR JOINT, AT ANY TIME AND IN ANY MANNER AND THROUGH ANY MARKET OR DEALER, WITHOUT PRIOR NOTICE OR MARGIN CALL TO CLIENT. CLIENT SHALL BE LIABLE AND WILL PROMPTLY PAY IB FOR ANY DEFICIENCIES IN CLIENT'S ACCOUNT THAT

ARISE FROM SUCH LIQUIDATION OR REMAIN AFTER SUCH LIQUIDATION. IB HAS NO LIABILITY FOR ANY LOSS SUSTAINED BY CLIENT IN CONNECTION WITH SUCH LIQUIDATIONS (OR IF THE IB SYSTEM DELAYS EFFECTING, OR DOES NOT EFFECT, SUCH LIQUIDATIONS) EVEN IF CLIENT RE-ESTABLISHES ITS POSITION AT A WORSE PRICE.

ii. IB may allow Client to pre-request the order of liquidation in event of a margin deficiency, but such requests are not binding on IB and IB retains sole discretion to determine the assets to be liquidated and the order/manner of liquidation. IB may liquidate through any market or dealer, and IB or its affiliates may take the other side of the transactions consistent with laws and regulations. If IB liquidates any/all positions in Client's Account, such liquidation shall establish Client's gain/loss and remaining indebtedness to IB, if any. Client shall reimburse and hold IB harmless for all actions, omissions, costs, fees (including, but not limited to, attorney's fees), or liabilities associated with any such transaction undertaken by IB. If IB executes an order for which Client did not have sufficient equity, IB has the right, without notice, to liquidate the trade and Client shall be responsible for any resulting loss and shall not be entitled to any resulting profit.

iii. Any steps taken by IB to close out Client's positions unilaterally will be entirely without prejudice to IB's other rights under the Agreement and otherwise, in particular the right to payments from Client of all amounts outstanding.

iv. If IB does not, for any reason, liquidate under-margined positions, and issues a margin call, Client must satisfy such call immediately by depositing funds. If Client fails to meet two or more successive Margin Calls or demands for variation adjustment, IB may be required to report particulars of all of the Client's option/future position to the HKFE or the SFC. Client acknowledges that even if a margin call is issued, IB still may liquidate positions at any time.

v. Client acknowledges that IB also has the right to liquidate all or part of Client's positions without prior notice: (i) if any dispute arises concerning any Client trade, (ii) upon any "Default" as described in 17 below, or (iii) whenever IB deems liquidation necessary or advisable for IB's protection.

vi. No conduct or omission on behalf of IB, nor any agreement purportedly entered into on IB's behalf (save an agreement in accordance with the terms of the Agreement), shall constitute any form of waiver or variation or relaxation of IB's rights to close out clients' positions unilaterally.

14. **Short Sales**:

Client acknowledges that short sales must be done in a Margin Account, subject to Margin Requirements; that prior to selling short, IB must believe it has reasonable grounds to believe that it can arrange for the Client to borrow the stock so that the Client has a presently exercisable and unconditional right to vest the stock in the purchaser; and that if IB cannot borrow stock (or re-borrow after a recall notice) IB may buy-in stock on Client's behalf, without notice to Client, to cover short positions, and Client is liable for any associated losses/costs. Short selling of Hong Kong stocks generally will require Client to enter into a securities lending agreement and to register such agreement and file periodic returns with the Hong Kong Inland Revenue Department in order to comply with exemptions to stamp tax liability in connection with such short sales. IB may provide assistance to Client in connection with filing for stamp tax relief in connection with short sales of Hong Kong stocks, but Client remains ultimately and solely responsible for complying with IRD stamp tax rules and IB shall have no liability whatsoever in the event that a transaction or transactions is not eligible for stamp tax relief.

15. **Safekeeping of Securities; Client Funds**:

a. The Client appoints IB to act as custodian for the Client to provide custody of Client's securities. The Client agrees not to pledge, charge, sell, grant an option or otherwise deal in any securities held by IB as custodian without the prior written consent of IB.

b. Unless otherwise authorized by Client in the Client Securities Standing Authority or other written authorisation, any securities held in Hong Kong by IB for safekeeping on behalf of the Client may, at IB's

discretion, be deposited in safe custody in a segregated Account which is designated as a trust or client Account with an authorized financial institution as defined in the Ordinance, an Approved Custodian or another intermediary licensed by the SFC for dealing in securities in each case in Hong Kong.

c. IB, its affiliate or its appointed sub-custodian are not bound to redeliver to the Client the identical securities received from or for the Client but may redeliver to the Client securities of like quantity, type and description.

d. Securities held by IB for the safekeeping pursuant to this clause are held by IB at the sole risk of the Client and IB shall not be responsible for or liable in respect of any loss or damage suffered by the Client unless such loss or damage has been caused as a direct consequence of a gross act of negligence or fraud on the part of IB.

e. All monies or other properties received by IB from the Client or from any other person, including the HKFE Clearing House for the Account of the Client in respect of the futures/options contracts transacted on behalf of the Client, shall be held by IB as trustee, segregated from IB's own assets. All monies or other property so held by IB shall not form part of the assets of IB for insolvency or winding up purposes but shall be promptly returned to Client upon the appointment of a provisional liquidator, liquidator or similar officer over all or any part of IB's business or assets.

16. **IB's Right to Loan/Pledge Client Assets:**

As allowed by Client Securities Rules or other relevant law, IB is authorized by Client to lend to itself, or others, Client securities or assets. IB may, without notice, pledge, re-pledge, hypothecate or re-hypothecate Client's securities and assets, separately or together with those of other clients, for any amount due in any IB account in which Client has an interest, without retaining in IB's possession or control a like amount of assets. For loans of securities, Client acknowledges that IB may receive financial and other benefits to which Client is not entitled. Such loans could limit Client's ability to exercise securities' voting rights.

17. **Security Interest:**

All assets of any kind held by or on behalf of IB for Client's Account are hereby pledged to IB and are subject to a perfected first priority lien and security interest in IB's favor to secure performance of obligations and liabilities to IB arising under this or any other Agreement.

18. **Event of Default:**

A "Default" occurs automatically, without notice upon: (i) Client breach/repudiation of any agreement with IB; (ii) Client failure to provide assurance satisfactory to IB of performance of an obligation, after request from IB in IB's sole discretion; (iii) proceedings by/against Client under any bankruptcy, insolvency, or similar law; (iv) assignment for the benefit of Client's creditors; (v) appointment of a receiver, trustee, liquidator or similar officer for Client or Client property; (vi) Client representations being untrue or misleading when made or later becoming untrue; (vii) legal incompetence of Client; (viii) proceeding to suspend Client's business or license by any regulator or organization; (ix) IB having reason to believe that any of the foregoing is likely to occur imminently. Client unconditionally agrees that, upon a Default, IB may terminate any or all IB's obligations to Client and IB shall have the right in its discretion, but not the obligation, without prior notice, to liquidate all or any part of Client's positions in any IB account, individual or joint, at any time and any manner and through any market or dealer. Client shall reimburse and hold IB harmless for all actions, omissions, costs, fees (including, but not limited to, attorney's fees), or liabilities associated with any Client Default or any transaction undertaken by IB upon Default.

19. **Suspicious Activity:**

If IB in its sole discretion believes that a Client Account has been involved in any fraud or crime or violation of any laws or regulations, or has been accessed unlawfully, or is otherwise involved in any suspicious activity (whether victim or perpetrator or otherwise), IB may suspend or freeze the Account or any privileges of the Account, may freeze or liquidate funds or assets, or may utilize any of the remedies in this Agreement for a "Default".

20. **Multi-Currency Function in IB Accounts:**

   a. For a Client with a Margin Account, the Client may be able to trade products denominated in different currencies using a base currency chosen by Client. Upon purchase of a product denominated in a different currency from the base currency, a margin loan is created to fund the purchase, secured by the assets in Client's Accounts. If Client maintains positions denominated in foreign currencies, IB will calculate Margin Requirements by applying exchange rates specified by IB.

   b. IB WILL APPLY "HAIRCUTS" (A PERCENTAGE DISCOUNT ON THE FOREIGN CURRENCY EQUITY AMOUNT) TO REFLECT THE POSSIBILITY OF FLUCTUATING EXCHANGE RATES BETWEEN THE BASE CURRENCY AND THE FOREIGN CURRENCY. CLIENT MUST CLOSELY MONITOR MARGIN REQUIREMENTS AT ALL TIMES, PARTICULARLY FOR POSITIONS DENOMINATED IN FOREIGN CURRENCIES, BECAUSE FLUCTUATION IN THE CURRENCY AND THE VALUE OF THE UNDERLYING POSITION CAN CAUSE A MARGIN DEFICIT.

   c. Client agrees that IB's obligations to Client shall be denominated in: (i) the Hong Kong dollar; (ii) a currency in which funds were deposited by Client or were converted at the request of Client, to the extent of such deposits and conversions; or (iii) a currency in which funds have accrued to the client as a result of trading conducted on a designated contract market or registered derivatives transaction execution facility, to the extent of such accruals. Information regarding Client's currency conversions is provided on the IB Client statements.

21. **Foreign Currency Exchange ("Forex") Transactions:**

   a. <u>HIGH RISKS OF LEVERAGED FOREX TRADING</u>:

      LEVERAGED FOREX TRADING IS HIGHLY RISKY DUE TO THE LEVERAGE (MARGIN) INVOLVED, AND MAY RESULT IN LOSS OF FUNDS GREATER THAN CLIENT DEPOSITED IN THE ACCOUNT. Client represents that he or she has read and acknowledges the "Hong Kong Risk Disclosure Statement" provided separately by IB.

   b. For Forex and Leveraged Forex transactions, IB generally will act as agent or riskless principal and charge a fee. IB may effect Forex and Leveraged Forex transactions through an affiliate or third party, which may profit or lose from such transactions. Client agrees that IB may transfer to or from any of the Client's Accounts held with IB any funds or assets that may be required to avoid margin calls, reduce debit balances or for any other lawful reason.

   c. <u>Netting</u>:

      Client acknowledges and authorizes IB to net off, as permitted by the relevant laws, Rules and regulations, the Client's open Forex or Leveraged Forex position in the following manner:

      i. <u>Netting by Novation</u>:

         Each Forex transaction between Client and IB will immediately be netted with all the existing Forex transactions between Client and IB for the same currencies to constitute one transaction.

      ii. <u>Payment Netting</u>:

         If on any delivery date more than one delivery of a currency is due, each party shall aggregate the amounts deliverable and only the difference shall be delivered.

      iii. <u>Close-Out Netting</u>:

         If Client: (a) incurs a margin deficit in any IB account, (b) defaults on any obligation to IB, (c) becomes subject to bankruptcy, insolvency or other similar proceedings, or (d) fails to pay debts when due, IB has the right but not the obligation to close-out Client's Forex transactions, liquidate all or some of Client's collateral and apply the proceeds to any debt to IB. Upon Close-Out Netting or any "Default", all outstanding Forex transactions will be deemed terminated as of the time

immediately preceding the triggering event, petition or proceeding. IB's rights herein are in addition to any other rights IB has (whether by agreement, by law or otherwise).

d. Nothing herein constitutes a commitment of IB to offer Forex transactions generally or to enter into any specific Forex transaction. IB reserves the unlimited right to refuse any Forex order or to decline to quote a two-way market in any currency.

22. **Commodity Options and Futures Not Settled in Cash:**

Client acknowledges that: (a) commodity options cannot be exercised and must be closed out by offset; and (b) for futures contracts that settle not in cash but by physical delivery of the commodity (including currencies not on IB's Deliverable Currency List), Client cannot make or receive delivery. If Client has not offset a commodity option or physical delivery futures position prior to the deadline on the IB website, IB is authorized to roll or liquidate the position or liquidate any position or commodity resulting from the option or futures contract, and Client is liable for all losses/costs.

23. **Position Limits; Transfers; Automatic Exercise of Options:**

a. Client acknowledges that IB may be required to close out the Client's open position in order to comply with the position limits of the relevant exchange.
b. The Client acknowledges that the relevant options or futures exchange or its clearing house may do all things necessary to close out or to transfer any open positions held by IB on the Client's behalf and money and securities standing to the credit of the Client's account with IB to another member of the relevant options or futures exchange if deemed necessary under the rules of the relevant exchange or clearing house.
c. In relation to options contracts traded on the SEHK, Client acknowledges that on the expiry day, and only on the expiry day, the SEHK Option System will automatically generate exercise instructions in respect of all open long positions which are in-the-money by or above a percentage prescribed by SEOCH from time-to-time. If Client does not wish for such automatically generated exercise to occur, Client may instruct IB to override this automatically generated exercise before the System Closure time as specified in the SEOCH Procedures. Similar procedures for automatic exercise of certain options exist on foreign options markets and Client agrees to review the automatic exercise procedures for any exchange on which Client trades.

24. **Commissions and Fees, Interest Charges, Funds:**

a. Commissions and fees are as specified on the IB website unless otherwise agreed in writing by an officer of IB. Client acknowledges that IB deducts commissions/fees from Client Accounts, which will reduce Account equity. Positions may be liquidated if commissions or other charges cause a margin deficiency. Changes to commissions/fees are effective immediately upon either of posting on the IB website or email or other written notice to Client. IB shall pay credit interest to and charge debit interest from Client at interest rates and terms on the IB website. Client funds will not be disbursed until after transactions are settled. Terms and conditions for deposit and withdrawal of funds (including holding periods) are as specified on the IB website.
b. The Client hereby authorizes IB to apply any monies, approved debt securities or approved securities that the Client may pay to IB in order to: (i) meet obligations to the relevant clearing house (provided that no withdrawal from the Client's Accounts with IB may be made which would have the effect that the relevant margin requirements or trading liabilities conducted on behalf of any client are thereby financed by any other client); (ii) pay commission, brokerage, levies and other proper charges for contracts transacted by IB on behalf of the Client; and/or (iii) make payments in accordance with the Client's directions (provided that no money may be paid into another account of the Client unless that account is also a segregated bank account). The Client acknowledges that IB may apply such monies, approved debt securities or approved securities in or towards meeting IB's obligations to any party insofar as such obligations arise in connection with or incidental to all purchase/sales transactions transacted on the Client's behalf. The Client agrees that IB may retain interest on the Client's money.

25. **Account Deficits:**

If a cash Account incurs a deficit, margin interest rates will apply until the balance is repaid, and IB has the right, but not the obligation, to treat the Account as a margin Account. Client agrees to pay reasonable costs of collection for any unpaid Client deficit, including attorneys' and collection agent fees.

26. **Risks of Foreign Markets; After Hours Trading:**

Client acknowledges that trading securities, options, futures, currencies, or any product on a foreign market is speculative and involves high risk. Client may have varying level and type of protection in relation to transactions on different markets and exchanges. There are also special risks of trading outside ordinary market hours, including risk of lower liquidity, higher volatility, changing prices, un-linked markets, news announcements affecting prices, and wider spreads. Client represents that Client is knowledgeable and able to assume these risks.

27. **Knowledge of Securities, Warrants and Options; Corporate Actions:**

Client acknowledges Client's responsibility for knowing the terms of any securities, options, warrants or other products in Client's Account, including upcoming corporate actions (e.g., tender offers, reorganizations, stock splits, etc.). IB has no obligation to notify Client of deadlines or required actions or dates of meetings, nor is IB obligated to take any action without specific written instructions sent by Client to IB electronically through the IB website.

28. **Quotes, Market Information, Research and Internet Links:**

Quotes, news, research and information accessible through IB (including through links to outside websites) ("Information") may be prepared by independent Providers. The Information is the property of IB, the Providers or their licensors and is protected by law. Client agrees not to reproduce, distribute, sell or commercially exploit the Information in any manner without written consent of IB or the Providers. IB reserves the right to terminate access to the Information. None of the Information constitutes a recommendation by IB or a solicitation to buy or sell. Neither IB nor the Providers guarantee accuracy, timeliness, or completeness of the Information, and Client should consult an advisor before making investment decisions. RELIANCE ON QUOTES, DATA OR OTHER INFORMATION IS AT CLIENT'S OWN RISK. IB DOES NOT WARRANT IN ANY FASHION, AND IS NOT RESPONSIBLE FOR, THE ACCURACY OR TIMELINESS OF THE INFORMATION. IN NO EVENT WILL IB OR THE PROVIDERS BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES ARISING FROM USE OF THE INFORMATION. THERE IS NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, REGARDING THE INFORMATION, INCLUDING WARRANTY OF MERCHANTIBILITY, WARRANTY OF FITNESS FOR A PARTICULAR USE, OR WARRANTY OF NON-INFRINGEMENT.

29. **License to Use IB Software:**

IB grants to Client a non-exclusive, non-transferable license to use IB Software solely as provided herein. Title to IB Software and updates shall remain the sole property of IB, including all patents, copyrights and trademarks. Client shall not sell, exchange, or transfer the IB Software to others. Client shall not copy, modify, translate, decompile, reverse engineer, disassemble or reduce to a human readable form, or adapt, the IB Software or use it to create a derivative work, unless authorized in writing by an officer of IB. IB is entitled to immediate injunctive relief for threatened breaches of these undertakings.

30. **LIMITATION OF LIABILITY AND LIQUIDATED DAMAGES PROVISION:**

CLIENT ACCEPTS THE IB SYSTEM "AS IS", AND WITHOUT WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE, PURPOSE OR APPLICATION; TIMELINESS; FREEDOM FROM INTERRUPTION; OR ANY IMPLIED WARRANTIES ARISING FROM TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE. UNDER NO CIRCUMSTANCES SHALL IB BE LIABLE FOR ANY PUNITIVE, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGES, INCLUDING LOSS OF BUSINESS, PROFITS OR GOODWILL. IB SHALL NOT BE LIABLE TO CLIENT BY REASON OF DELAYS OR INTERRUPTIONS OF SERVICE OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF THE IB SYSTEM, REGARDLESS OF CAUSE, INCLUDING, BUT NOT LIMITED TO,

THOSE CAUSED BY HARDWARE OR SOFTWARE MALFUNCTION; GOVERNMENTAL, EXCHANGE OR OTHER REGULATORY ACTION; ACTS OF GOD; WAR, TERRORISM, OR IB'S INTENTIONAL ACTS. CLIENT RECOGNIZES THAT THERE MAY BE DELAYS OR INTERRUPTIONS IN THE USE OF THE IB SYSTEM, INCLUDING, FOR EXAMPLE, THOSE CAUSED INTENTIONALLY BY IB FOR PURPOSES OF SERVICING THE IB SYSTEM. IN NO EVENT SHALL IB'S LIABILITY, REGARDLESS OF THE FORM OF ACTION AND DAMAGES SUFFERED BY CLIENT, EXCEED THE HIGHEST TOTAL MONTHLY COMMISSIONS PAID BY CLIENT TO IB OVER THE 6 MONTHS PRIOR TO ANY INCIDENT.

31. **Client Must Maintain Alternative Trading Arrangements:**

Computer-based systems such as those used by IB are inherently vulnerable to disruption, delay or failure. CLIENT MUST MAINTAIN ALTERNATIVE TRADING ARRANGEMENTS IN ADDITION TO CLIENT'S IB ACCOUNT FOR EXECUTION OF CLIENT'S ORDERS IN THE EVENT THAT THE IB SYSTEM IS UNAVAILABLE. By signing this Agreement, Client represents that Client maintains alternative trading arrangements.

32. **Consent To Accept Electronic Records And Communications:**

IB provides electronic trade confirmations, account statements, tax information and other Client records and communications (collectively, "Records and Communications") in electronic form. Electronic Records and Communications may be sent to Client's Trader Workstation ("TWS") or to Client's e-mail address, or for security purposes may be posted on the IB website and client will need to login and retrieve the Communication. By entering into this Agreement, Client consents to the receipt of electronic Records and Communications. Such consent will apply on an ongoing basis and for every tax year unless withdrawn by Client. Client may withdraw such consent at any time by providing electronic notice to IB through the IB website. If Client withdraws such consent, IB will provide required tax documents in paper form upon request by telephone or via the IB website. However, IB reserves the right to require Client to close Client's Account. In order to trade using the IB TWS, and to receive Records and Communications through the TWS, there are certain system hardware and software requirements, which are described on the IB website at www.interactivebrokers.com. Since these requirements may change, Client must periodically refer to the IB website for current system requirements. To receive electronic mail from IB, Client is responsible for maintaining a valid Internet e-mail address and software allowing client to read, send and receive e-mail. Client must notify IB immediately of a change in Client's e-mail address by using those procedures to change a Client e-mail address that may be available on the IB website.

33. **Rules and Laws:**

   a. All transactions under this Agreement shall be subject to the constitution, rules, regulations, customs, usages, rulings and interpretations, from time to time extant or in force of the HKEx, HKFE or SEHK or other markets as applicable (and of their respective clearing house, if any), where the transactions are executed by IB or IB agents. All transactions under this agreement shall also be subject to any law, Rule, or regulation then applicable thereto, including but not limited to, the provisions of the Ordinance, as amended from time to time, and the Rules and regulations thereunder.
   b. All transactions entered between IB and the Client relating to any money, foreign currency, currency option, currency future, or currency forward contract or foreign exchange contract shall be governed by and subject to all the rules, regulations, orders and laws of the country of the currency or money concerned and those of Hong Kong and/or the by-laws, rules and regulations of the exchange or market concerned in which the transaction is done.
   c. This Agreement is governed by the laws of the Hong Kong SAR, without giving effect to conflict of laws provisions. Except where arbitration is provided, the Client submits to the non-exclusive jurisdiction of the Courts of Hong Kong in respect of all disputes, differences and claims relating to or arising out of the Agreement. IN ALL JUDICIAL ACTIONS, ARBITRATIONS, OR DISPUTE RESOLUTION METHODS, THE PARTIES WAIVE ANY RIGHT TO PUNITIVE DAMAGES.

34. **Use of your Personal Data:**

Interactive Brokers intends to use your name and email address to send you information relating, but not limited, to new product announcements, market updates, upcoming IB webinars and other relevant information relating to Interactive Brokers' services. By signing this Agreement, you indicate your consent and agreement to such use. If you do not agree to such use of your personal information, you can exercise your opt-out option by following the instructions on the IB website, or by visiting the following link:ï¿½ https://www.interactivebrokers.com/en/?f=%2Fen%2Fgeneral%2Fcontact%2Foptout.php%3Fib_entity %3Dllc

35. **Miscellaneous:**

   a. Client agrees to the provision of this Agreement in English and represents that Client understands its terms and conditions. This Agreement contains the entire agreement between the parties, who have made no other representations or warranties. If any provision of this Agreement is unenforceable, it shall not invalidate other provisions. Failure of IB to enforce any term or condition of this Agreement is not a waiver of the term/ condition.
   b. Client consents to recording of all telephone conversations. Client acknowledges the IBG Privacy Statement and consents to collection/use of Client information as described therein.
   c. Client may not assign or transfer any rights or obligations hereunder without the prior written consent of IB. Upon notice to Client, IB may assign its rights and obligations under this Agreement to another broker. This Agreement shall inure to the benefit of IB's successors and assigns. IB may terminate this Agreement or its services to Client at any time. Client may close its Account upon notice to IB electronically through the IB website, but only after all positions are closed and all other requirements specified on the IB website regarding Account closure are satisfied.
   d. Client authorizes IB, directly or through third parties, to make any inquiries that IB considers necessary to conduct business with Client. This may include ordering a credit report and performing other credit checks in the event of any default or breach of the obligations herein by Client, or verifying the information Client provides against third party databases. Any information obtained is maintained in accordance with the Interactive Brokers Group Privacy Statement.
   e. IB is licensed to trade in the products approved by the various exchanges including HKFE or SEHK, as applicable, from time to time. Contract specifications for the products in question are available on request.
   f. If Client suffers pecuniary loss by reason of IB's default, the Client may have the right to claim under the Investor Compensation Fund established under the Ordinance. The liability of the Investor Compensation Fund will be restricted to valid claims as provided for in the Ordinance and the relevant subsidiary legislation and will be subject to the monetary limits specified in the Securities and Futures (Investor Compensation -ï¿½ compensation Limits) Rules and accordingly there can be no assurance that any pecuniary loss sustained by reason of such a default will necessarily be recouped from the Investor Compensation Fund in full, in part or at all.
   g. Every contract executed on the HKFE shall be subject to the charge of an applicable Investor Compensation Fund levy and a levy pursuant to the Ordinance, the cost of both of which shall be borne by the Client.

36. **Mandatory Arbitration:**

   a. This agreement contains a pre-dispute arbitration clause. By signing this Agreement the parties agree as follows:

      » ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.
      » ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.
      » THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

» THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD.
» UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.
» THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION.
» IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.
» THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

b.  Client agrees that any controversy, dispute, claim, or grievance between IB, any IB affiliate or any of their shareholders, officers, directors employees, associates, or agents, on the one hand, and Client or, if applicable, Client's shareholders, officers, directors employees, associates, or agents on the other hand, arising out of, or relating to, this Agreement, or any Account(s) established hereunder in which securities may be traded; any transactions therein; any transactions between IB and Client; any provision of the Client Agreement or any other agreement between IB and Client; or any breach of such transactions or agreements, shall be resolved by arbitration, in accordance with the rules then prevailing of any one of the following: (a) The Securities and Futures Commission; (b) The Hong Kong International Arbitration Centre or (c) any exchange of which IB is a member, as the true claimant-in-interest may elect. If Client is the claimant-in-interest and has not selected an arbitration forum within ten days of providing notice of Client's intent to arbitrate, IB shall select the forum. The award of the arbitrators, or a majority of them, shall be final, and judgment upon the award rendered may be entered in any court having jurisdiction.

c.  THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN PARAGRAPH 36. BY SIGNING THIS AGREEMENT CLIENT ACKNOWLEDGES THAT THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AND THAT CLIENT HAS RECEIVED, READ AND UNDERSTOOD THE TERMS THEREOF.

# EXHIBIT B



# Activity Statement

May 30, 2025

? Help

Interactive Brokers Hong Kong Limited, Suite 1512, Two Pacific Place, 88 Queensway, Admiralty, Hong Kong

## Account Information

| | |
|---|---|
| Name | Stephanie L Wong |
| Account | U8686280 |
| Address of Account Holder(s) | NEPTUNE TERRACE<br>FLAT 27A, TOWER ONE<br>CHAI WAN, HONG KONG, 00852<br>Hong Kong Special Administrative Region of China |
| Account Type | Individual |
| Customer Type | Individual |
| Account Capabilities | Cash |
| Base Currency | USD |

## Net Asset Value

| | May 29, 2025 | May 30, 2025 | | | | Change in NAV | Total |
|---|---|---|---|---|---|---|---|
| | Total | Long | Short | Total | Change | Starting Value | 4,855,022.34 |
| Cash | 43,058.56 | 54,564.26 | 0.00 | 54,564.26 | 11,505.70 | Mark-to-Market | -1,205,567.11 |
| Stock | 3,506,103.50 | 3,567,200.00 | 0.00 | 3,567,200.00 | 61,096.50 | Dividends | 75.00 |
| Bonds | 1,298,116.13 | 24,481.02 | 0.00 | 24,481.02 | -1,273,635.11 | Withholding Tax | -22.50 |
| Interest Accruals | 7,639.15 | 372.39 | 0.00 | 372.39 | -7,266.76 | Change in Dividend Accruals | -18.50 |
| Broker Interest Accruals | 362.05 | 372.39 | 0.00 | 372.39 | 10.34 | Interest | 7,476.21 |
| Bond Interest Accruals | 7,277.10 | 0.00 | 0.00 | 0.00 | -7,277.10 | Change in Interest Accruals | -7,266.76 |
| Dividend Accruals | 105.00 | 86.50 | 0.00 | 86.50 | -18.50 | Commissions | -2,994.50 |
| Total | 4,855,022.34 | 3,646,704.17 | 0.00 | 3,646,704.17 | -1,208,318.17 | Ending Value | 3,646,704.17 |
| Time Weighted Rate of Return | | | | | -24.89% | | |

## Mark-to-Market Performance Summary

| Symbol | Quantity | | Price | | Mark-to-Market P/L | | | | | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | |
| **Stocks** | | | | | | | | | | |
| AAPL | 1,900 | 0 | 199.9500 | 200.8500 | 1,710.00 | -3,344.00 | -9.90 | 0.00 | -1,643.90 | |
| ADBE | 100 | 0 | 413.3600 | 415.0900 | 173.00 | -24.50 | -1.02 | 0.00 | 147.48 | |
| AMD | 500 | 0 | 113.0300 | 110.7300 | -1,150.00 | 321.60 | -2.60 | 0.00 | -831.00 | |
| AMZN | 200 | 0 | 205.7000 | 205.0100 | -138.00 | -67.76 | -1.04 | 0.00 | -206.80 | |

## Mark-to-Market Performance Summary

| Symbol | Quantity | | Price | | Mark-to-Market P/L | | | | | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | |
| ASML | 200 | 0 | 747.0650 | 736.7700 | -2,059.00 | 1,588.85 | -1.04 | 0.00 | -471.19 | |
| B | 400 | 0 | 19.0000 | 19.1600 | 64.00 | -96.00 | -2.08 | 0.00 | -34.08 | |
| BA | 1,300 | 0 | 208.1800 | 207.3200 | -1,118.00 | 86.46 | -6.78 | 0.00 | -1,038.32 | |
| BABA | 100 | 0 | 117.1800 | 113.8400 | -334.00 | 14.50 | -1.02 | 0.00 | -320.52 | |
| BIDU | 200 | 0 | 84.3900 | 81.9000 | -498.00 | 91.00 | -1.04 | 0.00 | -408.04 | |
| CCL | 200 | 0 | 23.1600 | 23.2200 | 12.00 | -39.00 | -1.04 | 0.00 | -28.04 | |
| CMG | 200 | 0 | 49.7300 | 50.0800 | 70.00 | -121.00 | -1.04 | 0.00 | -52.04 | |
| DIS | 200 | 0 | 112.0200 | 113.0400 | 204.00 | -95.00 | -1.04 | 0.00 | 107.96 | |
| DOCU | 300 | 0 | 85.7100 | 88.6100 | 870.00 | -579.00 | -1.56 | 0.00 | 289.44 | |
| FSLY | 300 | 0 | 7.3400 | 7.2800 | -18.00 | 10.50 | -1.56 | 0.00 | -9.06 | |
| FTNT | 8,000 | 0 | 102.0400 | 101.7800 | -2,080.00 | 1,806.70 | -41.68 | 0.00 | -314.97 | |
| GOOG | 200 | 0 | 172.9600 | 172.8500 | -22.00 | -221.00 | -1.04 | 0.00 | -244.04 | |
| HCAI | 0 | 560,000 | -- | 6.3700 | 0.00 | -1,205,450.83 | -2,819.60 | 0.00 | -1,208,270.43 | |
| LLY | 50 | 0 | 722.5700 | 737.6700 | 755.00 | -314.50 | -1.01 | 0.00 | 439.49 | |
| LRCX | 500 | 0 | 84.1600 | 80.7900 | -1,685.00 | 900.82 | -2.61 | 0.00 | -786.78 | |
| META | 100 | 0 | 645.0500 | 647.4900 | 244.00 | -201.50 | -1.02 | 0.00 | 41.48 | |
| MRNA | 300 | 0 | 26.9300 | 26.5600 | -111.00 | -210.00 | -1.56 | 0.00 | -322.56 | |
| MU | 500 | 0 | 96.8000 | 94.4600 | -1,170.00 | 165.00 | -2.61 | 0.00 | -1,007.61 | |
| NIO | 200 | 0 | 3.6800 | 3.5400 | -28.00 | 0.10 | -1.04 | 0.00 | -28.94 | |
| NKE | 300 | 0 | 61.4400 | 60.5900 | -255.00 | -29.79 | -1.56 | 0.00 | -286.35 | |
| NVAX | 300 | 0 | 7.1900 | 7.3400 | 45.00 | -88.00 | -1.56 | 0.00 | -44.56 | |
| NVDA | 1,600 | 0 | 139.1900 | 135.1300 | -6,496.00 | 2,786.50 | -8.33 | 0.00 | -3,717.83 | |
| ON | 200 | 0 | 42.9400 | 42.0200 | -184.00 | 85.00 | -1.04 | 0.00 | -100.04 | |
| PANW | 600 | 0 | 185.8200 | 192.4200 | 3,960.00 | -1,056.00 | -3.13 | 0.00 | 2,900.87 | |
| PYPL | 300 | 0 | 70.9300 | 70.2800 | -195.00 | 21.69 | -1.56 | 0.00 | -174.88 | |
| SGOV | 600 | 0 | 100.6800 | 100.7100 | 18.00 | 2.40 | -3.12 | 0.00 | 17.28 | |
| SNAP | 1,000 | 0 | 8.2800 | 8.2500 | -30.00 | -76.00 | -5.21 | 0.00 | -111.21 | |
| SNOW | 200 | 0 | 202.3100 | 205.6700 | 672.00 | -423.51 | -1.04 | 0.00 | 247.45 | |
| TSLA | 2,400 | 0 | 358.4300 | 346.4600 | -28,728.00 | 36,838.46 | -12.51 | 0.00 | 8,097.96 | |
| VIR | 300 | 0 | 5.1900 | 4.9400 | -75.00 | -25.50 | -1.56 | 0.00 | -102.06 | |
| WYNN | 300 | 0 | 90.7300 | 90.5400 | -57.00 | -151.50 | -1.56 | 52.50 | -157.56 | |
| XYZ | 200 | 0 | 62.1600 | 61.7500 | -82.00 | -34.00 | -1.04 | 0.00 | -117.04 | |
| ZM | 250 | 0 | 79.9400 | 81.2500 | 327.50 | -355.00 | -1.30 | 0.00 | -28.80 | |
| **Total Stocks** | | | | | **-37,388.50** | **-1,168,283.80** | **-2,949.50** | **52.50** | **-1,208,569.30** | |
| **Forex** | | | | | | | | | | |
| GBP | 35.16 | 35.16 | 1.3491 | 1.3455 | -0.13 | 0.00 | 0.00 | 0.00 | -0.13 | |
| HKD | 225.34 | 225.34 | 0.12752 | 0.12754 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| USD | 42,982.39 | 54,488.22 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| **Total Forex** | | | | | **-0.12** | **0.00** | **0.00** | **0.00** | **-0.12** | |
| **Bonds** | | | | | | | | | | |
| United States Treasury T 2 1/4 03/31/26 T 2 1/4 03/31/26 | 100,000 | 0 | 98.425781 | 98.460938 | 35.16 | -47.21 | -5.00 | 387.30 | 370.25 | |
| United States Treasury T 3 09/30/25 T 3 09/30/25 | 125,000 | 0 | 99.59375 | 99.601563 | 9.76 | -34.18 | -5.00 | 645.49 | 616.07 | |

## Mark-to-Market Performance Summary

| Symbol | Quantity | | Price | | Mark-to-Market P/L | | | | | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | Prior | Current | Prior | Current | Position | Transaction | Commissions | Other | Total | |
| United States Treasury T 4 1/4 12/31/25 T 4 1/4 12/31/25 | 165,000 | 0 | 100.003906 | 100.007813 | 6.45 | -64.45 | -5.00 | 2,963.85 | 2,900.85 | |
| United States Treasury T 4 5/8 06/30/25 T 4 5/8 06/30/25 | 80,000 | 0 | 100.050781 | 100.050781 | 0.00 | -24.99 | -5.00 | 1,563.81 | 1,533.82 | |
| United States Treasury T 5 08/31/25 T 5 08/31/25 | 150,000 | 0 | 100.164063 | 100.167969 | 5.86 | -46.87 | -5.00 | 1,915.76 | 1,869.75 | |
| **Total Bonds** | | | | | **57.24** | **-217.71** | **-25.00** | **7,476.21** | **7,290.74** | |
| **Treasury Bills** | | | | | | | | | | |
| United States Treasury B 06/12/25 912797LN5 | 161,000 | 0 | 99.846528 | 99.882153 | 57.36 | 0.94 | -5.00 | 0.00 | 53.30 | |
| United States Treasury B 09/04/25 912797MH7 | 150,000 | 0 | 98.862271 | 98.894194 | 47.88 | 5.68 | -5.00 | 0.00 | 48.56 | |
| United States Treasury B 10/02/25 912797MS3 | 200,000 | 0 | 98.536458 | 98.573278 | 73.64 | 16.60 | -5.00 | 0.00 | 85.24 | |
| United States Treasury B 11/28/25 912797NL7 | 25,000 | 25,000 | 97.889305 | 97.924097 | 8.69 | 0.00 | 0.00 | 0.00 | 8.69 | |
| United States Treasury B 07/08/25 912797PZ4 | 150,000 | 0 | 99.542292 | 99.57725 | 52.44 | 2.56 | -5.00 | 0.00 | 49.99 | |
| **Total Treasury Bills** | | | | | **240.00** | **25.78** | **-20.00** | **0.00** | **245.78** | |
| **Total (All Assets)** | | | | | **-37,091.38** | **-1,168,475.73** | **-2,994.50** | **7,528.71** | **-1,201,032.91** | |

## Realized & Unrealized Performance Summary

| Symbol | Cost Adj. | Realized | | | | | Unrealized | | | | | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | Total | |
| **Stocks** | | | | | | | | | | | | | |
| AAPL | 0.00 | 0.00 | 0.00 | 222,087.55 | 0.00 | 222,087.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 222,087.55 | |
| ADBE | 0.00 | 0.00 | 0.00 | 0.00 | -15,517.52 | -15,517.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -15,517.52 | |
| AMD | 0.00 | 0.00 | 0.00 | 17,581.50 | 0.00 | 17,581.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17,581.50 | |
| AMZN | 0.00 | 0.00 | 0.00 | 8,781.70 | 0.00 | 8,781.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,781.70 | |
| ASML | 0.00 | 0.00 | 0.00 | 7,270.81 | -3,731.00 | 3,539.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,539.81 | |
| B | 0.00 | 382.29 | 0.00 | 0.00 | -1,366.74 | -984.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -984.45 | |
| BA | 0.00 | 0.00 | 0.00 | 14,045.90 | -70,186.17 | -56,140.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -56,140.27 | |
| BABA | 0.00 | 0.00 | 0.00 | 0.00 | -10,503.52 | -10,503.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10,503.52 | |
| BIDU | 0.00 | 0.00 | 0.00 | 0.00 | -32,024.54 | -32,024.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -32,024.54 | |
| CCL | 0.00 | 0.00 | 0.00 | 0.00 | -1,197.04 | -1,197.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -1,197.04 | |
| CMG | 0.00 | 95.98 | -499.02 | 0.00 | 0.00 | -403.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -403.05 | |
| DIS | 0.00 | 0.00 | 0.00 | 0.00 | -11,701.54 | -11,701.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -11,701.54 | |
| DOCU | 0.00 | 0.00 | 0.00 | 0.00 | -44,400.56 | -44,400.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -44,400.56 | |
| FSLY | 0.00 | 0.00 | 0.00 | 0.00 | -24,053.06 | -24,053.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -24,053.06 | |
| FTNT | 0.00 | 0.00 | 0.00 | 736,005.03 | 0.00 | 736,005.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 736,005.03 | |
| GOOG | 0.00 | 0.00 | -3,335.05 | 0.00 | 0.00 | -3,335.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -3,335.05 | |

## Realized & Unrealized Performance Summary

| Symbol | Cost Adj. | Realized | | | | | Unrealized | | | | | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | Total | |
| HCAI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -1,208,270.43 | 0.00 | 0.00 | -1,208,270.43 | -1,208,270.43 | |
| LLY | 0.00 | 566.99 | 0.00 | 0.00 | 0.00 | 566.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 566.99 | |
| LRCX | 0.00 | 0.00 | -5,724.53 | 0.00 | 0.00 | -5,724.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5,724.53 | |
| META | 0.00 | 345.48 | 0.00 | 0.00 | 0.00 | 345.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 345.48 | |
| MRNA | 0.00 | 0.00 | 0.00 | 0.00 | -103,646.56 | -103,646.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -103,646.56 | |
| MU | 0.00 | 0.00 | 0.00 | 18,355.39 | 0.00 | 18,355.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18,355.39 | |
| NIO | 0.00 | 0.00 | 0.00 | 0.00 | -7,093.94 | -7,093.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -7,093.94 | |
| NKE | 0.00 | 0.00 | -1,293.45 | 0.00 | -19,604.90 | -20,898.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -20,898.36 | |
| NVAX | 0.00 | 0.00 | 0.00 | 0.00 | -64,836.56 | -64,836.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -64,836.56 | |
| NVDA | 0.00 | 1,868.98 | 0.00 | 115,270.19 | 0.00 | 117,139.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 117,139.17 | |
| ON | 0.00 | 0.00 | 0.00 | 0.00 | -10,786.04 | -10,786.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10,786.04 | |
| PANW | 0.00 | 6,528.95 | 0.00 | 40,560.58 | 0.00 | 47,089.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 47,089.54 | |
| PYPL | 0.00 | 0.00 | 0.00 | 0.00 | -53,047.88 | -53,047.88 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -53,047.88 | |
| SGOV | 0.00 | 129.15 | 0.00 | 0.00 | 0.00 | 129.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 129.15 | |
| SNAP | 0.00 | 0.00 | 0.00 | 0.00 | -21,751.71 | -21,751.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -21,751.71 | |
| SNOW | 0.00 | 0.00 | 0.00 | 0.00 | -23,792.55 | -23,792.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -23,792.55 | |
| TSLA | 0.00 | 0.00 | 0.00 | 557,542.96 | 0.00 | 557,542.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 557,542.96 | |
| VIR | 0.00 | 0.00 | 0.00 | 0.00 | -15,295.06 | -15,295.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -15,295.06 | |
| WYNN | 0.00 | 0.00 | 0.00 | 0.00 | -8,794.06 | -8,794.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -8,794.06 | |
| XYZ | 0.00 | 0.00 | 0.00 | 0.00 | -41,087.04 | -41,087.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -41,087.04 | |
| ZM | 0.00 | 0.00 | 0.00 | 0.00 | -66,546.80 | -66,546.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -66,546.80 | |
| **Total Stocks** | **0.00** | **9,917.81** | **-10,852.06** | **1,737,501.60** | **-650,964.83** | **1,085,602.52** | **0.00** | **-1,208,270.43** | **0.00** | **0.00** | **-1,208,270.43** | **-122,667.91** | |
| **Forex** | | | | | | | | | | | | | |
| GBP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.19 | 0.00 | 0.00 | 0.00 | 3.19 | 3.19 | |
| HKD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -0.28 | 0.00 | 0.00 | -0.28 | -0.28 | |
| **Total Forex** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **3.19** | **-0.28** | **0.00** | **0.00** | **2.91** | **2.91** | |
| **Bonds** | | | | | | | | | | | | | |
| United States Treasury T 2 1/4 03/31/26 T 2 1/4 03/31/26 | 0.00 | 300.72 | -2.51 | 663.59 | 0.00 | 961.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 961.81 | |
| United States Treasury T 3 09/30/25 T 3 09/30/25 | 0.00 | 791.68 | 0.00 | 0.00 | 0.00 | 791.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 791.68 | |
| United States Treasury T 4 1/4 12/31/25 T 4 1/4 12/31/25 | 0.00 | 0.00 | -522.73 | 0.00 | 0.00 | -522.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -522.73 | |
| United States Treasury T 4 5/8 06/30/25 T 4 5/8 06/30/25 | 0.00 | 0.00 | -93.12 | 0.00 | 0.00 | -93.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -93.12 | |
| United States Treasury T 5 08/31/25 T 5 08/31/25 | 0.00 | 0.00 | -678.53 | 4.97 | 0.00 | -673.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -673.56 | |
| **Total Bonds** | **0.00** | **1,092.40** | **-1,296.89** | **668.56** | **0.00** | **464.08** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **464.08** | |
| **Treasury Bills** | | | | | | | | | | | | | |
| United States Treasury B 06/12/25 912797LN5 | 0.00 | 4,916.68 | 0.00 | 0.00 | 0.00 | 4,916.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,916.68 | |
| United States Treasury B 09/04/25 912797MH7 | 0.00 | 1,242.66 | 0.00 | 0.00 | 0.00 | 1,242.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,242.66 | |

## Realized & Unrealized Performance Summary

| Symbol | Cost Adj. | Realized | | | | | Unrealized | | | | | Total | Code |
| | | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | S/T Profit | S/T Loss | L/T Profit | L/T Loss | Total | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| United States Treasury B 10/02/25 912797MS3 | 0.00 | 793.53 | 0.00 | 0.00 | 0.00 | 793.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 793.53 | |
| United States Treasury B 11/28/25 912797NL7 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 119.91 | 0.00 | 0.00 | 0.00 | 119.91 | 119.91 | |
| United States Treasury B 07/08/25 912797PZ4 | 0.00 | 963.73 | 0.00 | 0.00 | 0.00 | 963.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 963.73 | |
| **Total Treasury Bills** | 0.00 | 7,916.60 | 0.00 | 0.00 | 0.00 | 7,916.60 | 119.91 | 0.00 | 0.00 | 0.00 | 119.91 | 8,036.51 | |
| **Total (All Assets)** | 0.00 | 18,926.81 | -12,148.95 | 1,738,170.17 | -650,964.83 | 1,093,983.20 | 123.10 | -1,208,270.72 | 0.00 | 0.00 | -1,208,147.62 | -114,164.41 | |

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market | | Realized S/T | | Realized L/T | |
| | | MTD | YTD | MTD | YTD | MTD | YTD |
|---|---|---|---|---|---|---|---|
| **Stocks** | | | | | | | |
| AAPL | APPLE INC | -25,143.10 | -112,232.97 | 0.00 | 0.00 | 222,087.55 | 340,429.01 |
| ADBE | ADOBE INC | 3,985.48 | -2,984.52 | 0.00 | 0.00 | -15,517.52 | -15,517.52 |
| AMD | ADVANCED MICRO DEVICES | 7,009.00 | -4,711.00 | 0.00 | 0.00 | 17,581.50 | 17,581.50 |
| AMZN | AMAZON.COM INC | 4,049.20 | -7,225.94 | 0.00 | 0.00 | 8,781.70 | 14,302.06 |
| ASML | ASML HOLDING NV-NY REG SHS | 15,681.21 | 10,948.19 | 0.00 | 0.00 | 3,539.81 | 3,539.81 |
| B | BARRICK MINING CORP | -218.08 | -218.08 | 382.29 | 382.29 | -1,366.74 | -1,366.74 |
| BA | BOEING CO/THE | 31,383.68 | 39,495.68 | 0.00 | 0.00 | -56,140.27 | -56,140.27 |
| BABA | ALIBABA GROUP HOLDING-SP ADR | -545.52 | 9,260.05 | 0.00 | 0.00 | -10,503.52 | -22,183.95 |
| BIDU | BAIDU INC - SPON ADR | -1,094.04 | -392.04 | 0.00 | 0.00 | -32,024.54 | -32,024.54 |
| CCL | CARNIVAL CORP | 935.96 | -380.04 | 0.00 | 0.00 | -1,197.04 | -1,197.04 |
| CMG | CHIPOTLE MEXICAN GRILL INC | -210.04 | -403.05 | -403.05 | -403.05 | 0.00 | 0.00 |
| COIN | COINBASE GLOBAL INC -CLASS A | 0.00 | 5,268.14 | 0.00 | 0.00 | 0.00 | 2,297.14 |
| DIS | WALT DISNEY CO/THE | 4,321.96 | 311.96 | 0.00 | 0.00 | -11,701.54 | -11,701.54 |
| DOCU | DOCUSIGN INC | 1,477.44 | -979.56 | 0.00 | 0.00 | -44,400.56 | -44,400.56 |
| FIGS | FIGS INC-CLASS A | 0.00 | -319.07 | 0.00 | 0.00 | 0.00 | -8,233.07 |
| FSLY | FASTLY INC - CLASS A | 467.94 | -639.06 | 0.00 | 0.00 | -24,053.06 | -24,053.06 |
| FTNT | FORTINET INC | -14,074.97 | 64,659.21 | 0.00 | 0.00 | 736,005.03 | 791,187.21 |
| GOLD | BARRICK GOLD CORP | 168.00 | 1,902.85 | 0.00 | 0.00 | 0.00 | -1,481.68 |
| GOOG | ALPHABET INC-CL C | 2,169.96 | -2,720.05 | -3,335.05 | -3,335.05 | 0.00 | 10,074.00 |
| HCAI | HUACHEN AI PARKING MANAGEMEN | -1,208,270.43 | -1,208,270.43 | 0.00 | 0.00 | 0.00 | 0.00 |
| IBIT | ISHARES BITCOIN TRUST ETF | 364.65 | 2,278.58 | 134.65 | 581.75 | 0.00 | 0.00 |
| LLY | ELI LILLY & CO | 566.99 | 3,985.24 | 566.99 | 1,250.64 | 0.00 | 0.00 |
| LMT | LOCKHEED MARTIN CORP | 0.00 | 1,227.67 | 0.00 | 996.67 | 0.00 | 0.00 |
| LRCX | LAM RESEARCH CORP | 5,458.22 | 5,339.22 | -5,724.53 | -5,724.53 | 0.00 | 0.00 |
| LULU | LULULEMON ATHLETICA INC | 2,717.99 | 1,755.49 | 1,755.49 | 1,755.49 | 0.00 | 0.00 |
| META | META PLATFORMS INC-CLASS A | 9,626.58 | 10,925.57 | 10,925.57 | 10,925.57 | 0.00 | 0.00 |
| MRNA | MODERNA INC | -805.56 | -4,717.56 | 0.00 | 0.00 | -103,646.56 | -103,646.56 |
| MU | MICRON TECHNOLOGY INC | 8,917.39 | 6,582.50 | 0.00 | 0.00 | 18,355.39 | 26,845.85 |
| NIO | NIO INC - ADR | -102.94 | -164.94 | 0.00 | 0.00 | -7,093.94 | -7,093.94 |

## Month & Year to Date Performance Summary

| Symbol | Description | Mark-to-Market MTD | Mark-to-Market YTD | Realized S/T MTD | Realized S/T YTD | Realized L/T MTD | Realized L/T YTD |
|---|---|---|---|---|---|---|---|
| NKE | NIKE INC -CL B | 1,225.65 | -4,190.36 | -1,293.45 | -1,293.45 | -19,604.90 | -19,604.90 |
| NVAX | NOVAVAX INC | 111.44 | -299.56 | 0.00 | 0.00 | -64,836.56 | -64,836.56 |
| NVDA | NVIDIA CORP | 44,714.17 | 5,744.37 | 1,868.98 | 1,868.98 | 115,270.19 | 115,270.19 |
| ON | ON SEMICONDUCTOR | 547.96 | -4,122.04 | 0.00 | 0.00 | -10,786.04 | -10,786.04 |
| PANW | PALO ALTO NETWORKS INC | 2,234.87 | 6,611.87 | 6,528.95 | 6,528.95 | 40,560.58 | 40,560.58 |
| PTON | PELOTON INTERACTIVE INC-A | 0.00 | 217.36 | 0.00 | 0.00 | 0.00 | -28,955.64 |
| PYPL | PAYPAL HOLDINGS INC | 1,352.12 | -4,500.88 | 0.00 | 0.00 | -53,047.88 | -53,047.88 |
| SGOV | ISHARES 0-3 MONTH TREASURY B | 179.11 | 199.49 | 129.15 | 129.15 | 0.00 | 0.00 |
| SNAP | SNAP INC - A | 208.79 | -2,601.21 | 0.00 | 0.00 | -21,751.71 | -21,751.71 |
| SNOW | SNOWFLAKE INC-CLASS A | 8,811.45 | 9,827.45 | 0.00 | 0.00 | -23,792.55 | -23,792.55 |
| TSLA | TESLA INC | 191,145.96 | -100,886.04 | 0.00 | 0.00 | 557,542.96 | 557,542.96 |
| TSM | TAIWAN SEMICONDUCTOR-SP ADR | 5,260.96 | 5,216.44 | 4,288.45 | 4,288.45 | 0.00 | 10,774.41 |
| VIR | VIR BIOTECHNOLOGY INC | -381.06 | -747.06 | 0.00 | 0.00 | -15,295.06 | -15,295.06 |
| WYNN | WYNN RESORTS LTD. | 2,968.44 | 1,265.94 | 0.00 | 0.00 | -8,794.06 | -8,794.06 |
| XYZ | BLOCK INC | 620.96 | -4,683.04 | 0.00 | 0.00 | -41,087.04 | -41,087.04 |
| ZM | ZOOM COMMUNICATIONS INC | 571.20 | 241.43 | 0.00 | 0.00 | -66,546.80 | -107,699.07 |
| **Total Stocks** | | **-891,591.08** | **-1,275,123.84** | **15,824.43** | **17,951.86** | **1,086,536.77** | **1,205,713.71** |
| **Bonds** | | | | | | | |
| T 2 1/4 03/31/26 | United States Treasury T 2 1/4 03/31/26 | 223.45 | 1,346.86 | 298.22 | 298.22 | 663.59 | 663.59 |
| T 3 09/30/25 | United States Treasury T 3 09/30/25 | 689.31 | 2,825.21 | 791.68 | 791.68 | 0.00 | 0.00 |
| T 4 1/4 12/31/25 | United States Treasury T 4 1/4 12/31/25 | 2,681.70 | 4,327.40 | -522.73 | -522.73 | 0.00 | 0.00 |
| T 4 5/8 06/30/25 | United States Treasury T 4 5/8 06/30/25 | 1,518.19 | 900.87 | -93.12 | -93.12 | 0.00 | 0.00 |
| T 5 08/31/25 | United States Treasury T 5 08/31/25 | 1,770.14 | 3,801.90 | -678.53 | -678.53 | 4.97 | 4.97 |
| **Total Bonds** | | **6,882.79** | **13,202.24** | **-204.48** | **-204.48** | **668.56** | **668.56** |
| **Treasury Bills** | | | | | | | |
| 912797KJ5 | United States Treasury B 03/20/25 | 0.00 | 1,244.99 | 0.00 | 3,487.32 | 0.00 | 0.00 |
| 912797KS5 | United States Treasury B 04/17/25 | 0.00 | 1,792.94 | 0.00 | 3,461.72 | 0.00 | 0.00 |
| 912797LB1 | United States Treasury B 05/15/25 | 246.02 | 2,281.35 | 4,144.83 | 4,144.83 | 0.00 | 0.00 |
| 912797LN5 | United States Treasury B 06/12/25 | 601.22 | 2,769.81 | 4,916.68 | 4,916.68 | 0.00 | 0.00 |
| 912797MH7 | United States Treasury B 09/04/25 | 514.16 | 1,242.66 | 1,242.66 | 1,242.66 | 0.00 | 0.00 |
| 912797MS3 | United States Treasury B 10/02/25 | 551.04 | 793.53 | 793.53 | 793.53 | 0.00 | 0.00 |
| 912797MT1 | United States Treasury B 03/13/25 | 0.00 | 1,258.50 | 0.00 | 2,435.32 | 0.00 | 0.00 |
| 912797NL7 | United States Treasury B 11/28/25 | 56.51 | 119.91 | 0.00 | 0.00 | 0.00 | 0.00 |
| 912797NT0 | United States Treasury B 04/01/25 | 0.00 | 1,526.94 | 0.00 | 1,662.29 | 0.00 | 0.00 |
| 912797PZ4 | United States Treasury B 07/08/25 | 436.03 | 963.73 | 963.73 | 963.73 | 0.00 | 0.00 |
| **Total Treasury Bills** | | **2,404.98** | **13,994.36** | **12,061.43** | **23,108.08** | **0.00** | **0.00** |
| **Total (All Assets)** | | **-882,303.31** | **-1,247,927.24** | **27,681.38** | **40,855.46** | **1,087,205.34** | **1,206,382.27** |

## Cash Report

| | Total | Month to Date | Year to Date |
|---|---|---|---|
| **Base Currency Summary** | | | |
| Starting Cash | 43,058.56 | | |
| Commissions | -2,994.50 | -3,017.43 | -3,182.12 |

## Cash Report

| | Total | Month to Date | Year to Date |
|---|---:|---:|---:|
| Withdrawals | 0.00 | -110,000.00 | -110,000.00 |
| Dividends | 75.00 | 1,087.61 | 3,305.78 |
| Broker Interest Paid and Received | 0.00 | 455.08 | 1,432.70 |
| Bond Interest Paid and Received | 7,476.21 | 7,400.90 | 12,961.90 |
| Trades (Sales) | 4,779,622.45 | 5,059,730.07 | 6,129,340.19 |
| Trades (Purchase) | -4,772,650.83 | -5,026,499.09 | -6,162,630.08 |
| Other Fees | 0.00 | -2.00 | -6.00 |
| Withholding Tax | -22.50 | -263.57 | -861.33 |
| Cash FX Translation Gain/Loss | -0.12 | | |
| Ending Cash | 54,564.26 | | |
| Ending Settled Cash | 40,116.44 | | |
| **GBP** | | | |
| Starting Cash | 35.16 | | |
| Ending Cash | 35.16 | | |
| Ending Settled Cash | 35.16 | | |
| **HKD** | | | |
| Starting Cash | 225.34 | | |
| Ending Cash | 225.34 | | |
| Ending Settled Cash | 225.34 | | |
| **USD** | | | |
| Starting Cash | 42,982.39 | | |
| Commissions | -2,994.50 | -3,017.43 | -3,182.12 |
| Withdrawals | 0.00 | -110,000.00 | -110,000.00 |
| Dividends | 75.00 | 1,087.61 | 3,305.78 |
| Broker Interest Paid and Received | 0.00 | 455.08 | 1,432.70 |
| Bond Interest Paid and Received | 7,476.21 | 7,400.90 | 12,961.90 |
| Trades (Sales) | 4,779,622.45 | 5,059,730.07 | 6,129,340.19 |
| Trades (Purchase) | -4,772,650.83 | -5,026,499.09 | -6,162,630.08 |
| Other Fees | 0.00 | -2.00 | -6.00 |
| Withholding Tax | -22.50 | -263.57 | -861.33 |
| Ending Cash | 54,488.22 | | |
| Ending Settled Cash | 40,040.39 | | |

## Open Positions

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---:|---:|---:|---:|---:|---:|---:|---|
| **Stocks** | | | | | | | | |
| **USD** | | | | | | | | |
| HCAI | 560,000 | 1 | 8.52762578 | 4,775,470.43 | 6.3700 | 3,567,200.00 | -1,208,270.43 | |
| **Total** | | | | **4,775,470.43** | | **3,567,200.00** | **-1,208,270.43** | |

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---:|---:|---:|---:|---:|---:|---:|---|
| **Treasury Bills** | | | | | | | | |
| **USD** | | | | | | | | |
| United States Treasury B 11/28/25 912797NL7 | 25,000 | 1 | 97.44444 | 24,361.11 | 97.924097 | 24,481.02 | 119.91 | |

## Open Positions

| | | | | | |
|---|---|---|---|---|---|
| Total | | | 24,361.11 | 24,481.02 | 119.91 |

## Forex Balances

| Description | Quantity | Cost Price | Cost Basis in USD | Close Price | Value in USD | Unrealized P/L in USD | Code |
|---|---|---|---|---|---|---|---|
| Forex | | | | | | | |
| USD | | | | | | | |
| GBP | 35.16 | 1.2547 | -44.12 | 1.3455 | 47.31 | 3.19 | |
| HKD | 225.34 | 0.1288 | -29.02 | 0.12754 | 28.74 | -0.28 | |
| USD | 54,488.22 | 0.0000 | -54,488.22 | 1.0000 | 54,488.22 | 0.00 | |
| Total | | | -54,561.36 | | 54,564.26 | 2.91 | |

## Trades

| Symbol | Date/Time | Quantity | T. Price | C. Price | Proceeds | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Stocks | | | | | | | | | | |
| USD | | | | | | | | | | |
| AAPL | 2025-05-30, 10:45:23 | -1,900 | 199.0900 | 200.8500 | 378,271.00 | -9.90 | -156,173.55 | 222,087.55 | -3,344.00 | C;IM;P |
| Total AAPL | | -1,900 | | | 378,271.00 | -9.90 | -156,173.55 | 222,087.55 | -3,344.00 | |
| ADBE | 2025-05-30, 10:48:13 | -100 | 414.8450 | 415.0900 | 41,484.50 | -1.02 | -57,001.00 | -15,517.52 | -24.50 | C;P |
| Total ADBE | | -100 | | | 41,484.50 | -1.02 | -57,001.00 | -15,517.52 | -24.50 | |
| AMD | 2025-05-30, 10:49:23 | -500 | 111.3732 | 110.7300 | 55,686.60 | -2.60 | -38,102.50 | 17,581.50 | 321.60 | C;P |
| Total AMD | | -500 | | | 55,686.60 | -2.60 | -38,102.50 | 17,581.50 | 321.60 | |
| AMZN | 2025-05-30, 10:50:26 | -200 | 204.6712 | 205.0100 | 40,934.24 | -1.04 | -32,151.50 | 8,781.70 | -67.76 | C;IA |
| Total AMZN | | -200 | | | 40,934.24 | -1.04 | -32,151.50 | 8,781.70 | -67.76 | |
| ASML | 2025-05-30, 10:47:25 | -200 | 744.71425 | 736.7700 | 148,942.85 | -1.04 | -145,402.00 | 3,539.81 | 1,588.85 | C;IM;P |
| Total ASML | | -200 | | | 148,942.85 | -1.04 | -145,402.00 | 3,539.81 | 1,588.85 | |
| B | 2025-05-30, 10:53:03 | -400 | 18.9200 | 19.1600 | 7,568.00 | -2.08 | -8,550.37 | -984.45 | -96.00 | C;P |
| Total B | | -400 | | | 7,568.00 | -2.08 | -8,550.37 | -984.45 | -96.00 | |
| BA | 2025-05-30, 10:45:34 | -1,300 | 207.38650385 | 207.3200 | 269,602.45 | -6.78 | -325,735.95 | -56,140.27 | 86.46 | C;P |
| Total BA | | -1,300 | | | 269,602.45 | -6.78 | -325,735.95 | -56,140.27 | 86.46 | |
| BABA | 2025-05-30, 10:50:35 | -100 | 113.9850 | 113.8400 | 11,398.50 | -1.02 | -21,901.00 | -10,503.52 | 14.50 | C |
| Total BABA | | -100 | | | 11,398.50 | -1.02 | -21,901.00 | -10,503.52 | 14.50 | |
| BIDU | 2025-05-30, 10:53:55 | -200 | 82.3550 | 81.9000 | 16,471.00 | -1.04 | -48,494.50 | -32,024.54 | 91.00 | C;P |
| Total BIDU | | -200 | | | 16,471.00 | -1.04 | -48,494.50 | -32,024.54 | 91.00 | |
| CCL | 2025-05-30, 10:54:37 | -200 | 23.0250 | 23.2200 | 4,605.00 | -1.04 | -5,801.00 | -1,197.04 | -39.00 | C |
| Total CCL | | -200 | | | 4,605.00 | -1.04 | -5,801.00 | -1,197.04 | -39.00 | |
| CMG | 2025-05-30, 10:55:02 | -200 | 49.4750 | 50.0800 | 9,895.00 | -1.04 | -10,297.01 | -403.05 | -121.00 | C |

## Trades

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total CMG** | | | **-200** | | | **9,895.00** | **-1.04** | **-10,297.01** | **-403.05** | **-121.00** | |
| DIS | 2025-05-30, 10:50:42 | | -200 | 112.5650 | 113.0400 | 22,513.00 | -1.04 | -34,213.50 | -11,701.54 | -95.00 | C;P |
| **Total DIS** | | | **-200** | | | **22,513.00** | **-1.04** | **-34,213.50** | **-11,701.54** | **-95.00** | |
| DOCU | 2025-05-30, 10:53:39 | | -300 | 86.6800 | 88.6100 | 26,004.00 | -1.56 | -70,403.00 | -44,400.56 | -579.00 | C;P |
| **Total DOCU** | | | **-300** | | | **26,004.00** | **-1.56** | **-70,403.00** | **-44,400.56** | **-579.00** | |
| FSLY | 2025-05-30, 10:52:41 | | -300 | 7.3150 | 7.2800 | 2,194.50 | -1.56 | -26,246.00 | -24,053.06 | 10.50 | C |
| **Total FSLY** | | | **-300** | | | **2,194.50** | **-1.56** | **-26,246.00** | **-24,053.06** | **10.50** | |
| FTNT | 2025-05-30, 10:34:02 | | -8,000 | 102.005838 | 101.7800 | 816,046.70 | -41.68 | -80,000.00 | 736,005.03 | 1,806.70 | C;P |
| **Total FTNT** | | | **-8,000** | | | **816,046.70** | **-41.68** | **-80,000.00** | **736,005.03** | **1,806.70** | |
| GOOG | 2025-05-30, 10:47:36 | | -200 | 171.7450 | 172.8500 | 34,349.00 | -1.04 | -37,683.01 | -3,335.05 | -221.00 | C;P |
| **Total GOOG** | | | **-200** | | | **34,349.00** | **-1.04** | **-37,683.01** | **-3,335.05** | **-221.00** | |
| HCAI | 2025-05-30, 10:33:41 | | 100,000 | 8.49976 | 6.3700 | -849,976.00 | -503.50 | 850,479.50 | 0.00 | -212,976.00 | O;P |
| HCAI | 2025-05-30, 10:34:57 | | 100,000 | 8.49998 | 6.3700 | -849,998.00 | -503.50 | 850,501.50 | 0.00 | -212,998.00 | O;P |
| HCAI | 2025-05-30, 10:45:57 | | 100,000 | 8.4999718 | 6.3700 | -849,997.18 | -503.50 | 850,500.68 | 0.00 | -212,997.18 | O;P |
| HCAI | 2025-05-30, 10:51:47 | | 90,000 | 8.54645167 | 6.3700 | -769,180.65 | -453.15 | 769,633.80 | 0.00 | -195,880.65 | O;P |
| HCAI | 2025-05-30, 10:54:14 | | 10,000 | 8.5500 | 6.3700 | -85,500.00 | -50.35 | 85,550.35 | 0.00 | -21,800.00 | O;P |
| HCAI | 2025-05-30, 11:01:09 | | 160,000 | 8.54999375 | 6.3700 | -1,367,999.00 | -805.60 | 1,368,804.60 | 0.00 | -348,799.00 | O;P |
| **Total HCAI** | | | **560,000** | | | **-4,772,650.83** | **-2,819.60** | **4,775,470.43** | **0.00** | **-1,205,450.83** | |
| LLY | 2025-05-30, 10:48:03 | | -50 | 731.3800 | 737.6700 | 36,569.00 | -1.01 | -36,001.00 | 566.99 | -314.50 | C |
| **Total LLY** | | | **-50** | | | **36,569.00** | **-1.01** | **-36,001.00** | **566.99** | **-314.50** | |
| LRCX | 2025-05-30, 10:53:46 | | -500 | 82.59165 | 80.7900 | 41,295.82 | -2.61 | -47,017.75 | -5,724.53 | 900.82 | C;P |
| **Total LRCX** | | | **-500** | | | **41,295.82** | **-2.61** | **-47,017.75** | **-5,724.53** | **900.82** | |
| META | 2025-05-30, 10:47:45 | | -100 | 645.4750 | 647.4900 | 64,547.50 | -1.02 | -64,201.00 | 345.48 | -201.50 | C |
| **Total META** | | | **-100** | | | **64,547.50** | **-1.02** | **-64,201.00** | **345.48** | **-201.50** | |
| MRNA | 2025-05-30, 10:53:11 | | -300 | 25.8600 | 26.5600 | 7,758.00 | -1.56 | -111,403.00 | -103,646.56 | -210.00 | C |
| **Total MRNA** | | | **-300** | | | **7,758.00** | **-1.56** | **-111,403.00** | **-103,646.56** | **-210.00** | |
| MU | 2025-05-30, 10:50:14 | | -500 | 94.7900 | 94.4600 | 47,395.00 | -2.61 | -29,037.00 | 18,355.39 | 165.00 | C;IM;P |
| **Total MU** | | | **-500** | | | **47,395.00** | **-2.61** | **-29,037.00** | **18,355.39** | **165.00** | |
| NIO | 2025-05-30, 10:52:10 | | -200 | 3.5405 | 3.5400 | 708.10 | -1.04 | -7,801.00 | -7,093.94 | 0.10 | C;P |
| **Total NIO** | | | **-200** | | | **708.10** | **-1.04** | **-7,801.00** | **-7,093.94** | **0.10** | |
| NKE | 2025-05-30, 10:54:54 | | -300 | 60.4907 | 60.5900 | 18,147.21 | -1.56 | -39,044.00 | -20,898.36 | -29.79 | C;IA |
| **Total NKE** | | | **-300** | | | **18,147.21** | **-1.56** | **-39,044.00** | **-20,898.36** | **-29.79** | |
| NVAX | 2025-05-30, 10:52:32 | | -300 | 7.04666667 | 7.3400 | 2,114.00 | -1.56 | -66,949.00 | -64,836.56 | -88.00 | C;P |
| **Total NVAX** | | | **-300** | | | **2,114.00** | **-1.56** | **-66,949.00** | **-64,836.56** | **-88.00** | |

## Trades

| Symbol | Date/Time | Quantity | T. Price | C. Price | Proceeds | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| NVDA | 2025-05-30, 10:45:14 | -1,600 | 136.8715625 | 135.1300 | 218,994.50 | -8.33 | -101,847.00 | 117,139.17 | 2,786.50 | C;P |
| Total NVDA | | -1,600 | | | 218,994.50 | -8.33 | -101,847.00 | 117,139.17 | 2,786.50 | |
| ON | 2025-05-30, 10:54:47 | -200 | 42.4450 | 42.0200 | 8,489.00 | -1.04 | -19,274.00 | -10,786.04 | 85.00 | C;P |
| Total ON | | -200 | | | 8,489.00 | -1.04 | -19,274.00 | -10,786.04 | 85.00 | |
| PANW | 2025-05-30, 10:48:55 | -600 | 190.6600 | 192.4200 | 114,396.00 | -3.13 | -67,303.34 | 47,089.54 | -1,056.00 | C |
| Total PANW | | -600 | | | 114,396.00 | -3.13 | -67,303.34 | 47,089.54 | -1,056.00 | |
| PYPL | 2025-05-30, 10:55:20 | -300 | 70.352295 | 70.2800 | 21,105.69 | -1.56 | -74,152.00 | -53,047.88 | 21.69 | C;IM;P |
| Total PYPL | | -300 | | | 21,105.69 | -1.56 | -74,152.00 | -53,047.88 | 21.69 | |
| SGOV | 2025-05-30, 10:49:10 | -600 | 100.7140 | 100.7100 | 60,428.40 | -3.12 | -60,296.12 | 129.15 | 2.40 | C;P |
| Total SGOV | | -600 | | | 60,428.40 | -3.12 | -60,296.12 | 129.15 | 2.40 | |
| SNAP | 2025-05-30, 10:47:55 | -1,000 | 8.1740 | 8.2500 | 8,174.00 | -5.21 | -29,920.50 | -21,751.71 | -76.00 | C;P |
| Total SNAP | | -1,000 | | | 8,174.00 | -5.21 | -29,920.50 | -21,751.71 | -76.00 | |
| SNOW | 2025-05-30, 10:49:42 | -200 | 203.55245 | 205.6700 | 40,710.49 | -1.04 | -64,502.00 | -23,792.55 | -423.51 | C;IM;P |
| Total SNOW | | -200 | | | 40,710.49 | -1.04 | -64,502.00 | -23,792.55 | -423.51 | |
| TSLA | 2025-05-30, 10:33:10 | -2,400 | 361.80936042 | 346.4600 | 868,342.47 | -12.51 | -310,787.00 | 557,542.96 | 36,838.46 | C;P |
| Total TSLA | | -2,400 | | | 868,342.47 | -12.51 | -310,787.00 | 557,542.96 | 36,838.46 | |
| VIR | 2025-05-30, 10:52:17 | -300 | 4.8550 | 4.9400 | 1,456.50 | -1.56 | -16,750.00 | -15,295.06 | -25.50 | C |
| Total VIR | | -300 | | | 1,456.50 | -1.56 | -16,750.00 | -15,295.06 | -25.50 | |
| WYNN | 2025-05-30, 10:50:50 | -300 | 90.0350 | 90.5400 | 27,010.50 | -1.56 | -35,803.00 | -8,794.06 | -151.50 | C;P |
| Total WYNN | | -300 | | | 27,010.50 | -1.56 | -35,803.00 | -8,794.06 | -151.50 | |
| XYZ | 2025-05-30, 10:55:12 | -200 | 61.5800 | 61.7500 | 12,316.00 | -1.04 | -53,402.00 | -41,087.04 | -34.00 | C |
| Total XYZ | | -200 | | | 12,316.00 | -1.04 | -53,402.00 | -41,087.04 | -34.00 | |
| ZM | 2025-05-30, 10:54:02 | -250 | 79.8300 | 81.2500 | 19,957.50 | -1.30 | -86,503.00 | -66,546.80 | -355.00 | C;IM;P |
| Total ZM | | -250 | | | 19,957.50 | -1.30 | -86,503.00 | -66,546.80 | -355.00 | |
| Total | | | | | -1,266,768.80 | -2,949.50 | 2,355,320.82 | 1,085,602.52 | -1,168,283.80 | |

| Symbol | Date/Time | Quantity | T. Price | C. Price | Proceeds | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bonds** | | | | | | | | | | |
| **USD** | | | | | | | | | | |
| T 2 1/4 03/31/26 4.22285354% | 2025-05-30, 10:55:43 | -100,000 | 98.4137275 | 98.460938 | 98,413.73 | -5.00 | -97,446.92 | 961.81 | -47.21 | C |
| Total T 2 1/4 03/31/26 | | -100,000 | | | 98,413.73 | -5.00 | -97,446.92 | 961.81 | -47.21 | |
| T 3 09/30/25 4.30710234% | 2025-05-30, 10:56:04 | -125,000 | 99.57421875 | 99.601563 | 124,467.77 | -5.00 | -123,671.09 | 791.68 | -34.18 | C |
| Total T 3 09/30/25 | | -125,000 | | | 124,467.77 | -5.00 | -123,671.09 | 791.68 | -34.18 | |
| T 4 1/4 12/31/25 4.30549572% | 2025-05-30, 10:56:13 | -165,000 | 99.96875 | 100.007813 | 164,948.44 | -5.00 | -165,466.17 | -522.73 | -64.45 | C |
| Total T 4 1/4 12/31/25 | | -165,000 | | | 164,948.44 | -5.00 | -165,466.17 | -522.73 | -64.45 | |
| T 4 5/8 06/30/25 4.36734111% | 2025-05-30, 10:56:25 | -80,000 | 100.01953125 | 100.050781 | 80,015.63 | -5.00 | -80,103.75 | -93.12 | -24.99 | C |
| Total T 4 5/8 06/30/25 | | -80,000 | | | 80,015.63 | -5.00 | -80,103.75 | -93.12 | -24.99 | |

## Trades

| Symbol | Date/Time | Quantity | T. Price | C. Price | Proceeds | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| T 5 08/31/25 4.39264104% | 2025-05-30, 10:56:19 | -150,000 | 100.13671875 | 100.167969 | 150,205.08 | -5.00 | -150,873.64 | -673.56 | -46.87 | C |
| Total T 5 08/31/25 | | -150,000 | | | 150,205.08 | -5.00 | -150,873.64 | -673.56 | -46.87 | |
| Total | | | | | 618,050.65 | -25.00 | -617,561.57 | 464.08 | -217.71 | |
| Symbol | Date/Time | Quantity | T. Price | C. Price | Proceeds | Comm/Fee | Basis | Realized P/L | MTM P/L | Code |
| Treasury Bills | | | | | | | | | | |
| USD | | | | | | | | | | |
| 912797LN5 4.28515693% | 2025-05-30, 10:56:33 | -161,000 | 99.8827361 | 99.882153 | 160,811.21 | -5.00 | -155,889.53 | 4,916.68 | 0.94 | C |
| Total 912797LN5 | | -161,000 | | | 160,811.21 | -5.00 | -155,889.53 | 4,916.68 | 0.94 | |
| 912797MH7 4.32680022% | 2025-05-30, 10:56:53 | -150,000 | 98.8979806 | 98.894194 | 148,346.97 | -5.00 | -147,099.31 | 1,242.66 | 5.68 | C |
| Total 912797MH7 | | -150,000 | | | 148,346.97 | -5.00 | -147,099.31 | 1,242.66 | 5.68 | |
| 912797MS3 4.3046905% | 2025-05-30, 10:55:55 | -200,000 | 98.5815806 | 98.573278 | 197,163.16 | -5.00 | -196,364.63 | 793.53 | 16.60 | C |
| Total 912797MS3 | | -200,000 | | | 197,163.16 | -5.00 | -196,364.63 | 793.53 | 16.60 | |
| 912797PZ4 4.28702971% | 2025-05-30, 10:56:41 | -150,000 | 99.57895 | 99.57725 | 149,368.43 | -5.00 | -148,399.70 | 963.73 | 2.56 | C |
| Total 912797PZ4 | | -150,000 | | | 149,368.43 | -5.00 | -148,399.70 | 963.73 | 2.56 | |
| Total | | | | | 655,689.77 | -20.00 | -647,753.17 | 7,916.60 | 25.78 | |

## Interest

| Date | Description | Amount |
|---|---|---|
| USD | | |
| 2025-05-30 | Sold Accrued Interest T 2 1/4 03/31/26 | 387.30 |
| 2025-05-30 | Sold Accrued Interest T 3 09/30/25 | 645.49 |
| 2025-05-30 | Sold Accrued Interest T 4 1/4 12/31/25 | 2,963.85 |
| 2025-05-30 | Sold Accrued Interest T 4 5/8 06/30/25 | 1,563.81 |
| 2025-05-30 | Sold Accrued Interest T 5 08/31/25 | 1,915.76 |
| Total | | 7,476.21 |

## Interest Accruals

| Base Currency Summary | |
|---|---|
| Starting Accrual Balance | 7,639.15 |
| Interest Accrued | 209.45 |
| Accrual Reversal | -7,476.21 |
| Ending Accrual Balance | 372.39 |

## Withholding Tax

| Date | Description | Amount | Code |
|---|---|---|---|
| USD | | | |
| 2025-05-30 | WYNN(US9831341071) Cash Dividend USD 0.25 per Share - US Tax | -22.50 | |
| Total | | -22.50 | |

## Dividends

| Date | Description | Amount |
|---|---|---|
| USD | | |
| 2025-05-30 | WYNN(US9831341071) Cash Dividend USD 0.25 per Share (Ordinary Dividend) | 75.00 |
| Total | | 75.00 |

## Change in Dividend Accruals

| Symbol | Date | Ex Date | Pay Date | Quantity | Tax | Fee | Gross Rate | Gross Amount | Net Amount | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Starting Dividend Accruals in USD | | | | | | | | | 105.00 | |
| Stocks | | | | | | | | | | |
| USD | | | | | | | | | | |

## Change in Dividend Accruals

| Symbol | Date | Ex Date | Pay Date | Quantity | Tax | Fee | Gross Rate | Gross Amount | Net Amount | Code |
|--------|------|---------|----------|----------|-----|-----|------------|--------------|------------|------|
| B | 2025-05-29 | 2025-05-30 | 2025-06-16 | 400 | 6.00 | 0.00 | 0.10 | 40.00 | 34.00 | Po |
| WYNN | 2025-05-30 | 2025-05-16 | 2025-05-30 | 300 | -22.50 | 0.00 | 0.25 | -75.00 | -52.50 | Re |
| Total | | | | | -16.50 | 0.00 | | -35.00 | -18.50 | |
| Ending Dividend Accruals in USD | | | | | | | | | 86.50 | |

## Financial Instrument Information

| Symbol | Description | Conid | Security ID | Underlying | Listing Exch | Multiplier | Type | Code |
|--------|-------------|-------|-------------|------------|--------------|------------|------|------|
| **Stocks** | | | | | | | | |
| AAPL | APPLE INC | 265598 | US0378331005 | AAPL | NASDAQ | 1 | COMMON | |
| ADBE | ADOBE INC | 265768 | US00724F1012 | ADBE | NASDAQ | 1 | COMMON | |
| AMD | ADVANCED MICRO DEVICES | 4391 | US0079031078 | AMD | NASDAQ | 1 | COMMON | |
| AMZN | AMAZON.COM INC | 3691937 | US0231351067 | AMZN | NASDAQ | 1 | COMMON | |
| ASML | ASML HOLDING NV-NY REG SHS | 117902840 | USN070592100 | ASML | NASDAQ | 1 | NY REG SHRS | |
| B | BARRICK MINING CORP | 780709675 | CA06849F1080 | B | NYSE | 1 | COMMON | |
| BA | BOEING CO/THE | 4762 | US0970231058 | BA | NYSE | 1 | COMMON | |
| BABA | ALIBABA GROUP HOLDING-SP ADR | 166090175 | US01609W1027 | BABA | NYSE | 1 | ADR | |
| BIDU | BAIDU INC - SPON ADR | 35359385 | US0567521085 | BIDU | NASDAQ | 1 | ADR | |
| CCL | CARNIVAL CORP | 5516 | PA1436583006 | CCL | NYSE | 1 | COMMON | |
| CMG | CHIPOTLE MEXICAN GRILL INC | 37655664 | US1696561059 | CMG | NYSE | 1 | COMMON | |
| DIS | WALT DISNEY CO/THE | 6459 | US2546871060 | DIS | NYSE | 1 | COMMON | |
| DOCU | DOCUSIGN INC | 316073742 | US2561631068 | DOCU | NASDAQ | 1 | COMMON | |
| FSLY | FASTLY INC - CLASS A | 366131373 | US31188V1008 | FSLY | NYSE | 1 | COMMON | |
| FTNT | FORTINET INC | 70236214 | US34959E1091 | FTNT | NASDAQ | 1 | COMMON | |
| GOOG | ALPHABET INC-CL C | 208813720 | US02079K1079 | GOOG | NASDAQ | 1 | COMMON | |
| HCAI | HUACHEN AI PARKING MANAGEMEN | 759331662 | KYG4645R1149 | HCAI | NASDAQ | 1 | COMMON | |
| LLY | ELI LILLY & CO | 9160 | US5324571083 | LLY | NYSE | 1 | COMMON | |
| LRCX | LAM RESEARCH CORP | 732440574 | US5128073062 | LRCX | NASDAQ | 1 | COMMON | |
| META | META PLATFORMS INC-CLASS A | 107113386 | US30303M1027 | META | NASDAQ | 1 | COMMON | |
| MRNA | MODERNA INC | 344809106 | US60770K1079 | MRNA | NASDAQ | 1 | COMMON | |
| MU | MICRON TECHNOLOGY INC | 9939 | US5951121038 | MU | NASDAQ | 1 | COMMON | |
| NIO | NIO INC - ADR | 332794741 | US62914V1061 | NIO | NYSE | 1 | ADR | |
| NKE | NIKE INC -CL B | 10291 | US6541061031 | NKE | NYSE | 1 | COMMON | |
| NVAX | NOVAVAX INC | 365598061 | US6700024010 | NVAX | NASDAQ | 1 | COMMON | |
| NVDA | NVIDIA CORP | 4815747 | US67066G1040 | NVDA | NASDAQ | 1 | COMMON | |
| ON | ON SEMICONDUCTOR | 8677881 | US6821891057 | ON | NASDAQ | 1 | COMMON | |
| PANW | PALO ALTO NETWORKS INC | 110619459 | US6974351057 | PANW | NASDAQ | 1 | COMMON | |
| PYPL | PAYPAL HOLDINGS INC | 199169591 | US70450Y1038 | PYPL | NASDAQ | 1 | COMMON | |
| SGOV | ISHARES 0-3 MONTH TREASURY B | 424099317 | US46436E7186 | SGOV | ARCA | 1 | ETF | |
| SNAP | SNAP INC - A | 268060148 | US83304A1060 | SNAP | NYSE | 1 | COMMON | |
| SNOW | SNOWFLAKE INC-CLASS A | 444884769 | US8334451098 | SNOW | NYSE | 1 | COMMON | |
| TSLA | TESLA INC | 76792991 | US88160R1014 | TSLA | NASDAQ | 1 | COMMON | |
| VIR | VIR BIOTECHNOLOGY INC | 387014896 | US92764N1028 | VIR | NASDAQ | 1 | COMMON | |
| WYNN | WYNN RESORTS LTD. | 16454492 | US9831341071 | WYNN | NASDAQ | 1 | COMMON | |
| XYZ | BLOCK INC | 212671971 | US8522341036 | XYZ | NYSE | 1 | COMMON | |
| ZM | ZOOM COMMUNICATIONS INC | 361181057 | US98980L1017 | ZM | NASDAQ | 1 | COMMON | |

## Financial Instrument Information

| Symbol | Description | Conid | Security ID | Underlying | Listing Exch | Multiplier | Type | Issuer | Maturity | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bonds** | | | | | | | | | | |
| T 2 1/4 03/31/26 | T 2 1/4 03/31/26 | 359443808 | US9128286L99 | T | | 1 | Govt | United States Treasury T 2 1/4 03/31/26 | 2026-03-31 | |
| T 3 09/30/25 | T 3 09/30/25 | 335637426 | US9128285C00 | T | | 1 | Govt | United States Treasury T 3 09/30/25 | 2025-09-30 | |
| T 4 1/4 12/31/25 | T 4 1/4 12/31/25 | 674683101 | US91282CJS17 | T | | 1 | Govt | United States Treasury T 4 1/4 12/31/25 | 2025-12-31 | |
| T 4 5/8 06/30/25 | T 4 5/8 06/30/25 | 639595566 | US91282CHL81 | T | | 1 | Govt | United States Treasury T 4 5/8 06/30/25 | 2025-06-30 | |
| T 5 08/31/25 | T 5 08/31/25 | 651359259 | US91282CHV63 | T | | 1 | Govt | United States Treasury T 5 08/31/25 | 2025-08-31 | |

| Symbol | Description | Conid | Security ID | Underlying | Listing Exch | Multiplier | Maturity | Code |
|---|---|---|---|---|---|---|---|---|
| **Treasury Bills** | | | | | | | | |
| 912797LN5 | B 06/12/25 | 709060869 | US912797LN52 | BILL | | 1 | 2025-06-12 | |
| 912797MH7 | B 09/04/25 | 726775476 | US912797MH75 | BILL | | 1 | 2025-09-04 | |
| 912797MS3 | B 10/02/25 | 733096301 | US912797MS31 | BILL | | 1 | 2025-10-02 | |
| 912797NL7 | B 11/28/25 | 745192289 | US912797NL78 | BILL | | 1 | 2025-11-28 | |
| 912797PZ4 | B 07/08/25 | 766507820 | US912797PZ47 | BILL | | 1 | 2025-07-08 | |

## Base Currency Exchange Rate

| Currency | Rate | Currency (Cont.) | Rate (Cont.) |
|---|---|---|---|
| AED | 0.272260 | KRW | 0.000723 |
| AUD | 0.643150 | KWD | 3.258600 |
| BGN | 0.579110 | MXN | 0.051448 |
| BHD | 2.652500 | MYR | 0.234930 |
| BRL | 0.174720 | NOK | 0.097895 |
| CAD | 0.727840 | NZD | 0.596510 |
| CHF | 1.215500 | OMR | 2.597600 |
| CNH | 0.138780 | PLN | 0.267000 |
| CNY | 0.138890 | QAR | 0.274400 |
| CZK | 0.045517 | RON | 0.224240 |
| DKK | 0.152120 | RUB | 0.012903 |
| EUR | 1.134800 | RUS | 0.012903 |
| GBP | 1.345500 | SAR | 0.266550 |
| HKD | 0.127540 | SEK | 0.104250 |
| HUF | 0.002810 | SGD | 0.774670 |
| IDR | 0.000061 | THB | 0.030428 |
| ILS | 0.284640 | TRY | 0.025508 |
| INR | 0.011693 | TWD | 0.033417 |
| JPY | 0.006942 | ZAR | 0.055553 |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|---|---|---|---|
| A | Assignment | Lo | Direct Loan |
| ADR | ADR Fee Accrual | M | Entered manually by IB |
| AEx | Automatic exercise for dividend-related recommendation. | MEx | Manual exercise for dividend-related recommendation. |
| AFx | AutoFX conversion resulting from trading | ML | Maximize Losses tax basis election |
| Adj | Adjustment | MLG | Maximize Long Term Gain tax basis election |
| Al | Allocation | MLL | Maximize Long Term Loss tax basis election |
| Aw | Away Trade | MSG | Maximize Short Term Gain tax basis election |
| B | Automatic Buy-in | MSL | Maximize Short Term Loss tax basis election |
| Bo | Direct Borrow | O | Opening Trade |
| C | Closing Trade | Off | Yes and No contracts offset to $1.00 cash settlement |
| CD | Cash Delivery | P | Partial Execution |
| CP | Complex Position | PE | Perpetual Investment |
| Ca | Cancelled | PI | Price Improvement |
| Co | Corrected Trade | PTA | Post Trade Allocation |
| Cx | Part or all of this transaction was a Crossing executed as dual agent by IB for two IB customers | Po | Interest or Dividend Accrual Posting |
| DT | Discounted Trade | Pr | Part or all of this transaction was executed by the Exchange as a Crossing by IB against an IB affiliate and is therefore classified as a Principal and not an agency trade |
| De | Delivery or Conversion Action | R | Dividend Reinvestment |
| ETF | ETF Creation/Redemption | RED | Redemption to Investor |
| Ep | Resulted from an Expired Position | RI | Recurring Investment |
| Ex | Exercise | RP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as riskless principal. |
| FP | The fractional portion of this trade was executed against IB or an affiliate. | RPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as riskless principal. |
| FPA | The fractional portion of this trade was executed against IB or an affiliate. IB acted as agent for the whole share portion of this trade. | Rb | Rebill |
| G | Trade in Guaranteed Account Segment | Re | Interest or Dividend Accrual Reversal |
| GEA | Exercise or Assignment resulting from offsetting positions | Ri | Reimbursement |
| HC | Highest Cost tax basis election | S0 | Contract settled to zero value |
| HFI | Investment Transferred to Hedge Fund | S1 | Contract settled to $1.00 |
| HFR | Redemption from Hedge Fund | SF | Trade is subject to IBKR Lite Surcharge Fee if volume of such trades exceeds 10% of the total monthly Lite trade volume |
| I | Internal Transfer | SI | This order was solicited by Interactive Brokers |
| IA | The transaction was executed against IB or an affiliate | SL | Specific Lot tax basis election |
| IM | A portion of the order was executed against IB or an affiliate; IB acted as agent on a portion. | SO | This order was marked as solicited by your Introducing Broker |
| INV | Investment Transfer from Investor | SS | Customer designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market |
| IPO | This transaction was executed as part of an IPO in which IB was a member of the selling group and is classified as a Principal trade. | ST | Short Term P/L |
| L | Ordered by IB (Margin Violation) | SY | Positions that may be eligible for Stock Yield. Potential for additional annualized income of 51.59 USD |
| LD | Adjusted by Loss Disallowed from Wash Sale | T | Transfer |
| LF | Liquidation of fractional position by IB | Un | Unvested shares from stock grant |
| LI | Last In, First Out (LIFO) tax basis election | XCH | Mutual Fund Exchange Transaction |
| LT | Long Term P/L | | |

## Notes/Legal Notes

### Notes

1. Stock exchange transactions generally settle on the trade date plus one business or two business days (T+1 or T+2). Options, futures and US open-end mutual fund transactions also settle on trade date plus one business day. Some exchanges and other transaction types may have longer or shorter settlement periods. Ending settled cash reflects the cash that has actually settled.

2. Initial and maintenance margin requirements are available within the Account Window of the Trader Workstation or the Margin Report available in Account Management.

3. Quantities preceded by a "-" sign indicate sell transactions. Other transactions are purchases.

4. IB acts as agent in executing the fractional share portion of your order. In certain circumstances, IB routes the fractional portion of your order to an affiliate, which may execute the fractional portion of the order as principal. In such circumstances, this is indicated by the codes associated with the trade. If an IB affiliate acts as principal in executing any fractional share portion of your order, the order will be executed at the price displayed for the opposite side of the NBBO from your order (the offer if you are buying and the bid if you are selling) at the time of execution. If an IB affiliate is acting as riskless principal in connection with filling the fractional share portion of your order, the affiliate will execute the fractional share portion of your order at the price it receives for the execution of the whole share.

5. In case of partial executions, commissions are charged on the total quantity executed on the original order. The commission is displayed on the first partial execution only.

6. Trade execution times are displayed in United States Eastern Time.

7. Borrow Fee Rate represents the cost to borrow stock expressed in percent per annum. It is applied to the collateral value on the stock borrow contract and is separate from any interest earned on credit cash balances. Similarly, Loan Fee Rate represents the benefit to lend stock. A positive rate indicates a cost to the borrower/benefit to the lender and a negative rate indicates a benefit to the borrower/cost to the lender. In general, the fee rates for hard-to-borrow stocks are higher than for normal availability stocks.

8. Interest Rate on Customer Collateral represents the interest paid on the collateral posted to the customer's account and received from lending stock.  A positive rate indicates a benefit to the lender.

9. The closing prices on this Activity Statement are indicative and may come from third-party sources. Interactive Brokers does not warrant the accuracy of the prices provided by third-party sources. Due to time zone differences, certain non-US mutual funds may deliver closing prices after the Activity Statement has been produced and the closing prices for such funds will reflect the previous day's price.

10. All Market Data and Research services are provided through Global Financial Information Services (GmbH).

11. Market data is provided by Global Financial Information Services (GmbH). Your local broker collects amounts owed for fees and tax for such data on behalf of Global Financial Information Services (GmbH). Note, you are responsible for any applicable taxes relating to the provision of these services.

12. RUS denotes Ruble balances that have been restricted by Russian authorities.

### Mutual Fund Notes

1. All purchase and sales of mutual funds are calculated against the published NAV (Net Asset Value) of the underlying fund and is displayed on this confirmation as the "C. Price" (Closing Price). Due to any fees charged by a fund and/or any share rounding, the net price you pay may vary from the published NAV and is shown on this confirmation as the "T. Price" (Trade Price).

### Fixed Income Notes

1. Call features for bonds or preferred stocks may affect the yield. For zero coupon, compound interest and multiplier securities, there are no periodic payments and securities may be callable below maturity value without notice to holder unless registered. For asset-backed securities, the actual yield may vary depending on the speed at which the underlying note is pre-paid. For additional information regarding bond yield, please contact the IB Help Desk at: ibkr.com/help. If this debt security is unrated by a nationally recognized statistical rating organization, it may pose a high risk of default. You should consult an independent advisor to determine whether unrated bonds are appropriate for your portfolio in light of your goals and your financial circumstances. Fees charged by bond trading centers are included in the cost of bond transactions.

### Legal Notes

1. **Please promptly report any inaccuracy or discrepancy in this statement, or in your account. Contact the IB Customer Service Department in writing using the form available on the IB website. You may also contact IB by phone, but if you report an error by phone, you should re-confirm such oral communication in writing in order to protect your rights.**

   **Interactive Brokers Singapore Pte. Ltd., www.interactivebrokers.com.sg, +65 6923 5600 (S.G.)**

   **Interactive Brokers Hong Kong Ltd, www.interactivebrokers.com.hk, +852 2156 7907 (H.K.)**

   **Interactive Brokers LLC, www.interactivebrokers.com, 877-442-2757 (U.S.)**

   **Interactive Brokers (UK) (Ltd), www.interactivebrokers.co.uk, 00800-42-276537 (Intl)**

   **Interactive Brokers Canada Inc., www.interactivebrokers.ca, 877-745-4222 (Can.)**

2. Interactive Brokers Hong Kong Ltd is located at Suite 1512, Two Pacific Place, 88 Queensway, Admiralty, Hong Kong.

3. Unless otherwise noted, Interactive Brokers acted as agent in the execution of the above transactions. For those exchanges where IB is not a direct clearing member or custodian, IB may use one of the following clearing agents or sub-custodians: Interactive Brokers LLC and Interactive Brokers (U.K.) Limited.

4. IB acts as agent or riskless principal in foreign currency exchange transactions.  Such transactions are executed against an IB affiliate or a third party, which acts as principal in such transactions and may have a long or short position and may have profited or lost in connection with the transaction.  Foreign currency exchange transactions executed by Customer through IB are not regulated or overseen by the SFC.

5. IB accepts liquidity rebates or other order flow payments from Alternative Trading Systems, market makers and exchanges for certain orders in stocks. IB receives payment for some option orders pursuant to exchange-mandated marketing fee programs or other arrangements. The source and nature of any compensation received by IB in connection with any transaction is available upon written request of the customer. For further information, check the IB website and the Order Routing and Payment for Order Flow Disclosure provided when you opened your account and annually or visit ibkr.com/help.

6. For security futures trades, if not already indicated on this statement, information about the time of any transaction, the identity of the counterparty to the transaction, and whether IB is acting as agent or principal, as agent for the counterparty, as agent for both parties to the contract, or as principal, and if acting as principal, whether the transaction was a block transaction or an exchange for physicals transaction, will be available upon written request of the customer.

7. Customer is requested to promptly advise Interactive Brokers of any material change in Customer's investment objectives.

## Notes/Legal Notes

8. For trades executed on the ASX market, the ASX 24 market and the Cboe Australia market, this confirmation is issued subject to: (i) the Applicable Laws, the directions, decisions and requirements of the relevant market operator, the operating rules of the relevant market, the clearing rules and where relevant, the relevant settlement rules, (ii) the customs and usages of the relevant financial market, and (iii) the correction of errors and omissions. Trades in Cash Market Products (as that term is defined in the relevant ASIC market integrity rules) on ASX market and Cboe Australia are cleared by BNP Paribas, ARBN 149 440 291, AFSL 402467, who is a participant of ASX Clear Pty Ltd and ASX Settlement Pty Ltd. Trades in Derivative Products on ASX and all products on ASX 24 are cleared by Interactive Brokers Australia ("IBA") as a participant of ASX Clear Pty Ltd and ASX Clear (Futures) Pty Ltd. If your transaction was a crossing transaction, IBA may have either acted on behalf of (i) both the buyer and seller of this transaction, or (ii) on behalf of the buyer or seller on one side of the transaction and acted as Principal on the other side. Under the Corporations Act 2001, where IBA enters into an exchange traded derivative on a customer's behalf, IBA is regarded as having issued the derivative to the customer.

9. For All Options Trades Executed on the Stock Exchange of Hong Kong ("SEHK"): (a) Options can involve a high degree of risk and may not be suitable for every investor. Investors should ensure they understand those risks before participating in the options market. (b) All options contracts executed on the SEHK were executed by Interactive Brokers Hong Kong Limited. (c) In the event of a default committed by Interactive Brokers resulting in the client suffering any pecuniary loss, the client shall have a right to claim under the Investor Compensation Fund established under the Hong Kong Securities and Futures Ordinance, subject to the terms of the Investor Compensation Fund from time to time. (d) All Exchange Traded Options Business made for or on behalf of a client shall be subject to the relevant provisions of the constitution, Rules of The Stock Exchange of Hong Kong Limited ("SEHK Rules"), regulations, the Articles, customs and usages of SEHK, the Options Trading Rules, the Clearing Rules of SEOCH, the CCASS Rules and the laws of Hong Kong, which shall be binding on both Interactive Brokers and the client.

# EXHIBIT C

Inquiry #T966872 - U8686280

**Summary:** *Urgent Complaint Regarding Account Hacking Incident on 30 May 2025, IBKR Case Number: 960561*
kpyy0121 2025/06/01 14:14:38
Dear Sir/Madam,
I am writing to formally file a complaint regarding a serious breach of my Interactive Brokers (IBKR) account that occurred on 30 May 2025. My account was hacked, and all of my existing holdings were liquidated without authorization. The intruder then used the proceeds to purchase a single stock (HCAI), which experienced a significant drop in value that same day—suggesting suspicious activity potentially linked to a broader case of market manipulation.
What is especially alarming is that no login notification email was sent when the hacker accessed my account, despite such notifications being a routine part of my own login experience. This raises grave concerns about the effectiveness of your two-factor authentication (2FA) and other critical security controls.
Immediate Actions Taken
As soon as I noticed a flurry of trade execution notifications on my mobile phone, I realized something was seriously wrong and acted without delay:
• At 16:13, I called IBKR Hong Kong but could not get through.
• I immediately call IBKR US but again could not get through.
• I called again at 16:19, and finally, at 16:20, I managed to speak with a service agent.
• The agent helped me change my account password, which took approximately 20 minutes to complete.
• I asked what the next course of action was, but was only told that the matter was "escalated" and that I should wait for an email from your security team.
• No further support or mitigation was provided, even as my account continued to reflect severe, unauthorized trading losses. My portfolio value dropped 30% (over USD1.2 million) from its value at the close of the previous business day.
Later that night, I called again at 23:57 and spoke with another agent, Sidhart, who reiterated that the case was escalated and there was nothing more anyone could do until the Hong Kong security team resumed work on 2 June. I expressed that this was unacceptable, given the severity and urgency of the breach, but was told no other IBKR offices worldwide could assist in the meantime.
On Saturday, I called again, but the Hong Kong office was closed and no one answered.
My Concerns
1. Security Failure: I still do not understand how the hacker bypassed all security protocols, including 2FA and login notification emails.
2. Response Delay: Despite my swift reporting, the case was not addressed in real-time. No emergency protocol appears to be in place to prevent or mitigate ongoing damage once unauthorized activity is detected.
3. Market Misconduct: The hacker's behavior—using hacked accounts to buy a collapsing stock—suggests possible coordinated market manipulation, which must be reported to the Securities and Exchange Commission (SEC) and Securities and Futures Commission (SFC) or equivalent regulatory authorities for investigation.
My Request
Given the seriousness of this matter, I formally request the following:
1. Immediate restoration of my account holdings and portfolio value to what they were prior to the hack on 30 May 2025.
2. A full and transparent investigation, with ongoing updates provided to me directly.
3. A detailed explanation of how your systems were compromised, including any gaps in authentication protocols and failure of email alerts. This explanation should include audit information on unusual login activity, irregular transaction activity, details recorded on activity from unusual IP addresses and details on emails/push notification activity that should have been sent during the period of this unauthorized activity, audit logs of changes to any of my account details such as email address/telephone numbers .
4. Immediate escalation to relevant regulatory authorities (SFC, SEC) to investigate this as a potential case of coordinated market manipulation.
This incident reflects a systemic vulnerability and not an isolated case, and I strongly urge your team to act with the urgency and transparency that such a serious issue demands.
This incident has not only caused me substantial financial loss but also a profound loss of confidence in your platform's ability to safeguard client assets. I expect a formal response and immediate action on this matter.
Please response immediately or call me at+447830852852 as I am currently out of Hong Kong.
Sincerely,
Stephanie Lin Foon Wong
Account number U8686280
Phone: +447830852852

IBCS 2025/06/02 20:37:33
Dear Ms. Wong,

IBKR received your complaint. Upon completion of our review, we will provide a written response on ticket no.979603.

Kind regards,
Jacky P
IBKR Client Services

# EXHIBIT D



**e-Report Centre**
Hong Kong Police Force

2025-06-02 21:48

e-Reference no:     ERC2506021049735

## Report Technology Crime and Deception

| Particulars of Informant | | | | | |
|---|---|---|---|---|---|
| Prefix | Miss | Name in English | WONG Stephanie | Name in Chinese | |
| Phone Number | (+852) 91358830 | Identification Document | HKID | Place of Issue | Hong Kong |
| Date of Birth | | 1964-08-03 | Aged | | 60 |
| Document Number | | D659216(4) | Email Address | | linfoon@yahoo.com |
| Residential Address | | Unit A, Floor 27, 2, Neptune Terrace, Chai Wan, Hong Kong Island | | | |
| Are you reporting on behalf of a company or business entity? | | | No | | |

| Brief Facts of Case | |
|---|---|
| Date and Time of Occurrence | 2025-05-30 15:33 |
| Location of the Crime | •      Date of Incident: 30 May 2025 <br> •      Approximate Time of Discovery: 09:30 New York (Eastern Time) |

**Brief description of the incident**

On 30 May 2025, my IBKR Hong Kong account was hacked.  The intruder liquidated my entire investment portfolio, including but not limited to Apple, Nvidia, Telsa, Amazon, Google etc.  The proceeds from these sales were then used to purchase a single stock:  HCAI (NASDAQ: HCAI).  Notably, HCAI experienced a significant drop on value the same day, raising concerns that this activity may linked to broader market manipulation.

A particularly troubling aspect of this incident is that I did not receive any login notification emails for this unauthorized access. Typically, such emails are automatically sent by IBKR whenever there is a login attempt, even when it is my own. This suggests a serious security breach or vulnerability in IBKR's security systems, including the effectiveness of their two-factor authentication (2FA) and other critical controls.

| | |
|---|---|
| Known Information on Suspect | No |
| Did you suffer any monetary loss? | Yes |
| Currency | USD United States of America Dollars |
| Amount | 1,300,000 |
| Is cryptocurrency involved in the transaction with the Suspect? | No |
| Do you have supporting documents to provide? (i.e. bank slips, etc.) | No |

# EXHIBIT E

Inquiry #T981507 - U8686280

**Summary:** *Ticket Summary not entered*
**IBCS 2025/06/03 02:21:07**
Dear Ms. Wong,

This is a follow-up regarding the report of unauthorized transactions in your account.

Please be advised that we have recently received an influx of cases where clients have received a text message regarding their W-8BEN tax forms and were requested to log in to their account via the link that was provided within the message. It has been confirmed that this was a phishing message which did not originate from IBKR.

Kindly assist to confirm if this is the scam message you have received or if you were contacted via another method (email or others). Please share any pertinent information regarding the scam message you received with screenshots, full links or URLs as reference for our further investigation.

We have reviewed your account and found 2 new networks and one device pairing seen accessing the account on 29 May 2025, prior to the unauthorized trades:
- 165.154.1.64 (Datacenter) - UCloud Information Technology (HK) Limited.
- 14.0.237.93 - Hong Kong | ISP: CSL Next G.
- New device MAC address: FE:8B:39:48:91:62

As a safety precaution, your account has been placed in closing only and frozen for withdrawals at this time.

To assist us with our investigation, please complete the following items:
1. Provide us a screenshot of the phishing SMS message received, full links or URLs.
2. Click on the sender's name to find out if there is a Caller ID and provide us with the details if any.
3. Review your account information (i.e. Personal information, contact details, and banking instructions) and confirm that there are no unauthorized changes.
4. We encourage you to file a police report if you have not already done so, and kindly share a copy of the report with us.
5. It is recommended to scan your devices for any malware.

Kindly also confirm whether you would like the account restrictions to be removed after the relevant department has completed the review.

Your cooperation and prompt response are greatly appreciated.

Kind regards,
Melvin C
IBKR Client Services

---

**kpyy0121 2025/06/03 09:21:23**
Hi Melvin,
1. I do not have a screenshot of any phishing SMS message or email. I don't recall clicking any SMS message or email.
2. So I don't have any sender's name or other information for you.
3. My account information (i.e. Personal information, contact details, and banking instructions) appears to be fine and no change.
4. We encourage you to file a police report if you have not already done so, and kindly share a copy of the report with us. I have filed a e-police report. Attached is the correspondence for your reference.
5. It is recommended to scan your devices for any malware. I have done so.

Kindly also confirm whether you would like the account restrictions to be removed after the relevant department has completed the review. [Stephanie: It is okay to continue with account restrictions - no more purchase and no transfer money out at all.]
    Mail - Re_ Enquiry from Hong Kong Police (E-Report _ ERC2506021049735 (T).pdf   Police report follow up emailRPTEFMTCAD_1748872104553.pdf   Police report

# EXHIBIT F



**Interactive Brokers Hong Kong Limited**
Suite 1512, Two Pacific Place
88 Queensway, Admiralty, Hong Kong
T: 852.2156.7979  |  F: 852.2509.4102
www.ibkr.hk

2 October 2025

BY E-MAIL (linfoon83@gmail.com)

RE: Stephanie L Wong
Interactive Brokers Account Number UXXXX280

Dear Ms. Wong:

Thank you for your correspondence dated June 1, 2025, in which you complain of allegedly unauthorized trades in your Interactive Brokers Hong Kong Limited ("IBHK") account on May 30, 2025.  We appreciate your patience as we reviewed your account activity and your assistance in filing a police report.

After careful consideration of your complaint and supporting documentation as well as evaluation of its own systems during the time frame, IBHK has concluded that the access to your account appeared to take place by a third party who obtained access to your valid IBHK credentials including your password, which IBHK does not retain and cannot access.  Presumably only you know your password.

The access to your account may have been the result of a "phishing" attack directed at you, such as those recently perpetrated by sophisticated criminals worldwide on customers of various financial institutions.  There was no breach of IBHK's security systems and IBHK will not offer compensation for the actions of this unknown third party nor will it restore your account to its pre-May 30 status.

### Background of IBHK

As background, IBHK is an online broker that provides trade execution services of self-directed trades to its clients.  IBHK does not employ brokers that manage client accounts or make trades on behalf of clients.  All trading in an IBHK account is self-directed by the customer.  IBHK does not make recommendations to customers about trading in their accounts.

### Background of Your Account

IBHK's records show that you opened your account with IBHK in 2018 as a sophisticated and experienced trader.  At the time that you opened your account, you indicated that you had more than ten years of experience trading stocks, options, futures, and bonds.  You indicated that your investment objectives were "Speculation," "Growth," and "Trading."

Regulated by the SFC
Member of SEHK and HKFE

*Activity at Issue in Your Account*

On May 23, 2025 and May 28, 2025, IBHK sent messages to its clients regarding recent SMS scams attempted on brokerage firm customers worldwide.  In this message, clients were reminded that IBHK never sends login links via SMS or instant messaging, and that clients should never click an SMS link to log into their IBHK accounts.

On May 30, 2025, multiple trades were made in your IBHK account, including the sales of various stocks (AAPL, BABA, GOOG) and purchase of a new stock, HCAI.  These sales and purchases were made after someone logged in to your IBHK account using your username and password.  On the same day, you called IBHK and reported that these trades were unauthorized.  IBHK assisted you with resetting your password.  You continued to correspond with IBHK and provided copies of a police report regarding the alleged unauthorized access to your account.  IBHK restricted your account at your request to prevent any further allegedly unauthorized access.

*IBHK Did Not Suffer a Security Breach*

IBHK takes all allegations of unauthorized account access seriously and we have carried out a thorough review of your login and trading history in and around the time of the alleged third-party access to your account.  Based on that review, IBHK has not identified any breach of or deficiencies in IBHK's systems and security controls, including a data breach, that could have permitted such third party access.  Nor have you provided any evidence of such a breach.  Moreover, even if a data breach had occurred – and it did not – such a breach would not allow a third party access to a client's account such as yours because IBHK does not store usernames with associated passwords or store any passwords of customers.  It is simply not possible for a third party to obtain a password from IBHK.

While we understand that you have told IBHK that you did not click on any suspicious link, and did not enter your credentials (including your password) into a fraudulent site as the result of phishing, your secure credentials were used to enter the disputed trades.

*Clients Are Bound by Trades Entered With Their Valid Credentials*

When IBHK receives valid user credentials for a customer login, it accepts the subsequently entered trades as authorized.  When you opened your account with IBHK, you explicitly agreed:

> Client acknowledges and confirms that Client will be the
> only person who can and will access the Client's Account
> and client will not allow anyone to access Client's
> Account…IBKR is entitled to rely on all instructions given,
> or apparently given, and all actions taken by Client or on its
> behalf entered using the Client's username and password,
> and Client is bound by any transaction or any dealing or

2

other action or omission in connection with its Account…IBKR will not be liable for any loss caused by IBKR acting on instructions, actions or omissions or other communications using the Client's username and password.

Client Agreement ¶6.  IBHK therefore views the May 30 trades in your account as legitimate trades entered using your valid password, which only you had access to, and will not offer you any compensation for allegedly unauthorized trades.

Any decision to hold or close the allegedly unauthorized HCAI position (or any other positions) going forward is your choice.  Please manage your risk accordingly if you no longer wish to hold the positions in your account.

***

We appreciate the police report that you have already provided to us.  IBHK will cooperate with any investigation by local law enforcement.

Please note again that IBHK never sends login links via SMS or instant message. IBHK's official website is www.interactivebrokers.com.hk.  Please take note of the information available on our website under the page "Warning on Frauds and Scams".  Do not provide bank, credit card, investment, insurance and provident fund account or other key personal information via hyperlinks embedded in suspicious messages purported to be coming from our institution.

In accordance with the SFC Code of Conduct, if you feel our response has not fully addressed your concerns, you are entitled to escalate your complaint to the Financial Dispute Resolution Centre.

Regards,
Interactive Brokers Hong Kong Limited

Regulated by the SFC
Member of SEHK and HKFE