USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _______________
DATE FILED: 9/25/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERACTIVE BROKERS LLC,

Plaintiff,

-v-

STEPHANIE LIN FOON WONG,

Defendant.

1:26-cv-6579-GHW

MEMORANDUM OPINION & ORDER

GREGORY H. WOODS, United States District Judge:

## I. INTRODUCTION

Stephanie Lin Foon Wong, a resident of Hong Kong and the United Kingdom, is a longtime customer of the brokerage firm Interactive Brokers Hong Kong ("IB HK"). Over time, the assets in her IB HK account grew to over five million dollars. That was until 2025, when her account was hacked. The two-factor authentication system used to protect IB HK's online platform failed to notify her of unauthorized access to her account and an unknown party was able to liquidate her assets. Ms. Wong lost over four million dollars as a result of this breach. IB HK has so far refused to reimburse Ms. Wong for her losses.

In May 2026, Ms. Wong sought another avenue to recoup her losses—arbitration. But Ms. Wong did not institute arbitration against IB HK in Hong Kong—the venue mandated by her customer agreement with IB HK. Instead, she brought an arbitration action against Interactive Brokers LLC ("IB LLC")—a U.S. affiliate of IB HK—through the Financial Industry Regulatory Authority ("FINRA"). Ms. Wong does not have any agreement or account with IB LLC. Nor has she purchased any goods or services from them. However, because IB LLC manages the two-factor authentication feature used on IB HK's platform and because IB HK's invoices say that IB HK "may" serve as a clearing agent or sub-custodian for IB HK, Ms. Wong argues that she is a

"customer" of IB LLC. And because FINRA members are required to arbitrate against their customers at a customer's request, Ms. Wong argues that she has the right to arbitrate against IB LLC. That arbitration is fast-approaching; its first hearing is scheduled for this coming Monday.

IB LLC filed this action to enjoin the FINRA arbitration and moved for a preliminary injunction in order stop all further arbitral proceedings until the Court can determine the merits of the dispute. Having never dealt with Ms. Wong, IB LLC argues that there is no agreement to arbitrate in front of FINRA. IB LLC has shown a strong likelihood that it will succeed in its position, because Ms. Wong has yet to show that she is a customer of IB LLC for the purpose of initiating a FINRA arbitration proceeding against IB LLC under clearly established Second Circuit authority. Likewise, because this Court finds that IB LLC has met its burden to establish a substantial likelihood that the Court has personal jurisdiction over Defendant under Fed. R. Civ. P. 4(k)(2), IB LLC's motion for a preliminary injunction is GRANTED.

## II. BACKGROUND

### a. Facts[1]

Ms. Wong is a resident of the United Kingdon and Hong Kong. Dkt. No. 35 ("Wong Decl.") ¶ 2; Dkt. No. 16 ("Statement of Claim") ¶ 6. Ms. Wong opened an account with IB HK in 2018. Statement of Claim ¶ 15. IB HK is a "duly organized legal entity, operating under the laws of Hong Kong," and is a subsidiary of Interactive Brokers Group LLC ("IBG LLC"). Dkt. No. 9 ("Schuerman Decl.") ¶¶ 5, 6. In 2022, Ms. Wong signed a client agreement with IB HK which became the governing agreement between the two. Schuerman Decl. ¶ 9. Over time, Ms. Wong deposited "$1,664,461.96 into her account," and after engaging in "disciplined, self-directed trading in U.S. equities . . . as well as U.S. Treasury bills," she grew her portfolio to a net asset value of

[1] The Court makes the following findings of fact based on the evidentiary record presented to it prior to and during the evidentiary hearing held on September 23, 2026. The facts are largely undisputed. Certain background facts are drawn from the complaint and Defendant's submissions in connection with the arbitral proceedings before FINRA.

$4,855,022.34. Statement of Claim ¶¶ 15–16.

On May 29, 2025, Ms. Wong's account was breached by an unauthorized third party. *Id.* ¶ 21. The two-factor authentication login feature employed by IB HK did not notify Ms. Wong that someone had been accessing her account. Wong Decl. ¶ 10. The unauthorized third party used that access to steal most of the assets held in Ms. Wong's account. ¶ 11. As a result, her account's "net asset value had fallen from $4,855,022.34 to approximately $781,986, a total loss of approximately $4,073,036.34, representing 83% of her life savings." Statement of Claim ¶ 26.

On May 29, 2026, Ms. Wong filed a statement of claim against IB LLC with FINRA. In it, she asserted 10 different claims against IB LLC in connection with the breach of her account with IB HK and the resulting loss of her assets. Statement of Claim ¶¶ 50–116. Several of those claims were asserted under New York state law. *Id.* ¶¶ 39–40. Ms. Wong's statement of claim asserted that she could properly arbitrate her claims in front of FINRA pursuant to FINRA Rule 12200 because she was a "customer" of IB LLC, which is a FINRA member. *Id.* ¶¶ 11–12.

FINRA Rule 12200 (Arbitration Under an Arbitration Agreement or the Rules of FINRA) provides the following:

> Parties must arbitrate a dispute under the Code if:
> - Arbitration under the Code is either:
>   (1) Required by a written agreement, or
>   (2) Requested by the customer;
> - The dispute is between a customer and a member or associated person of a member; and
> - The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Rule 12200.

FINRA Rule 12213 (Hearing Locations) gives FINRA's Director of Arbitration the power to designate the location of an arbitration hearing. It provides the following:

**(a) U.S. Hearing Location**

(1) The Director will decide which of FINRA's hearing locations will be the hearing location for the arbitration. Generally, the Director will select the hearing location closest to the customer's residence at the time of the events giving rise to the dispute, unless the hearing location closest to the customer's residence is in a different state, in which case the customer may request a hearing location in the customer's state of residence at the time of the events giving rise to the dispute.
(2) Before arbitrator lists are sent to the parties under Rule 12402(c) or Rule 12403(b), the parties may agree in writing to a hearing location other than the one selected by the Director.
(3) The Director may change the hearing location upon motion of a party, as set forth in Rule 12503.
(4) After the panel is appointed, the panel may decide a motion relating to changing the hearing location.

**(b) Foreign Hearing Location**

(1) If the Director and all parties agree, parties may have their hearing in a foreign hearing location and conducted by foreign arbitrators . . . .

FINRA Rule 12213.

When Ms. Wong filed her claims with FINRA, she also completed a submission agreement. Dkt. No. 34 ("Kronenberger Decl.") Exhibit 5 (the "Submission Agreement"). The Submission Agreement provides among other things that:

1. The undersigned parties ("parties") hereby submit the present matter in controversy . . . to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.
2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.
3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.
4. The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.
5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

*Id.* Paragraph 3 of the Submission Agreement gives FINRA's Director of Arbitration or the arbitrator the power to designate the location of the arbitration hearing.

On June 2, 2026, a FINRA senior case specialist sent an email to IB LLC, copying Ms. Wong's lawyer, alerting IB LLC that it had been named as a party to an arbitration. Dkt. No. 1 ("Compl.") Exhibit B at 1. That email also alerted the parties that "FINRA has selected **New York, NY** as the hearing location for this case." *Id.* at 4 (emphasis in original). It also noted that "FINRA will consider changing the hearing location upon motion of a party. After the panel is appointed, however, the panel will decide any motion relating to the changing of the hearing location." *Id.*

IB LLC brought this action on July 31, 2026, to enjoin the FINRA arbitration proceeding commenced by Ms. Wong. IB LLC argued that Ms. Wong was not their "customer," and that, therefore, they were not required to arbitrate anything with her under FINRA Rule 12200. Compl. ¶¶ 28–35. IB LLC asked FINRA to put the case on FINRA's inactive docket until the conclusion of this action. Kronenberger Decl. Exhibit 1. On August 5, 2026, IB LLC submitted its answer in the arbitration, disputing that the claim could be arbitrated through FINRA.[2] Dkt. No. 41 ("Arb. Answer"). On August 28, 2026, IB LLC's request to place the case on the inactive docket was denied. Kronenberger Decl. Exhibit 2.

IB LLC has no direct relationship with Ms. Wong. Like IB HK, IB LLC is a subsidiary of IBG LLC, but it is not a direct or indirect corporate parent of IB HK. Schuerman Decl. ¶ 5. Ms. Wong "has never held an account at IBLLC," and IB LLC has "no record of ever having sold any security or service to" Ms. Wong. *Id.* ¶¶ 2–3. "All of the securities purchases and sales at issue in the statement of claim filed by Wong before [FINRA] . . . were made in an account held by Wong at IB HK." *Id.* ¶ 4.

In support of her argument that she is IB LLC's "customer," Ms. Wong points to the account statements provided to her by IB HK. Wong Decl. ¶ 8. Those statements contain the

---

[2] IB LLC specified that it filed its substantive answer to the dispute "solely in order to preserve its rights in the event that a court of competent jurisdiction determines that IB LLC is obligated to arbitrate Ms. Wong's claim in this forum." Arb. Answer at 22.

following language:

> Unless otherwise noted, Interactive Brokers acted as agent in the execution of the above transactions. For those exchanges where IB is not a direct clearing member or custodian, IB may use one of the following clearing agents or sub-custodians: Interactive Brokers LLC and Interactive Brokers (U.K.) Limited.

Kronenberger Decl. Exhibit 4 at 16. Ms. Wong also asserts that she understood herself to be a client because she used, and relied on the effectiveness of, the "IB Key"—a two-factor authentication feature "operated by IB LLC." Ms. Wong asserts that "[w]hen [she] opened [her] brokerage account, the IB Key feature was something that had helped reassure me that my account would be secure." Wong Decl. ¶ 9. There is nothing in the record to suggest that Ms. Wong bought this feature directly from IB LCC.

**b. Procedural History**

IB LLC initiated this action on July 31, 2026. Compl. It is requesting that the Court enter a declaratory judgment that Ms. Wong "does not have any arbitration agreement with IB LLC," "is not a 'Customer' of IB LLC as that term is defined in the rules of the Financial Industry Regulatory Authority ("FINRA")," and "therefore, cannot pursue claims against IB LLC in arbitration without the consent of IB LLC. Compl. at 1. On the same day, Plaintiff filed its motion for a preliminary injunction, seeking to enjoin the underling arbitration until the Court could resolve the merits of this dispute. Dkt. No. 6.

Defendant filed her opposition to the motion for a preliminary injunction on September 11, 2026, Dkt. No. 33. Defendant argued that IB LLC did not have a reasonable likelihood of success on the merits of its arguments, because Ms. Wong was a customer under FINRA Rule 12200. Defendant also argued that because she did not give any input into the ultimate location of the arbitration, the Court lacked personal jurisdiction over her. She argued that although she agreed to arbitrate at a location selected by FINRA's Director of Arbitration, she had not consented to arbitrate in New York. Therefore, the general rule that an agreement to arbitrate in New York

implies consent to litigate regarding the arbitration in New York does not apply. IB LLC filed its reply on September 18, 2026, asserting Defendant consented to jurisdiction in New York based on its agreement to arbitrate. Dkt. No. 40.

On September 23, 2026, the Court held an evidentiary hearing on this matter. At the start of the hearing, the Court offered the parties the opportunity to submit additional evidence to it in addition to the evidence presented in their motion papers. Defendant requested leave to supplement the record with IB LLC's answer in the underlying arbitration. The Court accepted that document without objection, then it closed the record. The Court allowed the parties to submit supplemental briefing based on the arguments presented at the hearing; both parties have done so. Dkt. Nos. 42, 44.[3]

## III. LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation marks omitted). A party seeking a preliminary injunction to preserve the status quo "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Gazzola v. Hochul*, 88 F. 4th 186, 194 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The district court has wide discretion in determining whether to grant a preliminary injunction . . . ." *In re Feit & Drexler, Inc.*, 760 F.2d 406, 511 (2d Cir. 1985).

Plaintiff here is requesting a mandatory injunction. In contrast to a "typical preliminary injunction," which "seeks only to maintain the status quo pending a trial on the merits," a

[3] In her post-hearing submissions, Defendant has presented over 500 pages of documentary evidence that was not provided to the Court in advance of the hearing. The Court is not considering those additional materials. The Court was clear that the evidentiary record for purposes of the preliminary injunction hearing was closed.

mandatory injunction "is said to alter the status quo *by commanding some positive act*." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006). A mandatory injunction therefore "alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Id.* To meet that higher burden, a party seeking a mandatory injunction must show a "'clear' or 'substantial' likelihood of success on the merits.'" *Doninger v. Neihoff*, 527 F.3d 41, 47 (2d Cir. 2008) (citation omitted). "A heightened standard has also been applied where an injunction—whether or not mandatory—will provide the movant with substantially 'all the relief that is sought.'" *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). A harm alleged to be irreparable must be "actual and imminent, not merely possible," *Toney-Dick v. Doar*, 2013 WL 1314954, at *9 (S.D.N.Y. Mar. 18, 2013) (collecting cases), and "one that cannot be remedied if a court waits until the end of trial to resolve the harm," *Wabtec Corp.*, 559 F.3d at 118 (quotation omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). If the "harm can be remedied in money damages[, that] is the antithesis of irreparable harm." *Toney-Dick*, 2013 WL 1314954, at *9.

Even if the above factors are met, "[t]he district court has no power to grant an . . . injunction against a party over whom it has not acquired valid jurisdiction." *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir. 1990) (citation omitted). "A prima facie showing of jurisdiction will not suffice . . . where a plaintiff seeks preliminary injunctive relief. A court must have in personam jurisdiction over a party before it can validly enter even an interlocutory injunction against [it]." *Id.* (quoting *Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 59 (2d Cir. 1981). "Where a challenge to personal jurisdiction is interposed on an application for a preliminary injunction, the

district court must determine that the party moving for the injunction has established 'at least a reasonable probability of ultimate success on the question of the court's in personam jurisdiction' over the non-moving party." *Lam Yeen Leng v. Pinnacle Performance Ltd.*, 474 Fed. Appx. 810, 813 (2d Cir. 2012) (summary order) (quoting *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir.1990).

## IV. DISCUSSION

### a. Plaintiff Has Demonstrated a Substantial Likelihood of Success on the Merits Because Ms. Wang is Not its "Customer"

On this record, Plaintiff has demonstrated a substantial likelihood that it will succeed in demonstrating that Ms. Wong is not its "customer" and that, therefore, it is not bound to engage in arbitration with her pursuant to Rule 12200. As a threshold matter, the parties rightly do not dispute that the question of arbitrability is one for this Court to decide. "In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of whether or not a dispute is arbitrable is one for the court." *Citigroup Global Mkts., Inc. v. Abbar*, 761 F.3d 268, 275 (2d Cir. 2014) (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)). There is no arbitration agreement between the parties, therefore, the question is whether FINRA's Rule 12200 mandates that IB LLC arbitrate with Ms. Wong. "The arbitration rules of an industry self-regulatory organization such as FINRA are interpreted like contract terms; 'the organization's arbitration provision "should thus be interpreted to give effect to the parties' intent as expressed by the plain language of the provision."''" *Id.* (footnote omitted) (quoting *Wachovia Bank, Nat'l Ass'n*, 661 F.3d at 171).

IB LLC has shown that it has a substantial likelihood that it will succeed in proving that Ms. Wong is not IB LLC's "customer," triggering the applicability of Rule 12200. The Second Circuit addressed this issue directly in *Abbar*. In *Abbar*, Second Circuit held "that a 'customer' under FINRA Rule 12200 is one who, while not a broker or a dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." *Abbar*, 761 F.3d at 275.

"The ordinary meaning of the word 'customer' (no special meaning seems intended) is 'someone who buys goods or services.'" *Id.* (quoting *UBS Fin. Servs., v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir. 2011)). "By agreeing to accept 'a fee for its services' or by selling securities to an entity, a FINRA member understands that it may be compelled to arbitrate if a dispute arises with that entity." *Id.* "This may not be a 'comprehensive definition of the term . . . but it captures virtually all customer relationships." *Id.* (citation omitted).

"A customer relationship can also come into being by opening an account with the FINRA member." *Id.* (citing *Oppenheimer & Co., Inc. v. Neiderhardt*, 56 F.3d 352, 357 (2d Cir. 1995). "An account holder has a reasonable expectation to be treated as a customer whether or not goods or services are purchased directly from the FINRA member." *Id.* "Likewise, the FINRA member should anticipate that account-holders may avail themselves of the arbitration forum to dispute transactions arising from the account." *Id.* "So even if the FINRA member executes all securities transactions through an affiliate or provides services without fee, the account-holder can compel arbitration under Rule 12200." *Id.* at 275–76.

This is a "bright-line rule" that the Second Circuit intended to be "simple, predictable, and suitably broad." *Id.* at 276–77. The Second Circuit noted that "[i]n most cases, this definition of 'customer' can be readily applied to undisputed facts." *Id.* at 276. "When it is unclear whether goods or services were in fact purchased from the FINRA member, discovery (and possibly a trial) may be required." *Id.* (citations omitted). "But even then, it will not be necessary to make a detailed examination . . . of 'the substance, nature and frequency of each interaction and task performed by the various persons . . . , and the extent to which the person's activities shaped or caused the transaction.'" *Id.* (quoting *Citigroup Global Mkts., Inc. v. Abbar*, 943, F. Supp. 2d 404, 407 (S.D.N.Y. 2013)).

The record before the Court leads to the conclusion that Ms. Wong has not "purchase[d] a

good or service from" IB LLC, and that she does not have an "account with a FINRA member," as required for her to be treated as a "customer." *Abbar*, 761 F.3d at 275. IB LLC presented undisputed evidence through an affidavit that it does not have an account with her and that it did not sell products or services to her. The facts that Ms. Wang presents in support of her position do not permit the Court to find otherwise. First, the fact that Ms. Wong used the IB Key two-factor authentication feature to secure her account, and that she relied on this feature when creating her account with IB HK, is not enough to show that she bought a service from IB LLC. There is nothing in the evidentiary record that suggests that she purchased this feature from IB LLC; instead, the feature was made available to her by virtue of her acquisition of the services of IB HK. Nor is there evidence that IB LLC has collected a fee from Ms. Wong for the use of this service. Simply put, the record does not establish that Ms. Wong purchased this security feature from IB LLC.

Second, the fact that Ms. Wong's account statements note that IB HK "may use" IB LLC as a clearing agent or sub-custodian does not establish that she had an account with IB LLC. "May," of course, is a modal verb that is used "to indicate that something will possibly happen or be true in the future, but you cannot be certain." Collins Online Dictionary, https://www.collinsdictionary.com/us/dictionary/english/may (last visited September 25, 2026). In English "may" does not mean "will" or "does." At the most basic level, the language from Ms. Wong's account statements does not demonstrate that any of her assets were ever custodied at IB LLC. And, to the extent that IB HK held an account at IB LLC, and Ms. Wong held a security entitlement in assets custodied in IB HK's account at IB LLC through that arrangement, the Court is unaware of any authority that would treat her relationship with IB LLC as that of a "customer" or "account holder" at IB LLC.

The Second Circuit's "definition of 'customer' can be readily applied to undisputed facts." *Abbar*, 761 F.3d at 276. On this record, IB LLC has established a very strong likelihood that it will

prove that Ms. Wong is not its customer. Ms. Wong has not shown that she has purchased goods or services from IB LLC, nor has she shown that she had an account with them. Therefore, IB LLC has shown a substantial likelihood of showing that Ms. Wong is not its "customer" and that it is not bound to arbitrate any dispute with her pursuant to Rules 12200.

**b. There Is a Substantial Probability That the Court Has Personal Jurisdiction Over Ms. Wang**

IB LLC has shown at least a reasonable probability of ultimate success on the question of the Court's in personam jurisdiction over Ms. Wong—but not on the grounds initially advanced by it.[4] In its complaint, Plaintiff asserted that the Court has personal jurisdiction over Ms. Wong because "Wong consented to the personal jurisdiction of this Court by designating (or not objecting to FINRA's designation of) New York as the hearing location for the Arbitration." Compl. ¶ 4. In support of this position, Plaintiff pointed to the June 2, 2022 letter from FINRA, designating New York as the location for the arbitration. *Id.*[5] Plaintiff presented no argument to the Court in its motion for a preliminary injunction to support its position that the Court should accept FINRA's designation of New York as the location for the arbitration as constituting Ms. Wong's consent to the jurisdiction of this Court.

Defendant's opposition noticed the gap—Ms. Wong argued that she had not agreed to arbitrate in New York because the location for the arbitration had been chosen by FINRA, not her.

---

[4] As described above, the burden for Plaintiff at this stage is higher than the prima facie showing required to defeat a motion to dismiss. The Court reaches this conclusion applying that higher burden. The result may not be the same at the lower pleading standard.

[5] Plaintiff also cited to Sections 7, 9-11 of the Federal Arbitration Act (the "FAA"), which Plaintiff described in a parenthetical as "(providing jurisdiction over an arbitration by the U.S. District Court in the district where the arbitration takes place)." This parenthetical is not an accurate description of these provisions of the FAA. During the evidentiary hearing and in its briefing, Plaintiff's counsel has provided no support for the proposition that the FAA provides a district court authority over all aspects of an arbitration that occurs in its district—rather than with respect to awards issued as a result of an arbitration. *See, e.g.*, 9 U.S.C. § 9 ("If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding."). Plaintiff's parenthetical description of these statutory provisions in the complaint is misleading. The Court also notes that Plaintiff has not asserted that the Court has general jurisdiction over Ms. Wong or that she is subject to New York's long arm statute.

Indeed, she argued, she had no knowledge in advance of the state in which the arbitration would take place, so she could not be understood to have personally directed any activity into New York. She was dragged to New York by FINRA and did not come here by her choosing.

Confronted with Defendant's opposition, in its reply brief, Plaintiff asserted that jurisdiction over Ms. Wong could be found as a result of a series of Second Circuit cases holding that a "party who agrees to arbitrate in a particular jurisdiction consents not only to personal jurisdiction but also to venue of the courts within that jurisdiction." Dkt. No. 40 ("Reply") at 9 (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996)).

Plaintiff has not demonstrated on this record a reasonable probability that the Court will find personal jurisdiction over Defendant on this basis because it has not identified an agreement in which Defendant has agreed to arbitrate in a "particular jurisdiction"—here, New York. The long-standing rule in this Circuit is that "[w]hen a party agrees 'to arbitrate in [a state], where the [Federal Arbitration Act] makes such agreements specifically enforceable, [that party] must be deemed to have consented to the jurisdiction of the court that could compel the arbitration proceeding in [that state]." *Stuart*, 85 F.3d at 979 (quoting *Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 363 (2d Cir. 1964)). As the Circuit wrote in a seminal opinion on the topic, an "agreement to resolve disputes by arbitration in New York constitute[s] consent to personal jurisdiction in New York." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopoulos*, 553 F.2d 842, 844 (2d. Cir. 1977).

Pursuant to the Submission Agreement, Ms. Wong agreed to be bound by the FINRA rules, including its rule regarding the location of an arbitration. The question is whether by agreeing to those rules, Ms. Wong "agreed to resolve disputes by arbitration in New York"—notwithstanding the fact that the rules leave the decision regarding the location of the arbitration to FINRA, and the fact they do not refer specifically to New York.

Plaintiff has not made a sufficiently strong showing that she has. None of the Second Circuit cases upon which Plaintiff's argument relies have found personal jurisdiction in the absence of an agreement that specifically designates New York as the situs of the arbitration. In *Lecopoulos*, the Second Circuit court considered an arbitration agreement that provided that controversies between the parties must be submitted to arbitration "under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange [NYSE]." *Lecopoulos*, 553 F.2d at 844 n.1. The Second Circuit characterized that agreement—without an explanation regarding how it reached its conclusion—as an "agreement to resolve disputes by arbitration in New York."[6] *Id.* at 844. Once the Circuit categorized the agreement in that way, it easily applied the basic rule to conclude that "the agreement to resolve disputes by arbitration in New York constituted consent to personal jurisdiction in New York." *Id.* *Lecopoulos* cannot be understood to have established a free-floating rule that New York courts have jurisdiction over any arbitration that occurs in New York. The decision rested on the court's conclusion that there was an agreement to arbitrate in New York, from which consent to the jurisdiction of New York courts could be implied.

Later cases analyzing arbitration provisions similar to the one at issue in *Lecopoulos* came out the same way, finding that an agreement to arbitrate before the NYSE or NASD constituted consent to personal jurisdiction in the courts of New York. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Noonan*, No. 92-cv-3770-SWK, 1992 WL 196741 (S.D.N.Y. Aug. 3, 1992); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Shaddock*, 822 F. Supp. 125 (S.D.N.Y. 1993). Those cases found that because the NYSE and NASD had their principal arbitration offices in New York where the arbitrations were initially processed, or because of a New York choice of law provision, those agreements amounted

[6] The Court acknowledges that IB LLC has pointed to a case in its supplemental briefing that seems to be materially similar to the factual pattern at issue here. *See Matter of Samincorp S. Am.. Mins. & Mdse. Corp. (Tikvah Min. Co.)*, 250 N.Y.S.2d 151 (1964). However, like *Lecopoulos*, that case does not provide the Court with any reasoning that would help guide its consideration of the issue.

to consent to personal jurisdiction in New York.

Regardless of the merit of these authorities,[7] they do not provide support for the Court to conclude that the FINRA rules by themselves constitute an agreement by Ms. Wong to arbitrate in New York. The FINRA arbitration rules are materially different in several ways. The FINRA rules do not say New York; they designate no location at all. FINRA, unlike NYSE, is not located in New York; there is no evidence that its principal arbitration office is located here. The characteristics of the contract at issue in *Lecopoulos*—the ones that later district courts have inferred must have led the Second Circuit to conclude that an agreement to arbitrate in New York existed in *Lecopoulos*—are simply not present in the FINRA rules.

On this record, the Court does not conclude that Plaintiff has shown a reasonable probability of success in showing that the Court has personal jurisdiction over Ms. Wong by virtue of her agreement to conduct an arbitration pursuant to the FINRA rules in whatever jurisdiction was selected by FINRA. The caselaw upon which Plaintiff's argument relies requires an agreement to arbitrate "in a *particular* jurisdiction." *Stuart*, 85 F.3d at 983. The FINRA rules do not contain an agreement to arbitrate in a particular jurisdiction.[8]

However, given Plaintiff's failure to meet its burden to establish jurisdiction under Fed. R. Civ. P. 4(k)(1), the Court can conclude that Plaintiff has established a reasonable probability of success in showing that the Court has personal jurisdiction over Ms. Wong pursuant to Fed. R. Civ. P. 4(k)(2). Under Rule 4(k)(2), a court may exercise personal jurisdiction over a defendant if the

[7] The critique by New York State courts of these opinions and *Lecopoulos* itself were outlined by Judge Cedarbaum in *Credit Suisse Securities (USA) LLC v. Hilliard*, 469 F. Supp. 2d 103, 110. "Since these cases were decided, however, the First Department Appellate Division of the New York Supreme Court has questioned whether filing a Statement of Claim with, and consenting to arbitrate before, the NYSE or NASD constitutes consent to personal jurisdiction in the courts of New York.") (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McLeod*, 208 A.D.2d 81 (1st Dep't 1995)).

[8] The Court emphasizes three points here. First, the Court reaches this conclusion in the context of this application for prompt provisional relief and applies the burden applicable to such a motion. Second, this appears to be an edge case. Defendant is not located in the United States and has no presence in any state of the union yet invokes FINRA's rules for the conduct of an arbitration in the United States. And third, this is a request to stay an arbitration, not a request to enforce or vacate an arbitral award, which might fall tidily within the ambit of the FAA's jurisdictional provisions.

following requirements are met: "(1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of jurisdiction must be 'consistent with the United States Constitution and laws.'" *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (quoting Fed. R. Civ. P. 4(k)(2)). The Second Circuit has interpreted this rule as "'extend[ing] the reach of federal courts to impose jurisdiction over the person of all defendants against whom federal law claims are made and who can be constitutionally subjected to the jurisdiction of the courts of the United States.'" *Chew v. Dietrich*, 143 F.3d 24, 27 (2d Cir. 1998) (quoting Fed. R. Civ. P. 4, 1993 advisory committee's note to 1993 amendment). As the Second Circuit observed:

> Rule 4(k)(2) was specifically designed to "correct[ ] a gap" in the enforcement of federal law in international cases. The gap arose from the general rule that a federal district court's personal jurisdiction extends only as far as that of a state court in the state where the federal court sits. . . . The pre-1993 Rules, the Advisory Committee noted, left a significant lacuna "when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction."

*Porina v. Marward Shipping Co.*, 521 F.3d 122, 126-27 (2d Cir. 2008) (citing Fed R. Civ. P. 4 advisory committee's note, 1993 Amendments) (alterations in original). As amended, Rule 4(k)(2) closes that gap.

"Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment." *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003). "[D]ue process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks*, 714 F.3d at 673 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "The due process analysis for Rule 4(k)(2) jurisdiction hinges on whether the non-resident has sufficient minimum contacts with the United

States as a whole instead of with the specific forum state." *George Moundreas & Co SA v. Jinhai Intelligent Mfg. Co*, No. 20-cv-2626-VEC, 2021 WL 168930, at *11 (S.D.N.Y. Jan. 18, 2021) (citing *Porina*, 521 F.3d at 127).

"To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *In re Terrorist Attacks*, 714 F.3d at 673. "*Specific jurisdiction* exists where a forum exercises personal jurisdiction over a defendant 'in a suit arising out of or related to the defendant's contacts with the forum.'" *Porina*, 521 F.3d at 128 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). "A court's *general* jurisdiction over a non-resident, on the other hand, is based on a defendant's general business contacts with the forum, and 'permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.'" *Id.* (quoting *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)).

As to the first requirement, this action is proceeding under federal law. This case "involves arbitrability under the FAA." *Goldman, Sachs & Co. v. Golden Empire Schools Financing Authority*, 764 F.3d 210, 213 (2d Cir. 2014). Other courts in this district have found that "[b]ecause the [P]etition seeking confirmation of the arbitration awards arises under the FAA and the New York Convention, Petitioner has satisfied the initial requirement that the cause of action arise under federal law." *Equipav S.A. Pavimentação, Engenharia e Comercio Ltda. v. Bertin*, No. 22-cv-4594-PGG, 2024 WL 196670, at *6 (S.D.N.Y. Jan. 18, 2024) (quoting *George Moundreas & Co SA*, No. 20-cv-2626-VEC, 2021 WL 168930 at *11 (S.D.N.Y. Jan. 18, 2021). Because IB LLC is seeking to enjoin arbitration under federal law, the first requirement of Fed. R. Civ. P. 4(k)(2) is met.

IB LLC also has a shown a reasonable probability of success that it can show that "the defendant is not subject to the jurisdiction in any state's courts of general jurisdiction." Defendant asserts that she is a resident of a foreign country. She argues that she "is not subject to general

personal jurisdiction in New York," and that she "has insufficient connection to New York" for specific personal jurisdiction in New York. Opp. at 6–7. She has not identified any business or other contacts with any other state. Defendant has made no argument that there is some state court that has personal jurisdiction over her, and her reasons for denying jurisdiction in New York appear to be applicable to all 50 states. Therefore, there is a reasonable probability that Plaintiff can satisfy this requirement.[9]

Lastly, Plaintiff has a reasonable probability of success in showing that Ms. Wong has sufficient minimum contacts with the United States as a whole to satisfy the requirements of constitutional due process. When initiating arbitration through FINRA, Ms. Wong was aware that she would be arbitrating somewhere in the United States. FINRA's rule on the selection of hearing locations allows for arbitration in a foreign location only when both parties agree to do so. FINRA Rule 12213. Because there was no agreement to arbitrate abroad, she necessarily initiated the proceeding in the United States. She wanted to come somewhere in the United States to conduct her arbitration. She therefore has "sufficient minimum contacts with the United States" to hold that asserting personal jurisdiction over her comports with due process.

**c. Irreparable Harm**

Plaintiff will suffer irreparable harm if a preliminary injunction is not granted. "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest v. City Dal Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (quotation omitted). "The showing of irreparable harm is the

[9] The Court notes that "[i]n this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state." *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) (gathering cases). "Plaintiffs have not certified that [Defendant] not subject to jurisdiction in any other state." *TAGC Mgmt., LLC v. Lehman*, No. 10 CIV. 06563 RJH, 2011 WL 3796350, at *6 (S.D.N.Y. Aug. 24, 2011) (quoting *Tamam v. Fransabank Sal,* 677 F. Supp. 2d 720, 731 (S.D.N.Y. 2010)). This is not a barrier here, for there is a reasonable probability that, should Plaintiff not succeed in demonstrating its initial position that New York courts have jurisdiction over Defendant by virtue of her consent, Plaintiff will be able to certify that no other state has jurisdiction over her.

single most important prerequisite for the issuance of a preliminary injunction." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation omitted). The Second Circuit has held that "forced arbitration of inarbitrable claims may constitute irreparable harm when the arbitration is one 'for which any award would not be enforceable' and for which 'the time and resources . . . expend[ed] in arbitration is not compensable by any monetary award of attorneys' fees or damages.'" *Res. Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 115 (2d Cir. 2024) (quoting *Md. Cas. Co. Realty Advisory Bd. On Lab. Rels.*, 107 F.3d 979, 985 (2d Cir. 1997). "The critical issue for the Court to consider is whether the proffered injury is compensable–specifically here, whether attorneys' fees and arbitration costs are available to a prevailing party." *Res. Grp. Int'l Ltd.*, 91 F.4th at 116.

There will be irreparable harm if IB LLC is forced to arbitrate this claim. As explained above, Plaintiff is likely to succeed in showing that this claim in inarbitrable and therefore an award is not enforceable. Furthermore, there is nothing in the record to suggest that resources spent in litigating the underlying arbitration are compensable. There is no agreement between IB LLC and Ms. Wong that IB LLC can use to seek the reimbursement of funds. Pursuing any possible claim against Ms. Wong for reimbursement of those fees would be time-consuming and expensive because she asserts that no court in the United States has personal jurisdiction over her. Moreover, Ms. Wong may be largely judgment proof, as she asserts that nearly all of her assets were stolen as a result of the hack at issue in this case. Therefore, Plaintiff has demonstrated that there will be irreparable harm should it be required to arbitrate Ms. Wong's claims against it.[10]

**d. The Balance of Hardships and the Public Interest Weigh in Favor of Injunctive Relief**

[10] Defendant argues that there is no irreparable harm because IB LLC can limit their participation in the arbitration by filing a pre-hearing motion to dismiss for review by the arbitrators, and because there will still be judicial review of any resulting award. Dkt. 42 at 11–12. These arguments miss the point. First, IB LLC's counsel argued during the evidentiary hearing that they will not submit the question of arbitrability to the arbitrators, because they believe that the question is one that is reserved to the Court. Second, Defendant's argument ignores the fact that IB LLC will spend time and money litigating this matter in the underlying arbitration, with no way to recoup the costs if they ultimately prevail. Third, Defendant's argument assumes that any decision by the arbitrators would not be subject to vacatur as a result of a later court decision that IB LLC was not bound to arbitrate.

The balance of hardships and the public interest weighs in favor of an injunction. "[A] party forced to arbitrate a dispute that is not arbitrable is 'irreparably harmed by being forced to expend time and resources' on an unenforceable arbitration to which it has not consented.'" *Deutsche Bank Securities, Inc. v. Borjas*, No. 18-cv-10191-DLC, 2018 WL 6200045, at *2 (S.D.N.Y. Nov. 28, 2018) (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (citation omitted)). "For similar reasons, the public interest and equities favor enjoining an arbitration that is outside the scope of an arbitration agreement." *Id.* If the arbitration proceeds, Plaintiff will be required to expend substantial resources arbitrating the matter. Those expenditures will be for naught—a total waste of money and time for all involved—if this Court ultimately vacates the arbitrator's decision because of a finding that there was no agreement in the first instance. The substantial time, energy, and money involved in litigating an inarbitrable issue weighs heavily in favor of injunctive relief.

The issues Ms. Wong points to do not outweigh these costs. The hardship that she points to is the fact that an injunction will delay her ability to recover her losses. This is not persuasive because she is seeking economic recovery and she asserts that she is entitled to recover prejudgment interest. The prospect of prejudgment interest in the event that Defendant is successful offsets the costs of any delay. Ms. Wong's argument is particularly unpersuasive here because the delay is the result of her strategic decision to pursue arbitration against IB LLC in the United States under Rule 12200, rather than against IB HK in Hong Kong. Why Ms. Wong chose to pursue arbitration against IB LLC under the FINRA rule notwithstanding the existence of an agreement permitting her to arbitrate claims against IB HK—the direct account issuer—is unclear to the Court. But it is evident that by choosing this less clear path, Ms. Wong invited the delay that is the result of this order.

Furthermore, the public interest weighs in favor of the entry of injunctive relief. "There is a

significant public interest in conserving judicial and arbitration resources by preventing duplicative proceedings." *Morgan Stanley & Co., Inc. v. Seghers*, No. 10-cv-5378-DLC, 2010 WL 3952851, at *7 (S.D.N.Y. Oct. 8, 2010). Since Plaintiff has demonstrated a substantial likelihood of success on the merits, the public interest is advanced by conserving arbitration resources. This factor too weighs in favor of the entry of injunctive relief.

**e. No Bond Is Appropriate**

No bond is appropriate here. The imposition of any bond is in the sound discretion of the Court. Federal Rule of Civil Procedure 65(c) states the following "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." That rule affords the Court discretion to "dispense with the filing of a bond" where appropriate. *See, e.g.*, *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976). This injunction does not impose a cost on Defendant; it arguably reduces the costs by deferring the efforts required to engage in an arbitration that Plaintiff has sufficiently demonstrated to be unauthorized. Moreover, Defendant is seeking prejudgment interest, which—if her claims are successful—would provide her an avenue to recover for the cost of any delay in the adjudication of her claims.

## V. CONCLUSION

For the reasons described above, Plaintiff is entitled to a preliminary injunction enjoining the FINRA arbitration proceedings pending completion of this litigation. The FINRA arbitration may not proceed. Ms. Wong may comply with this Order by cooperating with Interactive Brokers LLC to inform FINRA that the arbitration is to be placed on inactive status until judgment issues in this case. Plaintiff's motion for a preliminary injunction is GRANTED.

SO ORDERED.

Dated: September 25, 2026
New York, New York

GREGORY H. WOODS
United States District Judge